# 23-343

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

JILL BLOOMBERG,

*Plaintiff-Appellant,*

-against-

THE NEW YORK CITY DEPARTMENT OF EDUCATION,
AND CARMEN FARINA,

*Defendants-Appellees.*

*On appeal from Order and Judgment of the U.S.*
*District Court for the Southern District of New York*
*Case No 1:17-cv-03136*

## PLAINTIFF-APPELLANT'S APPENDIX

**JULIEN MIRER SINGLA**
**& GOLDSTEIN PLLC**
1 Whitehall Street, 16th Floor
New York, New York 10004
(212) 231-2235
*Attorneys for Plaintiff-Appellant*

**NYC LAW DEPARTMENT,**
**APPEALS DIVISION**
100 Church Street, Room 6-178
New York, New York 10007
(212) 356-2490
*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS – APPENDIX

*Page*

Table of Contents .......................................................................A.i

Civil Docket for Case #: 1:17-cv-03136-PGG ...........................A.1

Memorandum Opinion & Order, Hon. Paul G. Gardephe, U.S.D.J.
(Sep. 24, 2019) .........................................................................A.16

Notice of Motion for Leave to Amend Complaint (Nov. 6, 2019)..........A.46

Affirmation in Support, Jeanne Mirer, Esq. (Nov. 6, 2019)....................A.47

    Exh. 1 -- Proposed Second Amended Complaint (Nov. 6,
    2019)...............................................................................A.50

Memorandum of Law in Opposition (Dec. 6, 2019) ...............................A.90

Order, Hon. Paul G. Gardephe, U.S.D.J. (Dec. 11, 2019).....................A.103

Letter to Chambers, Mirer (Dec. 17, 2019) ...........................................A.104

Reply Memorandum of Law (Jan. 10, 2020) ..........................................A.105

Order, Hon. Paul G. Gardephe, U.S.D.J. (Nov. 17, 2020) ....................A.117

Order, Hon. Paul G. Gardephe, U.S.D.J. (Sep. 23, 2021) .....................A.118

Notice of Motion for Reconsideration (Oct. 8, 2021) ...........................A.142

Affirmation in Support, Jeanne Mirer, Esq. (Oct. 8, 2021)...................A.143

Memorandum of Law in Support (Oct. 8, 2021)....................................A.146

Order, Hon. Paul G. Gardephe, U.S.D.J. (Oct. 15, 2021) .....................A.155

Memorandum of Law in Opposition (Nov. 12, 2021)............................A.156

Reply Memorandum of Law (Nov. 19, 2021).........................................A.164

Order, Hon. Paul G. Gardephe, U.S.D.J. (Dec. 20, 2022).....................A.169

Plaintiff's Supplemental Brief (Jan. 4, 2023) ........................................A.172

Defendants'  Supplemental Memorandum of Law in Opposition (Jan.
11, 2023)................................................................................A.182

i

Appendix A:  Amended Complaint, Civ. Action No. 09-cv-01307 (Dec. 8, 2009) .................................................................... A.191

Appendix B:  Memorandum of Law, Civ. Action No. 05-06473 (Feb. 15, 2008) ........................................................................... A.208

Order, Hon. Paul G. Gardephe, U.S.D.J. (Feb. 10, 2023) ..................... A.239

Notice of Appeal (Mar. 10, 2023) ........................................................ A.255

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

CLOSED,APPEAL,CASREF,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:17-cv-03136-PGG

| | |
|---|---|
| Bloomberg v. The New York City Department of Education et al | Date Filed: 04/28/2017 |
| Assigned to: Judge Paul G. Gardephe | Date Terminated: 09/23/2021 |
| Referred to: Magistrate Judge Sarah L Cave (Settlement) | Jury Demand: Plaintiff |
| Cause: 42:2000d Federally Assisted Programs | Nature of Suit: 442 Civil Rights: Jobs |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Jill Bloomberg**                                  represented by  **Maria Lauren Chickedantz**
Mirer Mazzocchi Schalet & Julien, PLLC
150 Broadway, Suite 1200
New York, NY 10038
212-231-2235
Fax: 212-409-8338
Email: maria@chickedantzlaw.com
*TERMINATED: 05/31/2018*
*LEAD ATTORNEY*

**Ria Julien**
Mirer Mazzocchi & Julien, PLLC
1 Whitehall Street
Ste 16th Floor
New York, NY 10004
212-231-2235
Fax: 212-409-8338
Email: rjulien@workingpeopleslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeanne Ellen Mirer**
Mirer Mazzocchi & Julien, PLLC
1 Whitehall Street
Ste 16th Floor
New York, NY 10004
212-231-2235
Email: jmirer@workingpeopleslaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The New York City Department of**            represented by  **Andrea Mary O'Connor**
**Education**                                   NYC Law Department, Office of the
Corporation Counsel (NYC)

A.1

100 Church Street
New York, NY 10007
(212)676-2750
Fax: (212)788-8877
Email: aoconnor@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Joseph Anci**
New York City Law Dept.
Office of Corp. Counsel
100 Church Street
New York, NY 10007
212-356-1106
Fax: 212-356-2439
Email: Joseph.Anci@jacksonlewis.com
*ATTORNEY TO BE NOTICED*

**William Andrew Grey**
Proskauer Rose LLP
11 Times Square
New York, NY 10036
212-969-2900
Email: wgrey@proskauer.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Carmen Farina**                      represented by  **Andrea Mary O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph Anci**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Andrew Grey**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/28/2017 | 1 | COMPLAINT against Carmen Farina, The New York City Department of Education. (Filing Fee $ 400.00, Receipt Number 0208-13599800)Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 04/28/2017) |
| 04/28/2017 | 2 | CIVIL COVER SHEET filed. (Chickedantz, Maria) (Entered: 04/28/2017) |
| 04/28/2017 | | ***NOTICE TO ATTORNEY REGARDING CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Maria Lauren Chickedantz. The following case opening statistical information was erroneously selected/entered: Arbitration code e (Exempt). The following correction(s) have been made to your case entry: the Arbitration code has been deleted. (pc)** (Entered: 04/28/2017) |
| 04/28/2017 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Paul G. Gardephe. Please download and review the Individual Practices |

A.2

| | | |
|---|---|---|
| | | of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (pc) (Entered: 04/28/2017) |
| 04/28/2017 | | Magistrate Judge Henry B. Pitman is so designated. (pc) (Entered: 04/28/2017) |
| 04/28/2017 | | Case Designated ECF. (pc) (Entered: 04/28/2017) |
| 04/28/2017 | 12 | ORDER: It is hereby ORDERED that Defendants submit, by Monday, May 1, 2017 at 10:00 a.m., an opposition to Plaintiff's motion for a temporary restraining order and preliminary injunction. It is further ORDERED that a hearing regarding Plaintiff's application will take place on Monday, May 1, 2017 at 3:00 p.m. in Courtroom 705 of the Thurgood Marshall United States Courhouse, 40 Foley Square, New York, New York. Set Deadlines/Hearing as to 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*: ( Responses due by 5/1/2017 at 03:00 PM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 4/28/2017) (mro) (Entered: 05/01/2017) |
| 04/29/2017 | 3 | **FILING ERROR - ELECTRONIC FILING OF NON-ECF DOCUMENT -** FIRST MOTION for Preliminary Injunction *on Order to Show Cause*. Document filed by Jill Bloomberg. Return Date set for 5/1/2017 at 10:00 AM.(Chickedantz, Maria) Modified on 5/3/2017 (db). (Entered: 04/29/2017) |
| 04/29/2017 | 4 | AFFIRMATION of Maria L. Chickedantz in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 04/29/2017) |
| 04/29/2017 | 5 | AFFIDAVIT of Louise Bauso in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 04/29/2017) |
| 04/29/2017 | 6 | AFFIDAVIT of Maysa Jarara in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 04/29/2017) |
| 04/29/2017 | 7 | AFFIDAVIT of Lisa Miller in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 04/29/2017) |
| 04/29/2017 | 8 | AFFIDAVIT of Jill Sandusky in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 04/29/2017) |
| 04/29/2017 | 9 | AFFIDAVIT of Rahsan Williams in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 04/29/2017) |
| 04/29/2017 | 10 | AFFIDAVIT of Jill Bloomberg in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Jill Bloomberg. (Attachments: # 1 Exhibit 1 - Mural, # 2 Exhibit 2 - Girls Volleyball Complaint, # 3 Exhibit 3 - Jan. 10, 2017 Discrimination Complaint, # 4 Exhibit 4 - Feb. 13, 2017 Flyer, # 5 Exhibit 5 - 3/22/17 Plaintiff' Cease & Desist Letter, # 6 Exhibit 6 - 3/27/17 DOE Response, # 7 Exhibit 7 - 3/28/17 Plaintiff's Reply, # 8 Exhibit 8 - 4/6/17 DOE Response, # 9 Exhibit 9 - Columbia University Letter in Support)(Chickedantz, Maria) (Entered: 04/29/2017) |
| 04/29/2017 | 11 | FIRST MEMORANDUM OF LAW in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*. . Document filed by Jill Bloomberg. (Chickedantz, |

A.3

| | | |
|---|---|---|
| | | Maria) (Entered: 04/29/2017) |
| 05/01/2017 | 13 | DECLARATION of Charity Guerra in Opposition re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Carmen Farina, The New York City Department of Education. (O'Connor, Andrea) (Entered: 05/01/2017) |
| 05/01/2017 | 14 | MEMORANDUM OF LAW in Opposition re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*. . Document filed by Carmen Farina, The New York City Department of Education. (O'Connor, Andrea) (Entered: 05/01/2017) |
| 05/01/2017 | 15 | DECLARATION of Charity Guerra in Opposition re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Carmen Farina, The New York City Department of Education. (O'Connor, Andrea) (Entered: 05/01/2017) |
| 05/01/2017 | 16 | NOTICE OF APPEARANCE by Andrea Mary O'Connor on behalf of Carmen Farina, The New York City Department of Education. (O'Connor, Andrea) (Entered: 05/01/2017) |
| 05/01/2017 | 17 | DECLARATION of Charity Guerra in Opposition re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Carmen Farina, The New York City Department of Education. (O'Connor, Andrea) (Entered: 05/01/2017) |
| 05/01/2017 | 18 | LETTER addressed to Judge Paul G. Gardephe from Andrea O'Connor dated May 1, 2017 re: declaration filed in opposition to plaintiff's motion for a temporary restraining order and preliminary injunction. Document filed by Carmen Farina, The New York City Department of Education.(O'Connor, Andrea) (Entered: 05/01/2017) |
| 05/01/2017 | 19 | NOTICE OF APPEARANCE by William Andrew Grey on behalf of Carmen Farina, The New York City Department of Education. (Grey, William) (Entered: 05/01/2017) |
| 05/01/2017 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Motion Hearing held on 5/1/2017 re: 3 FIRST MOTION for Preliminary Injunction on Order to Show Cause. filed by Jill Bloomberg. (Court Reporter Paul Speer / Thomas Murray) (mr) (Entered: 05/01/2017) |
| 05/01/2017 | 20 | NOTICE OF APPEARANCE by Joseph Anci on behalf of Carmen Farina, The New York City Department of Education. (Anci, Joseph) (Entered: 05/01/2017) |
| 05/02/2017 | 21 | AFFIDAVIT of Jill Bloomberg in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Jill Bloomberg. (Attachments: # 1 Exhibit 1 - Len Ragozin Foundation Website, # 2 Exhibit 2 - Documentary "Profiled" Page on Len Ragozin Website, # 3 Exhibit 3 - Len Ragozin DOE Film Permit, # 4 Exhibit 4 - Len Ragozin Extended Use/Special Requests Permit, # 5 Exhibit 5 - The Nation Article re: PSAL Race Discrimination and Retaliation, # 6 Exhibit 6 - City Limits Op-Ed re: PSAL & David Garcia-Rosen, # 7 Exhibit 7 - Socialist Worker Article re: PSAL and David Garcia-Rosen)(Chickedantz, Maria) (Entered: 05/02/2017) |
| 05/02/2017 | 22 | AFFIRMATION of Maria L. Chickedantz in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 05/02/2017) |
| 05/02/2017 | 23 | SECOND MEMORANDUM OF LAW in Support re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*. . Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 05/02/2017) |
| 05/02/2017 | 24 | LETTER MOTION for Leave to File sur-reply addressed to Judge Paul G. Gardephe from Andrea O'Connor dated May 2, 2017. Document filed by Carmen Farina, The New York City Department of Education.(O'Connor, Andrea) (Entered: 05/02/2017) |

A.4

| 05/02/2017 | 25 | ORDER granting 24 LETTER MOTION for Leave to File sur-reply addressed to Judge Paul G. Gardephe from Andrea O'Connor dated May 2, 2017. Document filed by Carmen Farina, The New York City Department of Education. The application is granted. Defendants are directed to submit their papers by 12:00 p.m. on Wednesday, May 3, 2017. So ordered. (Signed by Judge Paul G. Gardephe on 5/2/2017) (rjm) (Entered: 05/03/2017) |
|---|---|---|
| 05/02/2017 | | Set/Reset Deadlines: Surreplies due by 5/3/2017. (rjm) (Entered: 05/03/2017) |
| 05/03/2017 | 26 | ORDER: It is hereby ORDERED that the hearing in this matter, which is currently set for Wednesday, May 3, 2017 at 5:00 p.m., will take place in Courtroom 110 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. (Status Conference set for 5/3/2017 at 05:00 PM in Courtroom 110, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 5/3/2017) (cf) (Entered: 05/03/2017) |
| 05/03/2017 | 27 | DECLARATION of Charity Guerra in Opposition re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause*.. Document filed by Carmen Farina, The New York City Department of Education. (Attachments: # 1 Exhibit A)(O'Connor, Andrea) (Entered: 05/03/2017) |
| 05/03/2017 | 28 | RESPONSE in Opposition to Motion re: 3 FIRST MOTION for Preliminary Injunction *on Order to Show Cause. Defendants' Sur-reply*. Document filed by Carmen Farina, The New York City Department of Education. (Attachments: # 1 Appendix A)(O'Connor, Andrea) (Entered: 05/03/2017) |
| 05/03/2017 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Preliminary Injunction Hearing held on 5/3/2017. (Court Reporter Kristen Carannante) (mr) (Entered: 05/04/2017) |
| 05/04/2017 | 29 | TRANSCRIPT of Proceedings re: CONFERENCE held on 5/1/2017 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Thomas Murray, (212) 805-0300.  Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/25/2017. Redacted Transcript Deadline set for 6/5/2017. Release of Transcript Restriction set for 8/2/2017. (McGuirk, Kelly) (Entered: 05/04/2017) |
| 05/04/2017 | 30 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERECE proceeding held on 5/1/17 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 05/04/2017) |
| 05/04/2017 | 31 | ORDER denying 3 Motion for Preliminary Injunction. For the reasons stated during the May 3, 2017 hearing in this matter, Plaintiff's motion for a temporary restraining order and preliminary injunction is denied. (Signed by Judge Paul G. Gardephe on 5/4/2017) (cf) (Entered: 05/04/2017) |
| 05/10/2017 | 32 | LETTER addressed to Judge Paul G. Gardephe from Jeanne Mirer dated May 10, 2017 re: Advise the Court that Plaintiff intends to move forward with litigation.. Document filed by Jill Bloomberg.(Mirer, Jeanne) (Entered: 05/10/2017) |
| 05/12/2017 | 33 | TRANSCRIPT of Proceedings re: CONFERENCE held on 5/1/2017 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Thomas Murray, (212) 805-0300.  Transcript may be viewed at the court public terminal or purchased through the Court |

| | | |
|---|---|---|
| | | Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/2/2017. Redacted Transcript Deadline set for 6/12/2017. Release of Transcript Restriction set for 8/10/2017. (McGuirk, Kelly) (Entered: 05/12/2017) |
| 05/12/2017 | 34 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 5/1/17 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 05/12/2017) |
| 05/15/2017 | 35 | MEMO ENDORSEMENT on re: 32 Letter filed by Jill Bloomberg. ENDORSEMENT: Any Amended Complaint is to be filed by May 19, 2017. SO ORDERED. (Amended Pleadings due by 5/19/2017.) (Signed by Judge Paul G. Gardephe on 5/12/2017) (anc) (Entered: 05/15/2017) |
| 05/16/2017 | 36 | TRANSCRIPT of Proceedings re: argument held on 5/3/2017 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Kristen Carannante, (212) 805-0300.     Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/6/2017. Redacted Transcript Deadline set for 6/16/2017. Release of Transcript Restriction set for 8/14/2017. (McGuirk, Kelly) (Entered: 05/16/2017) |
| 05/16/2017 | 37 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a argument proceeding held on 5/3/17 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 05/16/2017) |
| 05/19/2017 | 38 | **FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR** FIRST AMENDED COMPLAINT amending 1 Complaint against Jill Bloomberg with JURY DEMAND.Document filed by Jill Bloomberg. Related document: 1 Complaint filed by Jill Bloomberg.(Chickedantz, Maria) Modified on 5/22/2017 (pc). (Entered: 05/19/2017) |
| 05/22/2017 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Maria Lauren Chickedantz to RE-FILE Document No. 38 Amended Complaint,. The filing is deficient for the following reason(s): the wrong party/parties whom the pleading is against were selected. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (pc)** (Entered: 05/22/2017) |
| 05/23/2017 | 39 | FIRST AMENDED COMPLAINT amending 1 Complaint against Carmen Farina, The New York City Department of Education with JURY DEMAND.Document filed by Jill Bloomberg. Related document: 1 Complaint filed by Jill Bloomberg.(Chickedantz, Maria) Modified on 5/24/2017 (pc). Modified on 5/26/2017 (pc). (Entered: 05/23/2017) |
| 05/24/2017 | 40 | **FILING ERROR - PDF ERROR -** REQUEST FOR ISSUANCE OF SUMMONS as to The New York City Department of Education and Carmen Farina, re: 39 Amended Complaint. Document filed by Jill Bloomberg. (Chickedantz, Maria) Modified on 5/26/2017 (pc). (Entered: 05/24/2017) |

A.6

| | | |
|---|---|---|
| 05/26/2017 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney to RE-FILE Document No. 40 Request for Issuance of Summons,. The filing is deficient for the following reason(s): Attorney's address field was not filled out. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (pc) (Entered: 05/26/2017) |
| 05/26/2017 | 41 | REQUEST FOR ISSUANCE OF SUMMONS as to The New York City Department of Education and Carmen Farina, re: 39 Amended Complaint,. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 05/26/2017) |
| 05/30/2017 | 42 | ELECTRONIC SUMMONS ISSUED as to Carmen Farina, The New York City Department of Education. (pc) (Entered: 05/30/2017) |
| 06/07/2017 | 43 | CERTIFICATE OF SERVICE of Summons and Amended Complaint,. Carmen Farina served on 5/31/2017, answer due 6/21/2017. Service was accepted by B. Mazyck, Messenger Center for NYC Law Department. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 06/07/2017) |
| 06/07/2017 | 44 | CERTIFICATE OF SERVICE of Summons and Amended Complaint,. The New York City Department of Education served on 5/31/2017, answer due 6/21/2017. Service was accepted by B. Mazyck, Messenger Center for NYC Law Department. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 06/07/2017) |
| 06/20/2017 | 45 | LETTER MOTION for Extension of Time *to answer, move or to otherwise respond to the complaint* addressed to Judge Paul G. Gardephe from Joseph Anci dated June 20, 2017. Document filed by Carmen Farina, The New York City Department of Education.(Anci, Joseph) (Entered: 06/20/2017) |
| 06/21/2017 | 46 | FIRST LETTER addressed to Judge Paul G. Gardephe from Maria L. Chickedantz dated June 21, 2017 re: In Opposition to Defendants' Request for an Extension. Document filed by Jill Bloomberg.(Chickedantz, Maria) (Entered: 06/21/2017) |
| 06/22/2017 | 47 | ORDER granting 45 Letter Motion for Extension of Time. The Application is granted. (Signed by Judge Paul G. Gardephe on 6/22/2017) (cf) (Entered: 06/22/2017) |
| 06/22/2017 | | Set/Reset Deadlines: Carmen Farina answer due 7/12/2017; The New York City Department of Education answer due 7/12/2017. (cf) (Entered: 06/22/2017) |
| 07/12/2017 | 48 | LETTER MOTION for Conference *Regarding Defendants' Anticipated Motion to Dismiss the Amended Complaint* addressed to Judge Paul G. Gardephe from Joseph Anci dated July 12, 2017. Document filed by Carmen Farina, The New York City Department of Education.(Anci, Joseph) (Entered: 07/12/2017) |
| 07/17/2017 | 49 | FIRST LETTER addressed to Judge Paul G. Gardephe from Maria L. Chickedantz dated July 17, 2017 re: Opposition to Defendants' July 12, 2017 Letter Motion. Document filed by Jill Bloomberg.(Chickedantz, Maria) (Entered: 07/17/2017) |
| 07/21/2017 | 50 | ORDER granting 48 Letter Motion for Conference. The Court will conduct a telephone conference in this matter on July 24, 2017 at 5:15 p.m. Counsel should contact chambers at 212-805-0224    once on the phone. Telephone Conference set for 7/24/2017 at 05:15 PM before Judge Paul G. Gardephe. (Signed by Judge Paul G. Gardephe on 7/20/2017) (cf) (Entered: 07/21/2017) |
| 07/25/2017 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Telephone Conference held on 7/25/2017. (Court Reporter Karen Gorlaski) (mr) (Entered: 07/25/2017) |

A.7

| 07/25/2017 | [51](#) | ORDER, It is hereby ORDERED that the following schedule will apply to Defendants' motion to dismiss and Plaintiff's cross-motion for judgment on the pleadings: Defendants' motion is due on September 1, 2017; Plaintiff's opposition and cross-motion is due on October 2, 2017; and Defendants' reply, if any, is due on October 16, 2017. So Ordered. (Cross Motions due by 10/2/2017., Motions due by 9/1/2017., Responses due by 10/2/2017, Replies due by 10/16/2017.) (Signed by Judge Paul G. Gardephe on 7/24/17) (yv) (Entered: 07/25/2017) |
|---|---|---|
| 08/31/2017 | [52](#) | CONSENT LETTER MOTION for Extension of Time to File *Defendants' Motion to Dismiss* addressed to Judge Paul G. Gardephe from Joseph Anci dated August 31, 2017. Document filed by Carmen Farina, The New York City Department of Education.(Anci, Joseph) (Entered: 08/31/2017) |
| 09/01/2017 | [53](#) | ORDER: granting [52](#) Letter Motion for Extension of Time to File Motion, Response, Cross Motion and Reply. SO ORDERED. Motion due by 9/8/2017. Response due by 10/9/2017. Cross-motion due by 10/9/2017. Reply due by 10/23/2017. (Signed by Judge Paul G. Gardephe on 9/1/2017) (ap) (Entered: 09/01/2017) |
| 09/01/2017 | | Set/Reset Deadlines: Cross Motions due by 10/9/2017. Motions due by 9/8/2017. Responses due by 10/9/2017. Replies due by 10/23/2017. (ap) (Entered: 09/01/2017) |
| 10/05/2017 | [54](#) | FIRST LETTER MOTION for Extension of Time *to file plaintiff's opposition to defendants' motion to dismiss* addressed to Judge Paul G. Gardephe from Maria Chickedantz dated October 5, 2017. Document filed by Jill Bloomberg.(Chickedantz, Maria) (Entered: 10/05/2017) |
| 10/06/2017 | [55](#) | ORDER granting [54](#) Letter Motion for Extension of Time. SO ORDERED. (Signed by Judge Paul G. Gardephe on 10/6/2017) (cf) (Entered: 10/06/2017) |
| 10/06/2017 | | Set/Reset Deadlines: Responses due by 10/17/2017 Replies due by 10/31/2017. (cf) (Entered: 10/06/2017) |
| 10/17/2017 | [56](#) | SECOND LETTER MOTION for Extension of Time *to file plaintiff's opposition to defendants' motion to dismiss* addressed to Judge Paul G. Gardephe from Maria Chickedantz dated October 17, 2017. Document filed by Jill Bloomberg.(Chickedantz, Maria) (Entered: 10/17/2017) |
| 10/19/2017 | [57](#) | ORDER granting [56](#) Letter Motion for Extension of Time. SO ORDERED. Cross Motions due by 10/23/2017. (Signed by Judge Paul G. Gardephe on 10/19/2017) (cf) (Entered: 10/19/2017) |
| 10/19/2017 | | Set/Reset Deadlines: Responses due by 11/20/2017 Replies due by 11/20/2017. (cf) (Entered: 10/19/2017) |
| 11/02/2017 | [58](#) | JOINT LETTER MOTION to Continue *Plaintiff's first request to amend her affidavit in support of her cross-motion, not on consent* addressed to Judge Paul G. Gardephe from Maria Chickedantz dated November 2, 2017. Document filed by Jill Bloomberg. (Chickedantz, Maria) (Entered: 11/02/2017) |
| 11/06/2017 | [59](#) | ORDER denying [58](#) Letter Motion to Continue. Plaintiff's application is denied. Plaintiff's Cross-Motion for Judgment on the pleadings will not be converted into a Rule 5.6 motion for Summary Judgment. There has been no discovery in this case and pre-discovery motions for Summary judgment are disfavored in this Circuit See, e.g, Lifetree Trading PTE., LTD. v. Washakie Renewable Energy, LLC, 2015 WL 3948097, at *6 (S.D.N.Y. June 29, 2015) see also Hellstrom v. U.S. Dep't of Veterans Affairs, 201 F.3d 94, 97 (2d Cir.2000). Plaintiff's application to file a Second Amended Complaint is denied. Plaintiff moved for Judgment on the pleadings on the basis of the First Amended Complaint, and |

| | | |
|---|---|---|
| | | this Court will decide their motion on the basis of that Complaint. (Signed by Judge Paul G. Gardephe on 11/6/2017) (cf) Modified on 12/8/2017 (cf). (Entered: 11/07/2017) |
| 11/14/2017 | [60](#) | CONSENT LETTER MOTION for Extension of Time *to Serve and File A Reply in Further Support of Defendants' Motion to Dismiss and Opposition to Plaintiff's Cross-Motion* addressed to Judge Paul G. Gardephe from Joseph Anci dated November 14, 2017. Document filed by Carmen Farina, The New York City Department of Education. (Anci, Joseph) (Entered: 11/14/2017) |
| 11/16/2017 | [61](#) | ORDER granting [60](#) Letter Motion for Extension of Time. The Application is granted. (Signed by Judge Paul G. Gardephe on 11/15/2017) (cf) (Entered: 11/16/2017) |
| 11/16/2017 | | Set/Reset Deadlines: Replies due by 12/4/2017. (cf) (Entered: 11/16/2017) |
| 11/27/2017 | [62](#) | FIRST LETTER MOTION for Conference *for Plaintiff's Intended Motion for Leave to Amend the Complaint* addressed to Judge Paul G. Gardephe from Maria L. Chickedantz dated November 27, 2017. Document filed by Jill Bloomberg. (Attachments: # [1](#) Exhibit Proposed Second Amended Complaint)(Chickedantz, Maria) (Entered: 11/27/2017) |
| 11/28/2017 | [63](#) | LETTER RESPONSE in Opposition to Motion addressed to Judge Paul G. Gardephe from Joseph Anci dated November 28, 2017 re: [62](#) FIRST LETTER MOTION for Conference *for Plaintiff's Intended Motion for Leave to Amend the Complaint* addressed to Judge Paul G. Gardephe from Maria L. Chickedantz dated November 27, 2017. *with Request for an Extension of Time for Defendants to File a Reply and to Oppose Plaintiff's Cross-Motion from December 4, 2017 to December 21, 2017.* Document filed by Carmen Farina, The New York City Department of Education. (Anci, Joseph) (Entered: 11/28/2017) |
| 12/28/2017 | [64](#) | ORDER denying [62](#) Letter Motion for Conference. This application is denied for the reason stated in the Court's November 6, 2017 Order (Dkt. No. 59). (Signed by Judge Paul G. Gardephe on 12/28/2017) (cf) (Entered: 12/29/2017) |
| 01/17/2018 | [65](#) | FIRST LETTER addressed to Judge Paul G. Gardephe from Maria L. Chickedantz dated January 17, 2018 re: Request for Referral to a Magistrate for a Settlement Conference. Document filed by Jill Bloomberg.(Chickedantz, Maria) (Entered: 01/17/2018) |
| 01/19/2018 | [66](#) | MEMO ENDORSEMENT on re: [65](#) Letter filed by Jill Bloomberg. ENDORSEMENT: The application is granted. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/19/2018) (mml) (Entered: 01/19/2018) |
| 01/19/2018 | [67](#) | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Settlement. Referred to Magistrate Judge Henry B. Pitman. (Signed by Judge Paul G. Gardephe on 1/19/2018) (mml) (Entered: 01/19/2018) |
| 03/05/2018 | | Set/Reset Hearings: Telephone Conference set for 3/12/2018 at 09:30 AM before Magistrate Judge Henry B. Pitman. (ajc) (Entered: 03/05/2018) |
| 03/12/2018 | | Minute Entry for proceedings held before Magistrate Judge Henry B. Pitman: Telephone Conference held on 3/12/2018. (ajc) (Entered: 03/12/2018) |
| 03/12/2018 | | Set/Reset Hearings: Settlement Conference set for 4/17/2018 at 02:00 PM in Courtroom 18A, 500 Pearl Street, New York, NY 10007 before Magistrate Judge Henry B. Pitman. (ajc) (Entered: 03/12/2018) |
| 04/10/2018 | [68](#) | CONSENT LETTER MOTION to Adjourn Conference *Scheduled for April 17, 2018* addressed to Magistrate Judge Henry B. Pitman from Joseph Anci dated April 10, 2018. Document filed by Carmen Farina, The New York City Department of Education.(Anci, Joseph) (Entered: 04/10/2018) |

| 05/11/2018 | 69 | NOTICE OF APPEARANCE by Ria Julien on behalf of Jill Bloomberg. (Julien, Ria) (Entered: 05/11/2018) |
|---|---|---|
| 05/31/2018 | 70 | MEMO ENDORSEMENT on NOTICE OF WITHDRAW AL OF COUNSEL. ENDORSEMENT: SO ORDERED. Attorney Maria Lauren Chickedantz terminated. (Signed by Judge Paul G. Gardephe on 5/30/2018) (cf) (Entered: 05/31/2018) |
| 05/31/2018 | 71 | NOTICE OF APPEARANCE by Jeanne Ellen Mirer on behalf of Jill Bloomberg. (Mirer, Jeanne) (Entered: 05/31/2018) |
| 05/31/2018 | | Minute Entry for proceedings held before Magistrate Judge Henry B. Pitman: Settlement Conference held on 5/31/2018. (ajc) (Entered: 06/01/2018) |
| 06/25/2018 | 72 | LETTER MOTION for Extension of Time to File Response/Reply as to 66 Memo Endorsement, Terminate Deadlines *and to So-Order Defendants' Proposed Briefing Schedule* addressed to Judge Paul G. Gardephe from Joseph Anci dated June 25, 2018. Document filed by Carmen Farina, The New York City Department of Education.(Anci, Joseph) (Entered: 06/25/2018) |
| 06/27/2018 | 73 | LETTER addressed to Judge Paul G. Gardephe from Jeanne Mirer dated June 27, 2018 re: Briefing schedule. Document filed by Jill Bloomberg.(Mirer, Jeanne) (Entered: 06/27/2018) |
| 07/02/2018 | 74 | ORDER granting 72 Letter Motion for Extension of Time to File Response/Reply. It is hereby ORDERED that the following schedule will apply to Defendants' motion to dismiss and Plaintiff's cross-motion for judgment on the pleadings: 1. Defendants' opposition to Plaintiff's cross-motion is due on July 31, 2018; 2. Plaintiff's reply in further support of her cross-motion, if any, is due on August 28, 2018; and 3. Defendants' reply in further support of their motion to dismiss, if any, is also due on August 28, 2018. Responses due by 7/31/2018 Replies due by 8/28/2018. (Signed by Judge Paul G. Gardephe on 7/2/2018) (mro) (Entered: 07/03/2018) |
| 08/24/2018 | 75 | LETTER MOTION for Extension of Time to File Response/Reply *as noted in this Court's order of July 2, 2018, from August 28, 2018 to September 6, 2018.* addressed to Judge Paul G. Gardephe from Jeanne Mirer dated August 24, 2018. Document filed by Jill Bloomberg.(Mirer, Jeanne) (Entered: 08/24/2018) |
| 08/27/2018 | 76 | ORDER granting 75 Letter Motion for Extension of Time to File Response/Reply. The Application is granted. (Signed by Judge Paul G. Gardephe on 8/27/2018) (tro) (Entered: 08/28/2018) |
| 08/27/2018 | | Set/Reset Deadlines: Replies due by 9/6/2018. (tro) (Entered: 08/28/2018) |
| 09/06/2018 | 77 | MOTION to Dismiss *Plaintiff's Amended Complaint*. Document filed by Carmen Farina, The New York City Department of Education.(Anci, Joseph) (Entered: 09/06/2018) |
| 09/06/2018 | 78 | MEMORANDUM OF LAW in Support re: 77 MOTION to Dismiss *Plaintiff's Amended Complaint.* . Document filed by Carmen Farina, The New York City Department of Education. (Anci, Joseph) (Entered: 09/06/2018) |
| 09/06/2018 | 79 | DECLARATION of Joseph Anci in Support re: 77 MOTION to Dismiss *Plaintiff's Amended Complaint.*. Document filed by Carmen Farina, The New York City Department of Education. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Anci, Joseph) (Entered: 09/06/2018) |
| 09/06/2018 | 80 | MEMORANDUM OF LAW in Opposition re: 77 MOTION to Dismiss *Plaintiff's Amended Complaint.* . Document filed by Jill Bloomberg. (Julien, Ria) (Entered: 09/06/2018) |

A.10

| 09/06/2018 | 81 | CROSS MOTION for Judgment on the Pleadings . Document filed by Jill Bloomberg. (Julien, Ria) (Entered: 09/06/2018) |
|---|---|---|
| 09/06/2018 | 82 | MEMORANDUM OF LAW in Support re: 81 CROSS MOTION for Judgment on the Pleadings . . Document filed by Jill Bloomberg. (Julien, Ria) (Entered: 09/06/2018) |
| 09/06/2018 | 83 | AFFIDAVIT of Jill Bloomberg in Support re: 81 CROSS MOTION for Judgment on the Pleadings .. Document filed by Jill Bloomberg. (Attachments: # 1 Exhibit A: March 27, 2017 letter, # 2 Exhibit B: April 6, 2017 letter, # 3 Exhibit C: Guerra Declaration, # 4 Exhibit D: OSI Report, # 5 Exhibit E: October 3, 2017 letter, # 6 Exhibit F: Mayors Office Notice)(Julien, Ria) (Entered: 09/06/2018) |
| 09/06/2018 | 84 | AFFIRMATION of Maria L Chickedantz in Support re: 81 CROSS MOTION for Judgment on the Pleadings .. Document filed by Jill Bloomberg. (Attachments: # 1 Exhibit 1: D-130 Regulation, # 2 Exhibit 2: November 25, 2014 letter, # 3 Exhibit 3: Commissioner's Decision 12, 761)(Julien, Ria) (Entered: 09/06/2018) |
| 09/06/2018 | 85 | MEMORANDUM OF LAW in Opposition re: 81 CROSS MOTION for Judgment on the Pleadings . . Document filed by Carmen Farina, The New York City Department of Education. (Anci, Joseph) (Entered: 09/06/2018) |
| 09/06/2018 | 86 | REPLY MEMORANDUM OF LAW in Support re: 81 CROSS MOTION for Judgment on the Pleadings . . Document filed by Jill Bloomberg. (Julien, Ria) (Entered: 09/06/2018) |
| 09/06/2018 | 87 | REPLY MEMORANDUM OF LAW in Support re: 77 MOTION to Dismiss *Plaintiff's Amended Complaint*. . Document filed by Carmen Farina, The New York City Department of Education. (Anci, Joseph) (Entered: 09/06/2018) |
| 01/22/2019 | 88 | NOTICE OF CHANGE OF ADDRESS by Jeanne Ellen Mirer on behalf of Jill Bloomberg. New Address: Mirer Mazzocchi & Julien, PLLC, 150 Broadway, Twelfth Floor, New York, New York, United States 10038, 212-231-2235.    (Mirer, Jeanne) (Entered: 01/22/2019) |
| 09/24/2019 | 89 | MEMORANDUM OPINION AND ORDER: For the reasons stated above, Defendants' motion to dismiss (Dkt. No. 77) is granted in its entirety, and Plaintiffs cross-motion for judgment on the pleadings (Diet. No. 81) is deemed withdrawn. The Clerk of Court is directed to terminate the motions. Any motion for leave to file a Second Amended Complaint is to be served and filed by October 23, 2019. The proposed Second Amended Complaint is to be attached as an exhibit to the motion. Defendants will submit their Answer to the surviving claim in the Amended Complaint by September 30, 2019. A conference pursuant to Fed. R. Civ. P. 16 will be held on October 21, 2019 at 12:30 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. Carmen Farina answer due 9/30/2017; The New York City Department of Education answer due 9/30/2017. (Motions due by 10/23/2019., Initial Conference set for 10/21/2019 at 12:30 PM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 9/24/2019) (jca) (Entered: 09/24/2019) |
| 09/27/2019 | 90 | JOINT LETTER MOTION for Extension of Time *For Defendants To Answer; For Plaintiff To Seek Leave To Amend; And To Adjourn The October 21, 2019 Initial Conference* addressed to Judge Paul G. Gardephe from Joseph Anci dated September 27, 2019. Document filed by Carmen Farina, The New York City Department of Education. (Anci, Joseph) (Entered: 09/27/2019) |
| 10/03/2019 | | NOTICE OF REASSIGNMENT OF A REFERRAL TO ANOTHER MAGISTRATE JUDGE. The referral in the above entitled action has been reassigned to Magistrate Judge |

A.11

| | | Sarah L. Cave, for Settlement. Magistrate Judge Henry B. Pitman no longer referred to the case. (ad) (Entered: 10/03/2019) |
|---|---|---|
| 10/07/2019 | 91 | ORDER granting 90 Letter Motion for Extension of Time. The application is granted. The conference is adjourned to Nov. 21, 2019 at 10:45 A.M. So ordered. (Signed by Judge Paul G. Gardephe on 10/1/2019) (js) (Entered: 10/07/2019) |
| 10/07/2019 | | Set/Reset Deadlines: Carmen Farina answer due 10/15/2019; The New York City Department of Education answer due 10/15/2019.( Motions due by 11/6/2019.), Set/Reset Hearings:( Initial Conference set for 11/21/2019 at 10:45 AM before Judge Paul G. Gardephe.) (js) (Entered: 10/07/2019) |
| 10/15/2019 | 92 | ANSWER to 39 Amended Complaint,. Document filed by Carmen Farina, The New York City Department of Education.(Anci, Joseph) (Entered: 10/15/2019) |
| 11/06/2019 | 93 | MOTION to Amend/Correct *Second Amended Complaint*. Document filed by Jill Bloomberg.(Mirer, Jeanne) (Entered: 11/06/2019) |
| 11/06/2019 | 94 | AFFIDAVIT of Jeanne Mirer in Support re: 93 MOTION to Amend/Correct *Second Amended Complaint*.. Document filed by Jill Bloomberg. (Attachments: # 1 Exhibit Proposed Second Amended Complaint)(Mirer, Jeanne) (Entered: 11/06/2019) |
| 11/14/2019 | 95 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 94 Affidavit in Support of Motion, 93 MOTION to Amend/Correct *Second Amended Complaint*. addressed to Judge Paul G. Gardephe from Joseph Anci dated November 14, 2019. Document filed by Carmen Farina, The New York City Department of Education. (Anci, Joseph) (Entered: 11/14/2019) |
| 11/18/2019 | 96 | ORDER granting 95 Letter Motion for Extension of Time to File Response/Reply re 93 MOTION to Amend/Correct *Second Amended Complaint*. The application is granted. So Ordered. (Responses due by 12/6/2019.) (Signed by Judge Paul G. Gardephe on 11/15/19) (yv) (Entered: 11/18/2019) |
| 11/18/2019 | 97 | ORDER: It is hereby ORDERED that the conference in this action previously scheduled for November 21, 2019 is adjourned. A conference is scheduled for November 21, 2019 at 3:15 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. (Signed by Judge Paul G. Gardephe on 11/18/2019) (rro) (Entered: 11/18/2019) |
| 11/20/2019 | 98 | ORDER: It is hereby ORDERED that the conference in this action previously scheduled for November 21, 2019 is adjourned. A conference is scheduled for December 12, 2019 at 11:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. (Initial Conference set for 12/12/2019 at 11:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 11/20) (jca) (Entered: 11/20/2019) |
| 12/06/2019 | 99 | MEMORANDUM OF LAW in Opposition re: 93 MOTION to Amend/Correct *Second Amended Complaint*. . Document filed by Carmen Farina, The New York City Department of Education. (Anci, Joseph) (Entered: 12/06/2019) |
| 12/11/2019 | 100 | ORDER: It is hereby ORDERED that the conference in this action previously scheduled for December 12, 2019 is adjourned sine die. (Signed by Judge Paul G. Gardephe on 12/11/2019) (va) (Entered: 12/12/2019) |
| 12/12/2019 | 101 | LETTER addressed to Judge Paul G. Gardephe from Jeanne Mirer dated December 12, 2019 re: Agreed Extension to File Plaintiff's Reply. Document filed by Jill Bloomberg. (Mirer, Jeanne) (Entered: 12/12/2019) |

| | | |
|---|---|---|
| 12/17/2019 | 102 | LETTER addressed to Judge Paul G. Gardephe from Jeanne Mirer dated December 17, 2019 re: Agreed Extension to File Plaintiff's Reply. Document filed by Jill Bloomberg. (Mirer, Jeanne) (Entered: 12/17/2019) |
| 12/17/2019 | 103 | MEMO ENDORSEMENT on re: 102 Letter filed by Jill Bloomberg. ENDORSEMENT: SO ORDERED. (Replies due by 1/10/2020.) (Signed by Judge Paul G. Gardephe on 12/17/2019) (jca) (Entered: 12/17/2019) |
| 01/10/2020 | 104 | FIRST REPLY MEMORANDUM OF LAW in Support re: 93 MOTION to Amend/Correct *Second Amended Complaint*. . Document filed by Jill Bloomberg. (Mirer, Jeanne) (Entered: 01/10/2020) |
| 11/17/2020 | 105 | ORDER: It is hereby ORDERED that Plaintiff Jill Bloomberg shall submit by Friday, November 20, 2020 a redline comparison between the First Amended Complaint (Dkt. No. 39) and the Proposed Second Amended Complaint (Dkt. No. 94-1). SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/17/2020) (jca) (Entered: 11/17/2020) |
| 11/20/2020 | 106 | LETTER addressed to Judge Paul G. Gardephe from Jeanne Mirer dated 11/20/2020 re: Order (Dkt #105) requesting redline complaints comparison. Document filed by Jill Bloomberg..(Julien, Ria) (Entered: 11/20/2020) |
| 11/20/2020 | 107 | LETTER addressed to Judge Paul G. Gardephe from Jeanne Mirer dated 11/20/2020 re: Order (Dkt #105) requesting redline complaints comparison with attachment. Document filed by Jill Bloomberg. (Attachments: # 1 Supplement Redline comparison of complaints).(Julien, Ria) (Entered: 11/20/2020) |
| 09/23/2021 | 108 | ORDER denying 93 Motion to Amend/Correct 93 MOTION to Amend/Correct *Second Amended Complaint*. Plaintiffs motion for leave to file a Second Amended Complaint (Dkt. No. 93) is denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 93) and to close this case. So Ordered. (Signed by Judge Paul G. Gardephe on 9/23/21) (yv) Transmission to Docket Assistant Clerk for processing. (Entered: 09/24/2021) |
| 10/08/2021 | 109 | MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, . Document filed by Jill Bloomberg..(Mirer, Jeanne) (Entered: 10/08/2021) |
| 10/08/2021 | 110 | AFFIDAVIT of Jeanne Mirer in Support re: 109 MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, .. Document filed by Jill Bloomberg..(Mirer, Jeanne) (Entered: 10/08/2021) |
| 10/08/2021 | 111 | MEMORANDUM OF LAW in Support re: 109 MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, . . Document filed by Jill Bloomberg..(Mirer, Jeanne) (Entered: 10/08/2021) |
| 10/15/2021 | 112 | ORDER with respect to 109 Motion for Reconsideration re 109 MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, . filed by Jill Bloomberg. It is hereby ORDERED that the following schedule will apply to Plaintiffs motion for reconsideration (Dkt. No. 109): 1. Defendants opposition is due on October 29, 2021; and 2. Plaintiffs reply, if any, is due on November 5, 2021. SO ORDERED. (Signed by Judge Paul G. Gardephe on 10/15/2021) (tg) (Entered: 10/15/2021) |
| 10/15/2021 | | Set/Reset Deadlines: Responses due by 10/29/2021 Replies due by 11/5/2021. (tg) (Entered: 10/15/2021) |
| 10/27/2021 | 113 | CONSENT LETTER MOTION for Extension of Time *To File Opposition To Plaintiff's Motion For Reconsideration* addressed to Judge Paul G. Gardephe from Joseph Anci dated October 27, 2021. Document filed by Carmen Farina, The New York City Department of Education..(Anci, Joseph) (Entered: 10/27/2021) |

| 11/04/2021 | 114 | ORDER granting 113 Letter Motion for Extension of Time. Memo Endorsed: The application is granted. Defendants will file their opposition to Plaintiff's motion for reconsideration by November 12, 2021, and Plaintiff will file a reply, if any, by November 19, 2021. SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/4/2021) (mml) (Entered: 11/05/2021) |
|---|---|---|
| 11/04/2021 | | Set/Reset Deadlines: Responses due by 11/12/2021 Replies due by 11/19/2021. (mml) (Entered: 11/05/2021) |
| 11/12/2021 | 115 | MEMORANDUM OF LAW in Opposition re: 109 MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, . . Document filed by Carmen Farina, The New York City Department of Education..(Anci, Joseph) (Entered: 11/12/2021) |
| 11/19/2021 | 116 | REPLY MEMORANDUM OF LAW in Support re: 109 MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, . . Document filed by Jill Bloomberg..(Mirer, Jeanne) (Entered: 11/19/2021) |
| 12/20/2022 | 117 | ORDER with respect to 109 Motion for Reconsideration re 109 MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, . filed by Jill Bloomberg. Accordingly, Plaintiff must cite case law satisfying this standard. The parties' briefing should address, inter alia, the applicability of the following cases in determining the appropriate pleading standard for a Title VI retaliation claim in the context of this case: Hickey v. Myers, 2010 WL 786459 (N.D.N.Y. Mar. 2, 2010) (Title VI retaliation standard); Lopez v. Webster Cent. Sch. Dist., 682 F. Supp. 2d 274 (W.D.N.Y. 2010) (sufficiency of allegations related to defendants' receipt of federal funds); New York Urb. League, Inc. v. Metro. Transp. Auth., 905 F. Supp. 1266 (S.D.N.Y.), vacated on other grounds, 71 F.3d 1031 (2d Cir. 1995) (applicability of Title VI to a state agency); Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003) (private right of action for retaliation under Title VI); Homer v. Kentucky High Sch. Athletic Ass'n, 43 F.3d 265 (6th Cir. 1994) (Civil Rights Restoration Act and the definition of "program or activity" under Title IX). The supplemental briefing will be filed according to the following schedule: (1) Plaintiffs supplemental brief is due by January 4, 2023; and (2) Defendants' supplemental brief is due by January 11, 2023. SO ORDERED.. (Signed by Judge Paul G. Gardephe on 12/20/2022) (kv) (Entered: 12/20/2022) |
| 01/04/2023 | 118 | RESPONSE in Support of Motion re: 109 MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, . *SUPPLEMENTAL BRIEF*. Document filed by Jill Bloomberg..(Julien, Ria) (Entered: 01/04/2023) |
| 01/11/2023 | 119 | RESPONSE in Opposition to Motion re: 109 MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, . . Document filed by Carmen Farina, The New York City Department of Education. (Attachments: # 1 Appendix A, # 2 Appendix B).(O'Connor, Andrea) (Entered: 01/11/2023) |
| 02/10/2023 | 120 | ORDER granting in part and denying in part 109 Motion for Reconsideration re 109 MOTION for Reconsideration re; 108 Order on Motion to Amend/Correct, . filed by Jill Bloomberg For the reasons stated above, Plaintiffs motion for reconsideration (Dkt. No. 109) is granted, but leave to amend is denied. The Clerk of Court is directed to close this case. SO ORDERED.. (Signed by Judge Paul G. Gardephe on 2/10/2023) (ks) (Entered: 02/10/2023) |
| 03/10/2023 | 121 | NOTICE OF APPEAL from 120 Order on Motion for Reconsideration,. Document filed by Jill Bloomberg. Filing fee $ 505.00, receipt number ANYSDC-27455325. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Julien, Ria) (Entered: 03/10/2023) |

A.14

| 03/13/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 121 Notice of Appeal. (tp) (Entered: 03/13/2023) |
| 03/13/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 121 Notice of Appeal, filed by Jill Bloomberg were transmitted to the U.S. Court of Appeals. (tp) (Entered: 03/13/2023) |

| | | | |
|---|---|---|---|
| **PACER Service Center** | | | |
| **Transaction Receipt** | | | |
| 06/06/2023 16:25:16 | | | |
| **PACER Login:** | Todd_Lewis | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cv-03136-PGG |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

A.15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

                    Plaintiff,

          - against -

THE NEW YORK CITY DEPARTMENT
OF EDUCATION and CARMEN FARINA,

                    Defendants.

**MEMORANDUM**
**OPINION & ORDER**

17 Civ. 3136 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiff Jill Bloomberg – a high school principal – brings this action against the

New York City Department of Education (the "DOE") and its chancellor.  Bloomberg claims

that a DOE investigation of her conduct – purportedly premised on her violation of a DOE

regulation governing DOE personnel's activity on behalf of political organizations – was

retaliatory and in violation of her First Amendment rights.  Bloomberg further contends that the

DOE regulation on which the investigation was based does not apply to her alleged conduct and,

in any event, is unconstitutionally vague.  The Amended Complaint asserts claims for retaliation

in violation of the First Amendment, Title VI of the Civil Rights Act of 1964 ("Title VI"), 42

U.S.C. §§ 2000d-1 et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code § 8-101 et seq.  Bloomberg also challenges the DOE regulation on Due Process

grounds.  (Am. Cmplt. (Dkt. No. 39))

          Defendants have moved to dismiss Plaintiff's First Amendment and Title VI

claims, and her Due Process claim.  (Mot. (Dkt. No. 77))  Plaintiff has cross-moved for partial

judgment on the pleadings seeking, inter alia, a declaration as to the DOE regulation's scope.

(Cross-Mot. (Dkt. No. 81); Pltf. Br. (Dkt. No. 82))

A.16

For the reasons stated below, Defendants' motion to dismiss will be granted in its entirety, and Plaintiff's cross-motion will be terminated as withdrawn.

## BACKGROUND

### I. FACTS

Plaintiff Bloomberg is the principal of Park Slope Collegiate ("PSC"), a secondary school in Park Slope, Brooklyn. (Am. Cmplt. (Dkt. No. 39) ¶¶ 1, 4, 21, 28) Plaintiff has served as the principal of PSC since 2004, and has been employed by the DOE since 1998. (Id. ¶¶ 9-10)

PSC is located at a facility known as the "John Jay Campus." The John Jay Campus houses PSC and three other schools: the Secondary School for Journalism ("Journalism"); The John Jay School for Law ("Law"); and Millennium Brooklyn High School ("Millennium"). (Id. ¶ 4; Bloomberg Aff., Ex. 3 (Dkt. No. 10-3)) Millennium joined the John Jay Campus in 2011. (Am. Cmplt. (Dkt. No. 39) ¶¶ 33, 36; Bloomberg Aff., Ex. 3 (Dkt. No. 10-3)) PSC's student body is 85 percent Black or Latino, while Millennium has a "high percentage" of white students, although the majority of the student body is Black or Latino.[1] (Am. Cmplt. (Dkt. No. 39) ¶ 56) Park Slope – where the schools are located – is "an increasingly affluent neighborhood . . . with a majority [w]hite population." (Id. ¶ 30)

"Since the outset of her tenure at PSC," Plaintiff "has encouraged desegregation of the school and opposed measures that reinforce and perpetuate de facto segregation." For example, Bloomberg opposed the addition of Millennium to the John Jay Campus. (Id. ¶ 32; see id. ¶¶ 33-52)

---

[1] Millenium is an offshoot of Millennium High School in Manhattan ("Millennium-Manhattan"). The student body of Millennium-Manhattan is approximately 25 percent Black or Latino. (Am. Cmplt. (Dkt. No. 39) ¶ 56)

2

A.17

**A.**     <u>**Plaintiff's January 10, 2017 Email**</u>

The Campus operates two sports programs.  One program is for students at PSC,

Journalism, Law, and a neighboring school – Brooklyn High School of the Arts ("Arts") – and

the second program is for students at Millennium and Millennium-Manhattan.  (<u>Id.</u> ¶ 56;

Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

According to Plaintiff, "[i]t is part of a principal's . . . regular job duties to request

sports teams of the [Public School Athletic League ("PSAL")].  For years[,] principals and

coaches in the John Jay Program had been making these formal requests but [their] requests were

regularly rejected."  (Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 5)

On January 10, 2017, Plaintiff sent the following email to Eric Goldstein, the

chief executive officer of the DOE sports programs, and Michael Prayor, the District

Superintendent,[2] concerning sports programs at the John Jay Campus:

> Dear CEO Goldstein and Superintendent Prayor,
>
> I am writing to request your assistance in uniting the PSAL sports teams on the
> John Jay Campus in Brooklyn.  Our campus houses [Journalism, Law,
> Millennium, and PSC].  Currently, the John Jay Campus Schools PSAL teams
> include students from [Journalism, Law, PSC and students from [Arts] on Dean
> Street.  [Millennium] students belong to the Millennium High School PSAL teams
> that also include students from [Millennium-Manhattan].  These separate sports
> programs, both of which practice and compete at the John Jay Campus
> ([Millennium-Manhattan] does not have a gym) offer vastly unequal opportunities
> to students.

(Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

The email includes the following chart:

---

[2] Four other DOE employees are copied on the email, including Donald Douglas, the executive
director of the PSAL.  (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3); Bloomberg Supp. Aff. (Dkt. No.
21) ¶ 7)

A.18

| School or Program | Number of PSAL Teams | Enrollment (SY 15-16) | % Black & Hispanic |
|---|---|---|---|
| [Law] | | 357 | 90.4 |
| [Journalism] | | 222 | 87.0 |
| PSC | | 356 (HS only) | 85 |
| [Arts] | | 924 | 90.7 |
| **John Jay Campus PSAL** | **9** | **1859** | |
| [Millennium] | | 620 | 51.5 |
| [Millennium-Manhattan] | | 641 | 25.2 |
| **Millennium High School PSAL** | **17** | **1261** | |

(Id. (emphasis in original))  The email goes on to state:

> Prior to this school year, the John Jay Campus had only four teams.  We were
> recently granted girls' cross-country, and girls' and boys' indoor and outdoor
> track[,] though we requested and were denied girls' and boys' swimming, girls'
> softball, flag football, double-dutch and JV volleyball as well as boys' volleyball
> and soccer.  Meanwhile, the number of [Millennium-Manhattan] teams continues
> to grow.
>
> The Principals of the schools at the John Jay Campus meet weekly to manage our
> shared campus.  From the time that [Millennium] joined our campus community
> in 2011, I have argued that they should be a part of our PSAL team.  Nonetheless,
> they opted to join with [Millennium-Manhattan] (which opened in 2002) and,
> over the years, have been granted 17 teams.  In spite of repeated requests to unite
> the teams and open up the opportunities that exist on the campus, but that are
> denied to students from three of the four schools, [Millennium] maintains its
> exclusive alliance with [Millennium-Manhattan].
>
> The PTA at PSC has also raised these inequities with Executive Director Donald
> Douglas but have heard nothing in response.
>
> The benefits of these separate and unequal programs to the students at
> [Millennium] and [Millennium-Manhattan] do not justify the disadvantages
> imposed on the students from [Arts, Law, Journalism,] and PSC.  Nor do
> whatever logistical difficulties may arise from uniting them.  The students at all
> six schools are equally deserving of opportunities to participate in extracurricular
> sports and it is the responsibility of the DOE and PSAL to facilitate that equity.
>
> I look forward to hearing from you soon.

(Id.)

      According to Plaintiff, her "primary protest" in this email "was the segregation of

the programs based on race."  (Am. Cmplt. (Dkt. No. 39) ¶ 57; see also id. ¶ 56 (the January 10,

A.19

2017 email "accus[ed] the DOE of race discrimination and segregation within the sports

programs in her building"); Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 9 ("The Complaint I made to

PSAL was designed to address what I believe was a violation of the law. . . ."))[3]

According to Plaintiff, she "received no meaningful response" to her January 10,

2017 email.  (Id. ¶ 58)  As a result, PSC's PTA organized a February 13, 2017 "leafleting

action," distributing flyers containing language from the January 10, 2017 email on the sidewalk

outside of the John Jay Campus building "to inform the community about the race discrimination

and segregation that [P]laintiff had complained about."  (Id. ¶ 59)

On March 3, 2017, Donald Douglas – the executive director of the PSAL, who

had been copied on Plaintiff's January 10, 2017 email – met with the principals of the schools

located at the John Jay Campus.  Although he "refused to combine the programs between the

PSC and other John Jay programs with the programs at Millennium," he did "grant[] John Jay an

additional five teams," and asked Plaintiff "if that made [her] happy."  (Bloomberg Supp. Aff.

(Dkt. No. 21) ¶¶ 7, 10)

Plaintiff describes her January 10, 2017 email as a "Title VI Complaint."  (Am.

Cmplt. (Dkt. No. 39) ¶ 59)  Plaintiff further alleges, "[u]pon information and belief," that "all

Title VI complaints made to DOE officials are immediately referred to the Office of Civil Rights

('OCR')."  (Id. ¶ 60)  Accordingly, "[b]ased on DOE policy and upon information and belief,

---

[3]  The Amended Complaint also notes that on November 29, 2016, Plaintiff "sent a letter to
Ramon Garcia, Assistant Commissioner of the School Safety Division, NYPD, and other DOE
officials," in connection with an incident in which the John Jay Campus girls' volleyball team
"had been singled out, humiliated, and treated like criminals by the school safety agents at
another, predominately White school."  (Am. Cmplt. (Dkt. No. 39) ¶¶ 54-55)  In her letter to
Garcia, Plaintiff notes that the principal of the other school "sent a letter of apology . . . [and]
agreed to host . . . a Unity Game"; the commander of the school safety personnel "also offered an
apology to the team."  (Bloomberg Aff., Ex. 2 (Dkt. No. 10-2))

A.20

[P]laintiff's Title VI Complaint . . . was referred to OCR by at least on or about January 15, 2017." (Id. ¶ 61)  Robin Greenfield – DOE's Executive Deputy Counsel for Employment and General Practice – is "directly responsible for responding to OCR complaints on behalf of DOE." (Id. ¶ 60)[4]

**B.    The OSI Investigation**

On May 12, 2016 – eight months before Plaintiff's January 10, 2017 email – the Special Commissioner of Investigation for the New York City School District ("SCI") received an anonymous complaint concerning Plaintiff.  SCI is independent of DOE, and its "sole function" "is to investigate allegations of corruption, conflicts of interest, unethical conduct[,] and other misconduct in the DOE." (Guerra Decl. (Dkt. No. 13) ¶¶ 6, 11; see also Am. Cmplt. (Dkt. No. 39) ¶¶ 69, 87)  The anonymous complaint alleged that Plaintiff "was a member of a political organization known as the [Progressive] Labor Party ('PLP') and was actively recruiting students into the organization and inviting them to participate in organizational activities including marches for her political organization." (Guerra Decl. (Dkt. No. 13) ¶ 11)

SCI is authorized by law to refer certain complaints to the Office of Special Investigations ("OSI"), an internal DOE investigatory unit overseen by DOE's Office of General Counsel.  (Id. ¶¶ 5-6; Am. Cmplt. (Dkt. No. 39) ¶ 60; see also New York City Mayoral Executive Order 11, § 3)[5]  SCI referred the anonymous complaint to OSI on May 13, 2016. (Guerra Decl. (Dkt. No. 13) ¶ 12)  OSI concluded that there was insufficient information to pursue the complaint, and – given that the identity of the complainant was unknown – on May 17, 2016, OSI "marked the complaint as closed pending additional information." (Id. ¶ 13)

---

[4]  Greenfield's position is within DOE's Office of General Counsel.  (Id. ¶ 60)
[5]  Mayoral Executive Order 11 is available at
https://www.nycourts.gov/library/queens/PDF_files/Orders/ord11.pdf.

A.21

On December 20, 2016, the anonymous complainant provided additional information to SCI, reporting, <u>inter alia</u>, that Plaintiff's husband was the president of the Len Ragozin Foundation (the "Foundation"), an organization associated with the Progressive Labor Party; that Plaintiff's husband included images of students and staff in a documentary he filmed for the Foundation, without the students' and staff's authorization; and that this documentary had been screened at PSC, with a $20 admission fee.[6] (Guerra Decl. (Dkt. No. 13) ¶¶ 14-15)[7] SCI referred the new report to OSI on January 25, 2017, about two weeks after Plaintiff had sent her January 10, 2017 email about sports programs at the John Jay Campus. (<u>Id.</u> ¶ 17)

Equipped with this new information, OSI re-opened its investigation of the complaint concerning Plaintiff, and assigned the investigation to Confidential Investigator Michelle Archie. (<u>Id.</u> ¶¶ 18, 21) As a result of the additional information provided on December 20, 2016, OSI was also able to identify and interview the complainant. (<u>Id.</u> ¶ 19)

Plaintiff asserts that, "[b]ecause Robin Greenfield would have received the information about [P]laintiff's January 10, 2017 Title VI Complaint on at least January 15, 2017, as she is the person responsible for receiving . . . all Title VI complaints[], and she also received

---

[6] On May 4, 2016, about a week before SCI received the May 12, 2016 anonymous complaint, the Foundation applied for an "extended use" permit for a June 3, 2016, 6:00 p.m. "film screening and panel discussion" at the PSC auditorium. The application requested permission to sell goods and solicit donations. The application does not provide a description of the Foundation. The application form states, however, that "[s]chool buildings cannot be used for . . . [p]olitical events, activities or meetings[,] including those conducted on behalf of an elected official, candidate, slate of candidates or political organizations. . . ." (Extended Use Permit App. (Dkt. No. 21-4)) The application was approved. (Permit Confirmation (Dkt. No. 21-3))

[7] The anonymous complainant also alleged that, under Plaintiff's watch, a bake sale was held at PSC to raise money for a May Day march; that PSC was failing to teach a required course; and that "students who voice opinions different from those of [P]laintiff are not allowed to express them." (Guerra Decl. (Dkt. No. 13) ¶ 16) Plaintiff denies all of these allegations. (Am. Cmplt. (Dkt. No. 39) ¶¶ 86-87)

A.22

the information regarding the complaints from OSI, she had specific knowledge of both the Title VI Complaint and the OSI complaints prior to the time the investigation was officially commenced." (Am. Cmplt. (Dkt. No. 39) ¶ 78)

On March 2, 2017, Archie informed Plaintiff that she was under investigation, but stated "that the allegations against her and the subject of the investigation could not be disclosed to her." (Id. ¶¶ 24, 63) That same day, however, Archie informed PSC's assistant principal, Carla Laban, "that the investigation . . . related to 'communist activities taking place at the school.'" (Id. ¶ 64) Archie showed Laban "a list of names" – including, among others, Plaintiff, her family members, current and former PSC teachers, and former students – and asked Laban to identify those she had seen "engag[e] in communist activities." (Id. ¶¶ 64-65) Laban disclosed the substance of her conversation with Archie at a PSC PTA meeting on March 16, 2017. (Id. ¶ 67)

On March 22, 2017, Plaintiff's counsel (and Caban) sent a letter to DOE's General Counsel asserting that Plaintiff "[was] . . . under investigation by the OSI" "[a]s a result of and in retaliation for her advocacy against segregation." (Bloomberg Aff., Ex. 5 (Dkt. No. 10-5) at 2; see also Am. Cmplt. (Dkt. No. 39) ¶ 68) Noting Plaintiff's January 10, 2017 email about sports programs at the John Jay Campus, and the February 13, 2017 "leafleting action," Plaintiff's letter asserted that there was "no question that it is illegal for an investigation to be instituted in direct retaliation for [Plaintiff's] recent actions protesting race discrimination." Plaintiff "demand[ed] that the OSI immediately close its retaliatory investigation," and threatened to file suit if DOE did not respond by March 27, 2017. (Bloomberg Aff., Ex. 5 (Dkt. No. 10-5) at 3-4)

A.23

On March 27, 2017, Robin Greenfield responded to Plaintiff's letter.  (Bloomberg Aff., Ex. 6 (Dkt. No. 10-6))  Greenfield informed Plaintiff that "[t]he substance of the complaint that OSI is investigating is unrelated to [Plaintiff's] complaint."  Greenfield noted that "the complaint being investigated initially was filed in May 2016, long before [Plaintiff] lodged a complaint about the sports teams on the John Jay Campus."  Greenfield also stated that "OSI has no knowledge of any complaint lodged by [Plaintiff] with the [PSAL] concerning racial segregation in the sports teams."  (Id.)  Finally, Greenfield stated that it was "entirely proper for the OSI investigator to ask questions about communist activities at [Plaintiff's] school and about whether staff is engaging students in an inappropriate manner," because "it would not be appropriate for school staff to solicit students to participate in any political events or to encourage them to support a particular political group or party."  (Id.)

In a March 28, 2017 letter to Greenfield, Plaintiff's counsel stated that Greenfield's response "in fact makes us believe that retaliation is indeed the motive for this investigation," as "[t]here could be no other reason for the OSI to sit on a complaint . . . for almost one year, only to commence the investigation within two weeks" of Plaintiff's January 10, 2017 email.  (Bloomberg Aff., Ex. 7 (Dkt. No. 10-7); Am. Cmplt. (Dkt. No. 39) ¶ 70)  Counsel "insist[ed] that [DOE] share . . . the exact nature of the allegations, including which specific activity violated which specific regulation."  (Bloomberg Aff., Ex. 7 (Dkt. No. 10-7))

In an April 6, 2017 letter, Greenfield addressed Plaintiff's demand for specifics concerning the complaint OSI was investigating:

> The complaint being investigated is that [Plaintiff] and two teachers at the Park Slope Collegiate School are members of a communist organization known as the Progressive Labor Party, that they are actively recruiting students into the organization during school hours, and that they invite students to participate in the organization's activities, including marches for communism.  If substantiated, this could constitute a violation of Chancellor's Regulation D-130, which provides, in

9

A.24

part, that staff may not be involved in any activities on behalf of a political organization during working hours.

(Bloomberg Aff., Ex. 8 (Dkt. No. 10-8); Am. Cmplt. (Dkt. No. 39) ¶ 72)

Greenfield's letter also explains that "[t]he complaint was initially filed with [SCI] in May of 2016 [and] . . . referred . . . to OSI. The complainant supplied further information in December 2016, and thereafter, OSI began its investigation. (Bloomberg Aff., Ex. 8 (Dkt. No. 10-8))

**C.  Chancellor's Regulation D-130**

Regulation D-130 (the "Regulation") "governs the use of school buildings by candidates, elected officials, and political organizations and the conduct of school employees and officers with respect to political campaigns and elections." (Regulation D-130 (Abstract) (Dkt. No. 79-3)) The Regulation's introduction provides:

> School buildings are not public forums for purposes of community or political expression. The following sets forth the rules which govern: (1) the use of, or access to, Department of Education school buildings by elected officials, candidates for elective office, or organizations working on behalf of such officials or candidates, both during school and non-school hours; (2) use of school facilities, equipment and supplies for political purposes by school employees, personnel, or staff members and officials; and (3) conduct of school employees, personnel, or staff members and officials with respect to political campaigns and elections.

(Id. (Introduction) (footnote omitted)).

Section I.B of the Regulation addresses the use of school facilities, equipment, and supplies, and provides that – generally – these resources "may not be used on behalf of any candidate, candidates, slate of candidates, or political organization/committee." (Id. at § I(B)) In particular,

1. The use of any Department of Education school during school/business hours by any person, group, organization, committee, etc., on behalf of, or for the benefit of any elected official, candidate, candidates, slate of candidates or political organization/committee is prohibited.

10

A.25

2. No rallies, forums, programs, etc., on behalf of, or for the benefit of any elected official, particular candidate, candidates, slate of candidates or political organization/committee may be held in a school building.

3. No material supporting any candidate, candidates, slate of candidates or political organization/committee may be distributed, posted, or displayed in any school building . . . .

. . . .

8. No Department of Education . . . equipment may be used to produce, reproduce, record, or disseminate information on behalf of any candidate, candidates, slate of candidates or political organization/committee.

(Id.)

Section I.C addresses the conduct of school personnel.  It provides:

1. While on duty or in contact with students, all school personnel shall maintain a posture of complete neutrality with respect to all candidates.  Accordingly, while on duty or in contact with students, school personnel may not wear buttons, pins, articles of clothing, or any other items advocating a candidate, candidates, slate of candidates or political organization/committee.

2. Personnel may not be involved in any activities, including fundraising, on behalf of any candidate, candidates, slate of candidates or political organization/committee during working hours.

3. Any campaigning by any personnel on Department of Education time is strictly prohibited. . . .

4. This regulation does not preclude school personnel from discussing or distributing information about election issues in connection with legitimate instructional programs and activities.

(Id. at § I(C))

Section II of Regulation D-130 addresses use of school buildings during non-

school hours.  Subsection A provides that "[t]he use of any Department of Education school after

school/business hours by any person, group, organization, committee, etc., on behalf of, or for

the benefit of any elected official, candidate, candidates, slate of candidates or political

organization/committee is prohibited," although there is an exception for "candidate forums."

(Id. § II(A))

11

A.26

Plaintiff contends that the supplemental allegations "regarding the May 2016 SCI complaint are false[] on their face," but that "even if they were true[,] there would be no violation of [Regulation] D-130." (Am. Cmplt. (Dkt. No. 39) ¶¶ 87-88)

## II.    **PROCEDURAL HISTORY**

The Complaint was filed on April 28, 2017, and asserts claims for retaliation under the First Amendment, Title VI, and the NYCHRL. (Cmplt. (Dkt. No. 1)) On April 29, 2017, Plaintiff moved for a temporary restraining order and preliminary injunction enjoining the DOE's investigation of her pending the outcome of this case. (Mot. (Dkt. No. 3))

On May 1 and May 3, 2017, this Court conducted a hearing on Plaintiff's application for injunctive relief. On May 3, 2017, the Court denied the application, finding that Plaintiff had not shown a likelihood of success or irreparable injury with respect to her retaliation claims under the First Amendment, Title VI, and the NYCHRL. (See May 1, 2017 Hearing Tr. (Dkt. No. 33); May 3, 2017 Hearing Tr. (Dkt. No. 36) at 37; see also Order (Dkt. No. 31))

On May 23, 2017, Plaintiff filed the Amended Complaint. (Am. Cmplt. (Dkt. No. 39)) The Amended Complaint includes the causes of action originally pled, but also asserts that OSI's investigation violates Plaintiff's Due Process rights, because Regulation D-130 does not address Plaintiff's alleged conduct, and because the Regulation is unconstitutionally vague. (Id.)

Defendants have moved to dismiss Plaintiff's First Amendment and Title VI retaliation claims, as well as her Due Process claim. (Def. Mot. (Dkt. No. 77)) Plaintiff has cross-moved for partial judgment on the pleadings, with respect to "the applicable scope" of Regulation D-130. (Pltf. Mot. (Dkt. No. 81)) Since filing her cross-motion, however, Plaintiff has acknowledged that her motion is procedurally improper, because the pleadings in this case have not yet closed. Accordingly, Plaintiff "[does] not oppose the Court finding Plaintiff's 12(c) motion premature." (See Pltf. Reply Br. (Dkt. No. 86) at 4; see also Fed. R. Civ. P. 12(c) ("After

12

A.27

the pleadings are closed – but early enough not to delay trial – a party may move for judgment

on the pleadings." (emphasis added))  Accordingly, the Court deems Plaintiff's cross-motion for

judgment on the pleadings withdrawn.

## DISCUSSION

**I.**  **LEGAL STANDARDS**

"To survive a motion to dismiss [pursuant to Fed. R. Civ. P. 12(b)(6)], a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).  "In considering a motion to dismiss . . . , the court is to

accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d

229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282

F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."

Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,

507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

"When determining the sufficiency of plaintiff['s] claim for Rule 12(b)(6)

purposes, consideration is limited to the factual allegations in plaintiff['s] amended complaint, . .

. to documents attached to the complaint as an exhibit or incorporated in it by reference, to

matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession

or of which plaintiff[] had knowledge and relied on in bringing suit." Brass v. Am. Film Tech.,

Inc., 987 F.2d 142, 150 (2d Cir. 1993).

A.28

"To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents." Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003) "[L]imited quotation" of a document, Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985), or a mere passing reference to a document, does not incorporate the document into the complaint. See, e.g., Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004); Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989).

"Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). For a document to be integral to a complaint, "the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon th[e] document[ ] in framing the complaint.'" DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted)); see also Williams v. City of New York, No. 14 Civ. 5123 (NRB), 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015) ("A document is not 'integral' simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint." (emphasis in original)).

## II.   **ANALYSIS**

### A.   **First Amendment Retaliation Claim**

The Amended Complaint alleges that, as a result of "the letter of complaint [Plaintiff] wrote on January 10, 2017," Plaintiff "is now subjected to an investigation in which she is . . . labeled as a communist." "By engaging in this investigation . . . defendant[s] ha[ve] violated plaintiff's rights to freedom of expression under the First Amendment." (Am. Cmplt.

14

A.29

(Dkt. No. 39) ¶¶ 137, 141-42)  Defendants seek dismissal of this claim on the ground that, "as a

matter of law, . . . [Plaintiff] cannot demonstrate that any speech alleged in the complaint was

made as a citizen, not as an employee."  (Def. Br. (Dkt. No. 78) at 5)

   A public employee asserting a First Amendment retaliation claim "must establish

that: '(1) h[er] speech or conduct was protected by the First Amendment; (2) the defendant took

an adverse action against h[er]; and (3) there was a causal connection between this adverse

action and the protected speech.'"  Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir.

2015) (quoting Cox v. Warwick Valley Cent. School Dist., 654 F.3d 267, 272 (2d Cir. 2011)).

"The inquiry into the protected status of speech is one of law, not fact."  Connick v. Myers, 461

U.S. 138, 148 n.7 (1983).

   Analyzing whether speech is protected by the First Amendment "encompasses

two separate subquestions:  '(1) whether the subject of the employee's speech was a matter of

public concern and (2) whether the employee spoke "as a citizen" rather than solely as an

employee.'"  Matthews, 779 F.3d at 172 (quoting Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir.

2011)).  "If the answer to either question is no, that is the end of the matter."  Id.  "'[B]efore

asking whether the subject matter of particular speech is a topic of public concern, [a] court must

decide whether the plaintiff was speaking 'as a citizen'. . . .'"  Agyeman v. Roosevelt Union Free

Sch. Dist., 254 F. Supp. 3d 524, 534 (E.D.N.Y. 2017) (quoting Mills v. City of Evansville, 452

F.3d 646, 647 (7th Cir. 2006), and citing Benvenisti v. City of N.Y., No. 04-CV-3166 (JGK),

2006 WL 2777274, at *7 (S.D.N.Y. Sept. 23, 2006) ("First, the Court must determine whether

the plaintiff was speaking as a 'citizen' for First Amendment purposes.  After that, the Court . . .

ask[s] whether  . . . the plaintiff's speech was made . . . upon 'matters of public concern.'"

(citations omitted))

15

A.30

In determining whether a plaintiff was speaking as an employee or as a citizen, courts consider whether (1) the speech "fall[s] outside of the employee's 'official responsibilities,'" and (2) whether a "civilian analogue" for the speech exists. <u>Matthews</u>, 779 F.3d at 173. A plaintiff speaks pursuant to her official job duties when the speech at issue "owe[s] its existence to" those job duties," <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 421-22, 423 (2006), or when the speech is "'part-and-parcel of [the employee's] concerns' about [her] ability to 'properly execute [her] duties.'" <u>Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.</u>, 593 F.3d 196, 203 (2d Cir. 2010) (citation omitted). "[S]peech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description or in response to a request by the employer." <u>Id.</u> Here, "the key question in determining whether [Plaintiff] spoke as an employee or as a citizen is whether h[er] speech was 'undertaken in the course of performing . . . h[er] primary employment responsibility' and was aired 'in furtherance of the execution of one of [her] core duties as [principal].'" <u>Morey v. Somers Cent. Sch. Dist.</u>, No. 06 CIV.1877 (PGG), 2010 WL 1047622, at *6 (S.D.N.Y. Mar. 19, 2010) (quoting <u>Weintraub</u>, 535 F.3d at 203 (internal quotation marks and citation omitted)), <u>aff'd</u>, 410 F. App'x 398 (2d Cir. 2011).

The Amended Complaint asserts that the January 10, 2017 email "was not something plaintiff was 'employed to do,' nor . . . 'part and parcel' of her regular job." (Am. Cmplt. (Dkt. No. 39) ¶ 137) This conclusory assertion is belied by Plaintiff's own statements, however, and by the email itself.

In an affidavit that is discussed in the Amended Complaint (<u>see</u>, <u>e.g.</u>, Am. Cmplt. (Dkt. No. 39) ¶ 86), Plaintiff asserts that "[i]t is part of a principal's . . . regular job duties to request sports teams of the PSAL." Indeed, "[f]or years[,] principals and coaches in the John Jay

16

A.31

program had been making these formal requests." (Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 5)  In

Plaintiff's January 10, 2017 email – which she sent by internal email to six DOE employees –

Plaintiff did just that: she "request[ed] [the] assistance" of Goldstein – who is in charge of

DOE's sports programs – and Superintendent Prayor "in uniting the PSAL sports teams on the

John Jay Campus." (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

       Plaintiff reminded Goldstein, Prayor, and the other DOE employees that "[p]rior

to [the 2016-17] school year, the John Jay campus had only four teams," while the sports

program for the Millennium schools "ha[d] been granted 17 teams."  As such, the two programs

"offer vastly unequal opportunities to students."  Plaintiff also submitted a chart reflecting the

percentage of Black or Latino students at each of the schools in the two sports programs.

Plaintiff told her DOE colleagues that "[t]he students at all [the] schools are equally deserving of

opportunities to participate in extracurricular sports and it is the responsibility of the DOE and

PSAL to facilitate that equity."  (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3))

      As this Court stated in ruling on Plaintiff's application for a temporary restraining

order and preliminary injunction, Plaintiff's January 10, 2017 email to her DOE colleagues was

"a plea for resources and a plea for fairness as to the availability of extracurricular sports teams"

for Plaintiff's students.  (May 3, 2017 Hearing Tr. (Dkt. No. 36) at 18)[8]  Such a request is

---

[8]  Plaintiff maintains that while her job duties include "request[ing] sports teams of the PSAL,"
they "do not include formulating, implementing or providing feedback on PSAL policy."
(Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 6)  Plaintiff's January 10, 2017 email does not
"formulat[e]" or "implement[]" PSAL policy, however.  While one could read Plaintiff's
complaints about the sports program as "providing feedback," her email is, in essence, a focused
plea for resources, rather than a "policy oriented complaint," as she now asserts.  (Id. ¶ 8, Am.
Cmplt. (Dkt. No. 39) ¶ 137)  As is common whenever someone requests more resources –
whether at DOE or in the private sector – Plaintiff supports her plea for more resources by
contrasting what her students have received to the resources provided to other schools.  But
Plaintiff's request for more resources cannot be fairly read as a "policy oriented complaint."
And even if her request could be construed in that fashion, any "policy oriented complaint" "was

A.32

"'undertaken in the course of performing . . . [Plaintiff's] primary employment responsibility,'" and is "'in furtherance of the execution of one of [Plaintiff's core duties as [principal].'" Morey, 2010 WL 1047622, at *6 (quoting Weintraub, 535 F.3d at 203). See Ehrlich v. Dep't of Educ. of City of New York, No. 11 CIV. 4114 RMB KNF, 2012 WL 424991, at *3 (S.D.N.Y. Feb. 6, 2012) ("[C]ourts have routinely held as a matter of law that a teacher's advocacy on behalf of her students falls squarely within her official duties as a teacher."); Verdi v. City of New York, 306 F. Supp. 3d 532, 548 (S.D.N.Y. 2018) ("Plaintiff's objections to the alleged [racially] discriminatory practices at P.S. 24 were lodged by him as part of his duties as a public employee to protect his students' and his putative students' rights. . . . Plaintiff's speech constituted advocacy on behalf of his students and putative students and was part-and-parcel of his duties as Assistant Principal at P.S. 24. Accordingly, his speech is not protected for the purposes of his [First Amendment] retaliation claim. . . ."); see also Agyeman, 254 F. Supp. 3d at 535 ("[T]he record and the case law demonstrate that plaintiff indisputably spoke as a public employee in her internal e-mails complaining about student discipline, the conduct of other teachers and District personnel, and the lack of resources and support. . . .")[9]

---

'undertaken in the course of performing . . . [Plaintiff's] primary employment responsibility' and was aired 'in furtherance of the execution of one of [her] core duties.'" Morey, 2010 WL 1047622, at *6 (quoting Weintraub, 535 F.3d at 203).

[9] Plaintiff also contends that her e-mail "accus[es] the DOE of race discrimination and segregation within the sports programs in her building," and that her "primary protest" in the email "was the segregation of the programs based on race." (Am. Cmplt. (Dkt. No. 39) ¶¶ 56, 57) In her brief opposing Defendants' motion to dismiss, Plaintiff likewise argues that "[s]he was seeking in th[e January 10, 2017] e-mail to raise a racially discriminatory condition prevailing in the John Jay Campus building regarding the racial segregation and racially discriminatory allocation of sports teams. . . . The fact that principals have to make an application to PSAL in order to get sports teams in general does not convert plaintiff's complaint about racial segregation and the racially disparate assignment of teams into one of her ordinary duties." (Pltf. Opp. Br. (Dkt. No. 80) at 19)

The cases Plaintiff cites (Pltf. Opp. Br. (Dkt. No. 80) at 19-23) are not to the contrary.  In Matthews v. City of New York, 779 F.3d 167 (2d Cir. 2015), the Second Circuit held that a police officer – in complaining to a supervisor about a precinct-wide quota system, which he argued was "causing unjustified stops" and harming the precinct's relationship with the community – had engaged in speech in his capacity as a private citizen and not as a police officer.  Matthews, 779 F.3d at 173-75.  The Matthews court found that the police officer's "speech to the Precinct's leadership . . . was not what he was 'employed to do,' . . . nor was it 'part-and-parcel' of his regular job. . . . [The officer's] policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work."  Id. at 174.

---

Whatever Plaintiff's intentions or motivations may have been in composing her email, Plaintiff's alleged "primary" concern about racial discrimination and segregation is not made manifest in the email.  Indeed, there is no reference to discrimination or segregation – or to comparable terms – in her email.  While Plaintiff includes a chart listing the percentage of Black or Hispanic students at each school in the two sports programs, the email does not address these statistics in any fashion.  Instead, the crux of the email is that (1) students at PSC and the other schools in its sports program deserve an opportunity to participate in extracurricular sports; (2) they are not being given this opportunity; and (3) the failure to offer them this opportunity is inequitable, because other students – including students at another school in the same building – have these opportunities.  While pointing out the "inequities," however, Plaintiff does not assert that they are the product of racial discrimination or a desire to segregate sports teams.

It also appears that the DOE recipients of Plaintiff's email understood her to be requesting that PSAL make more sports teams available to PSC and the other schools that are part of its sports program.  According to Plaintiff, Donald Douglas – a recipient of the email and the executive director of the PSAL – "granted John Jay an additional five teams," and asked Plaintiff "if that made [her] happy."  (Bloomberg Supp. Aff. (Dkt. No. 21) ¶¶ 7, 10)

Finally, even if Plaintiff had alleged racial discrimination and segregation more pointedly in her email, such allegations would not change the fact that she spoke as a public employee.  See Verdi, 306 F. Supp. 3d at 548 (where assistant principal "publicly complained that efforts have been and are being made to keep poor and minority children . . . out of [his school]," including by "wr[iting] to the Schools Chancellor . . .and DOE's Special Commissioner of Investigation regarding his concerns about the kindergarten enrollment process," he spoke as a public employee, rather than as a citizen).

19

A.34

Here, by contrast, Plaintiff concedes that "[i]t is part of a principal's . . . regular job duties to request sports teams of the PSAL" (Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 5), and – as discussed above – Plaintiff's January 10, 2017 email was thus part of her "regular job duties."

The other cases Plaintiff cites likewise do not demonstrate that Plaintiff spoke as a citizen rather than as PSC's principal. (See Pltf. Opp. Br. (Dkt. No. 80) at 21-23)[10]

---

[10] In Dillon v. Suffolk Cty. Dep't of Health Servs., 917 F. Supp. 2d 196 (E.D.N.Y. 2013), the court concluded that the plaintiff physician – in voicing concerns that Suffolk County's Health Department was deliberately indifferent to the medical needs of prisoners, to abuse of prisoners, and to alteration of medical records at a correctional facility – was not speaking pursuant to her job duties. In so ruling, the court emphasized that "unlike the complaint in Weintraub [, 593 F.3d at 203,] which referred to incidents in the teacher's own classroom, the Plaintiff's complaints referred to systemic mistreatment and corruption extending outside of her own personal duties and affecting inmates with whom she had no personal or job connection. The Court finds that this speech was . . . that of a concerned citizen seeking to bring certain wrongdoing to light." Dillon, 917 F. Supp. 2d at 210. Here, as in Weintraub – but unlike in Dillon – Plaintiff's January 10, 2017 email "refer[s] to [the sports programs] in [Plaintiff's] own [school]," and not to "systemic" failings "extending outside of [Plaintiff's] own personal duties and affecting [students] with whom she had no . . . job connection." See id.

Similarly, in Ramirez v. Hempstead Union Free Sch. Dist. Bd. of Educ., 33 F. Supp. 3d 158 (E.D.N.Y. 2014), the court concluded that the director of technology and chief information officer for a school district did not act pursuant to his job duties when he wrote letters accusing defendants of improperly inflating student grades to procure funding from local governments. The court emphasized that plaintiff's job was only to "maintain and upgrade the Board of Education's technological capabilities," and accordingly his job responsibilities were far removed from the conduct about which he complained. Ramirez, 33 F. Supp. 3d at 172-73. Here, as Plaintiff concedes, Plaintiff's email falls within the duties of a school principal.

Likewise in Griffin v. City of New York, 880 F. Supp. 2d 384 (E.D.N.Y. 2012), where a former New York City Police Department detective alleged retaliation after he reported a colleague's misconduct, the court concluded the plaintiff spoke as citizen, because plaintiff's job duties did not involve reporting such misconduct. Griffin, 880 F. Supp. 2d at 394-99.

Finally, in Smith v. County of Suffolk, 776 F.3d 114 (2d Cir. 2015), the Second Circuit did not analyze whether plaintiff spoke as a citizen. Smith, 776 F.3d at 125 ("[B]ecause defendants do not [raise the issue] on appeal, we do not revisit the district court's conclusions that Smith's media communications enjoyed First Amendment protection as citizen speech. . . .").

A.35

The Court concludes that Plaintiff's January 10, 2017 email to her DOE colleagues falls squarely within the scope of her duties as PSC principal.

Plaintiff argues, however, that her email falls within what she refers to as "the Givhan carve[-]out" to First Amendment retaliation doctrine. (Pltf. Opp. Br. (Dkt. No. 80) at 14-19)  According to Plaintiff, since the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410 (2006), courts have "reinforced what might be called the Givhan 'carve[-]out in Garcetti protecting employees who were retaliated against after raising issues of public concern . . . and in particular issues of race discrimination, which is quintessentially a matter of public concern." (Pltf. Opp. Br. (Dkt. No. 80) at 15)

Garcetti never mentions race discrimination, however.  And while the Supreme Court's 1979 decision in Givhan v. Western Line Consol. School Dist., 439 U.S. 410 (1979) -- in which the Supreme Court ruled in favor of a schoolteacher fired for criticizing school practices allegedly impeding integration efforts – concerns speech about race discrimination, Garcetti cites Givhan only for the proposition that "[e]mployees in some cases may receive First Amendment protection for expressions made at work," provided those expressions are not made pursuant to the employees' job duties.  Garcetti, 547 U.S. at 421.  To the extent that Plaintiff contends that Garcetti's cite to Givhan indicates "that when a public employee raises concerns of racial discrimination, the employee [invariably] does so as a citizen" (Pltf. Opp. Br. (Dkt. No. 80) at 18), nothing in Garcetti or its progeny supports that claim.  Indeed, the two cases Plaintiff cites for this proposition – Lane v. Franks, 573 U.S. 228 (2014), and Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011) – do not involve complaints about race discrimination, and do not suggest that any "carve-out" or exception applies when a public employee's speech involves allegations of race discrimination.

21

A.36

The Court concludes that the Amended Complaint does not state a claim for First Amendment retaliation, because Plaintiff's email was sent pursuant to her duties as the principal of PSC, rather than as a citizen. Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim will be granted.[11]

## B.   **TITLE VI CLAIM**

"Title VI prohibits intentional discrimination based on race in any program that receives federal funding." Verdi, 306 F. Supp. 3d at 542 (internal quotation marks and citation omitted). "Title VI does not contain an explicit anti-retaliation provision, but courts have

---

[11] In her opposition brief, Plaintiff contends – for the first time – that the Amended Complaint "alleges that retaliatory actions which occurred after she filed th[is] case violated her First Amendment Right to Petition," and that the Amended Complaint states a claim pursuant to the Petition Clause of the Constitution, which extends First Amendment protection not only to "freedom of speech," but to "the right of the people . . . to petition the Government for a redress of grievances." (Pltf. Opp. Br. (Dkt. No. 80) at 11-13; U.S. Const. amend. I)

The Amended Complaint does not state a Petition Clause claim, however. Indeed, the word "petition" does not appear in the Amended Complaint. In any event, the Supreme Court has stated that while "[c]ourts should not presume there is always an essential equivalence between [the Petition Clause] and [the Speech Clause] or that Speech Clause precedents necessarily and in every case resolve Petition Clause claims[,] . . . claims of retaliation by public employees do not call for this divergence. . . . The considerations that shape the application of the Speech Clause to public employees apply with equal force to claims by those employees under the Petition Clause." Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 388, 389 (2011). District courts in this Circuit have construed Guarnieri as indicating that a Petition Clause claim – like a First Amendment retaliation claim – will fail where a public employee's "petition" was pursuant to her job duties. See Ross v. New York City Dep't of Educ., 935 F. Supp. 2d 508, 526 (E.D.N.Y. 2013) ("[A] public employee asserting a claim under the Petition Clause must prove that his petitioning activity was made as a citizen and not pursuant to his official duties."); Lenox v. Town of N. Branford, No. 3:08CV01448 DJS, 2012 WL 6102470, at *10 (D. Conn. Dec. 7, 2012) ("This Court will analyze the Plaintiff's alleged protected petition under the same test it would use to analyze allegedly protected speech."), order vacated in part on reconsideration on other grounds, No. 3:08CV01448 DJS, 2013 WL 2155523 (D. Conn. May 16, 2013).

In sum, even if the Amended Complaint asserted a claim pursuant to the Petition Clause, that claim would fail along with Plaintiff's First Amendment retaliation claim.

22

generally construed the statute as creating an implied private right of action for retaliation."
Palmer v. Penfield Cent. Sch. Dist., 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013) (collecting cases).

To plead a claim for retaliation under Title VI, a plaintiff must "plausibly allege: '(1) participation in a protected activity known to the defendants; (2) adverse action by the defendants against the plaintiff; and (3) a causal connection between the plaintiff's protect[ed] activity and defendants' adverse action.'" Diaz v. City Univ. of New York, No. 15 Civ. 1319 (PAC) (MHD), 2016 WL 958684, at *2 (S.D.N.Y. Mar. 8, 2016).

In support of their motion to dismiss Plaintiff's Title VI claim, Defendants argue that the Amended Complaint does not plead sufficient facts about the federal funding DOE receives. (Def. Br. (Dkt. No. 78) at 22-23) According to Defendants, Plaintiff is required to plausibly allege "that the defendant received federal funding, identify the primary objective of the federal funding, and [demonstrate] that the alleged discrimination or retaliation was related to the primary objective of the program or subject benefiting from federal funding," and has not done so. (Id.)

Plaintiff responds that "[t]he cases cited by defendants relate to cases of employment discrimination," and that while these cases "add a requirement that a plaintiff must plead that federal funds are used for employment," Plaintiff "has not claimed employment discrimination." (Pltf. Opp. Br. (Dkt. No. 80) at 10) Plaintiff further asserts that "[i]t is uncontested that the DOE receives federal money for student programs from the Federal Department of Education." (Id.)

Title VI provides that "[n]othing contained in [it] shall be construed to authorize action under [Title VI] . . . with respect to any employment practice of any employer . . . except

23

A.38

where a primary objective of the Federal financial assistance is to provide employment." 42

U.S.C. § 2000d-3. "[T]his section essentially 'requires a logical nexus between the use of

federal funds and the practice toward which [the] action is directed.'" Johnson v. Cty. of Nassau,

411 F. Supp. 2d 171, 175 (E.D.N.Y. 2006) (quoting Ass'n Against Discrimination in

Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 276 (2d Cir. 1981)).  In the Title VI

employment discrimination context, courts have construed Section 2000d-3 as imposing "a

threshold requirement . . . that the employer be the recipient of federal funds aimed primarily at

providing employment." Ass'n Against Discrimination in Employment, Inc., 647 F.2d at 276;

see also Sulehria v. New York, No. 13-CV-6990 AJN, 2014 WL 4716084, at *5 (S.D.N.Y. Sept.

19, 2014) ("To state a claim under Title VI, a plaintiff must plausibly allege . . . that the

defendant was an entity receiving federal funding . . . [and] that the federal funds have been

made available primarily for providing employment.").

     Few cases have addressed this pleading requirement where plaintiff alleges that

her employer retaliated against her after she raised concerns about race discrimination affecting

others, including non-employees.  "It is unsettled . . . whether retaliation claims affecting

employment – in which an individual who voices concerns about discrimination against others is

retaliated against with respect to his or her employment – should be treated the same as straight

retaliation for employment discrimination claims. . . ." Verdi, 306 F. Supp. 3d at 544-45

(emphasis in original).

     Verdi v. City of New York presents the most thorough analysis of this question to

date.  In Verdi, plaintiff – an assistant principal employed by DOE – alleged that he was

retaliated against for opposing discriminatory admissions practices at his school.  The court

concluded that the "'primary objective of providing employment' requirement does not apply

24

A.39

when analyzing an employment-based retaliation claim where the victims of the discrimination about which the claimant complained (and for which complaining the claimant suffered retaliation) are the intended beneficiaries of the federal funding." Id. at 545-46.  The court reasoned that "[r]ecognizing a retaliation claim based on harms to a claimant's employment where the complained-of discrimination was against the intended beneficiaries of the relevant federal funding would vindicate rather than undermine the intent and spirit of § 2000d-3." Id. at 545.

The reasoning in Verdi is persuasive, but that reasoning does not obviate the need for Plaintiff to plead a "logical nexus between the use of federal funds and the practice to which [the] action is directed." Johnson, 411 F. Supp. 2d at 175 (internal quotation marks and citation omitted).  Accordingly, Plaintiff must plead a nexus between the use of federal funds and the alleged discriminatory practice about which Plaintiff allegedly complained, and for which complaints she allegedly suffered retaliation:  discrimination in the PSAL's sports programs.

The Amended Complaint alleges only that "[a]t all times relevant the DOE was and is a recipient of federal funding for purposes of Title VI," and that "[t]he New York City DOE receives Federal Financial Assistance." (Am. Cmplt. (Dkt. No. 37) ¶¶ 23, 125)  These allegations do not sufficiently plead the requisite "logical nexus." See Verdi, 306 F. Supp. 3d at 546 (dismissing Verdi's Title VI claim because his "allegations regarding federal funding are bare and conclusory and do not describe the federal funding the DOE received, let alone link that funding to the students whose discrimination was the subject of Plaintiff's complaints").

Accordingly, Defendants' motion to dismiss Plaintiff's Title VI claim will be granted.

A.40

**C.    <u>DUE PROCESS CLAIM</u>**

The Amended Complaint asserts that Regulation D-130 applies "exclusively to partisan electoral politics" (Am. Cmplt. (Dkt. No. 39) ¶ 115), and does not reach the conduct upon which the OSI investigation purportedly was predicated. (<u>Id.</u> ¶¶ 112-14) Plaintiff further contends that "[t]he DOE's application of [Regulation] D-130 does not give notice to a reasonable person in [P]laintiff's shoes that the conduct [P]laintiff is under investigation for is a violation of [the regulation]," and "[t]o the extent defendants assert D-130 is the basis for th[e] investigation [of Plaintiff]," Regulation D-130 "is void for vagueness and violates Plaintiff's right to due process." (<u>Id.</u> 119-20)

Defendants have moved to dismiss Plaintiff's Due Process claim, noting that the standards regarding vagueness challenges are "considerably . . . relaxed" where the regulation in question is civil, and where the government is acting as an employer. (Def. Br. (Dkt. No. 78) at 17) Defendants also assert that if this Court finds Regulation D-130 ambiguous, "the court must defer to the agency's interpretation of its own regulation, unless that interpretation is plainly erroneous." (<u>Id.</u>)

"The vagueness doctrine voids on due process grounds a rule that contains 'prohibitions [that] are not clearly defined.'" <u>Kramer v. New York City Bd. of Educ.</u>, 715 F. Supp. 2d 335, 356 (E.D.N.Y. 2010). "A punitive enactment is unconstitutionally vague when it (1) does not allow a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) lacks explicit standards, thus permitting arbitrary or discriminatory enforcement." <u>Id.</u> As to the second prong, "[a] statute or rule is inadequate . . . when it 'fails to provide sufficiently explicit standards for those who apply it,' and 'impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis.'" <u>Id.</u>

A.41

"In meeting these requirements, . . . 'the degree of linguistic precision . . . varies with the nature – and in particular, with the consequences of enforcement – of the statutory provision [or regulation].'" NYC C.L.A.S.H., Inc. v. City of New York, 315 F. Supp. 2d 461, 484 (S.D.N.Y. 2004) (quoting General Media Communications, Inc. v. Cohen, 131 F.3d 273, 286 (2d Cir. 1997)). Accordingly, "'[t]he standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement.'" Gen. Media Commc'ns, Inc., 131 F.3d at 286 (quoting Winters v. New York, 333 U.S. 507, 515 (1948).

"At the same time, statutes that implicate constitutionally protected rights, including the freedoms protected by the First Amendment, are subject to 'more stringent' vagueness analysis. Id. (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982)); see also Marchi v. Bd. of Coop. Educ. Servs. of Albany, 173 F.3d 469, 480 (2d Cir. 1999) ("'[W]here a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.'" (quoting Smith v. Goguen, 415 U.S. 566, 573 (1974)). "Aware that precise delineation of sanctionable conduct is close to impossible, [however,] courts have granted schools, acting in their capacity as employers, significant leeway." Marchi, 173 F.3d at 480.

Here, the Court concludes that Regulation D-130 unambiguously encompasses the reported conduct that instigated OSI's investigation. The regulation prohibits the "use of any [DOE] school during school/business hours by any person, group, organization, committee, etc., on behalf of, or for the benefit of any elected official, candidate, candidates, slate of candidates or political organization/committee." (Regulation D-130 (Dkt. No. 79-3) § I(B)(1)) It also prohibits personnel from being "involved in any activities, including fundraising, on behalf of

27

A.42

any candidate, candidates, slate of candidates or political organization/committee during working hours." (Id. § I(C)(2))  The regulation further prohibits "[t]he use of any Department of Education school after school/business hours by any person, group, organization, committee, etc., on behalf of, or for the benefit of any elected official, candidate, candidates, slate of candidates or political organization/committee." (Id. § II(A))

Here, OSI received information alleging that Plaintiff was a "member[] of a communist organization known as the Progressive Labor Party," and was "actively recruiting students into the organization during school hours," and was "invit[ing] students to participate in the organization's activities." (Bloomberg Aff., Ex. 8 (Dkt. No. 10-8); Am. Cmplt. (Dkt. No. 39) ¶ 72)  "[A] communist organization known as the Progressive Labor Party" is a "political organization" for purposes of the Regulation.

Plaintiff attempts to distinguish between "ideological organizations which do[] not run candidates and are not engaged in electoral politics," and organizations that are engaged in "electoral partisan politics," and insists that the term "political organization/committee" used throughout Regulation D-130 encompasses only the latter kind of organization.  (Am. Cmplt. (Dkt. No. 39) ¶¶ 4, 118, 135)  While Regulation D-130 contains references to campaigns and elections, it does not qualify or limit the scope of "political organization/committee" – a term that, on its face, encompasses the "Progressive Labor Party" – in the manner Plaintiff proposes. Moreover, Plaintiff's distinction between "ideological organizations which . . . do[] not run candidates" and "those engaged in electoral politics" is unclear and impractical.  For example, the name "Progressive Labor Party" suggests that the organization is engaged in "partisan politics."  And if Regulation D-130's application were to turn on whether a particular "party" is then engaged in "electioneering" (see Am. Cmplt. (Dkt. No. 39) ¶¶ 1, 143), the same

28

A.43

organization might fall within the ambit of the term "political organization/committee" at some times, but not at others – an absurd result.

Nor is Regulation D-130 void for vagueness. As an initial matter, the Regulation provides adequate notice of the conduct it prohibits. Indeed, the Regulation sets forth a detailed list of prohibited and permissible conduct. To the extent Plaintiff contends that the term "political organization" is impermissibly vague, the Court concludes that – although the term "political organization" is not defined in Regulation D-130 – a reasonable person would surely understand that "a communist organization known as the Progressive Labor Party" is a "political organization."

Finally, Regulation D-130 does not "lack[] explicit standards, thus permitting arbitrary or discriminatory enforcement." Kramer, 715 F. Supp. 2d at 356. As noted, the regulation sets out a detailed, specific list of prohibited and permissible conduct. Although the Amended Complaint suggests that the Regulation is enforced in an arbitrary and discriminatory manner, Plaintiff has not pled facts demonstrating that OSI ignored conduct comparable to that in which she allegedly engaged.

Accordingly, Defendants' motion to dismiss Plaintiff's Due Process claim will be granted.

## **CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss (Dkt. No. 77) is granted in its entirety, and Plaintiff's cross-motion for judgment on the pleadings (Dkt. No. 81) is deemed withdrawn. The Clerk of Court is directed to terminate the motions.

A.44

Any motion for leave to file a Second Amended Complaint is to be served and filed by October 23, 2019.  The proposed Second Amended Complaint is to be attached as an exhibit to the motion.

Defendants will submit their Answer to the surviving claim in the Amended Complaint by September 30, 2019.

A conference pursuant to Fed. R. Civ. P. 16 will be held on October 21, 2019 at 12:30 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.

Dated:  New York, New York
         September 24, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge

A.45

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JILL BLOOMBERG,

                 Plaintiff,

     v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                 Defendants.
-----------------------------------------------------------------x

17-cv-03136 (PGG)

**NOTICE OF MOTION**

**Mr. Joseph Anci:**

        **PLEASE TAKE NOTICE**, that upon the Affirmation of Jeanne E. Mirer, dated November 6, 2019 with the annexed proposed Second Amended Complaint plaintiff will move this Court, before the Honorable Judge Paul G. Gadarphe at the Room 705 of the Thurgood Marshall Courthouse located at 40 Foley Square  New York, New York, at a time and date set by the Court to permit the filing of the Second Amended Complaint in the above captioned matter.

Dated:  November 6, 2019
New York, New York

                 Respectfully submitted,

                 Jeanne Mirer
                 Jeanne Mirer
                 MIRER, MAZZOCCHI & JULIEN PLLC
                 Attorney for Plaintiffs
                 1 Whitehall  Street, 16th Floor
                 New York, New York 10004
                 (212) 231-2235

A.46

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JILL BLOOMBERG,

                Plaintiff,

      v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                Defendants.
-----------------------------------------------------------------x

      17-cv-03136 (PGG)

**AFFIRMATION OF JEANNE
MIRER IN SUPPORT OF
PLAINTIFF'S MOTION TO
FILE SECOND AMENDED
COMPLAINT**

      JEANNE MIRER, under penalty of perjury states as follows:

1. My firm, Mirer, Mazzocchi & Julien PLLC represents plaintiff, Jill Bloomberg in this action.

2. I submit this Affirmation in support of plaintiff's motion to file a second amended complaint.

3. On September 24, 2019 this Court issued its opinion on the motions to dismiss which had been filed by the defendants.

4. The case alleges that plaintiff, the Principal at Park Slope Collegiate (PSC), suffered adverse actions after she protested racially discriminatory allocation of sports teams to the schools in the John Jay campus, (other than Millenium) where PSC is located.

5. She alleged violations of the First Amendment and Fourteenth Amendment due process rights as well as violations of Title VI of the Civil Rights Act of 1964, and a violation of the New York City Human Rights Act.

6. The Court dismissed plaintiff's First amendment claim having determined that plaintiff acted in the scope of her job duties when she protested the separate and unequal allocation of sports teams.

A.47

7.  The Court dismissed plaintiff's Title VI claim based on a pleading deficiency with respect to the receipt of Federal funds by the students in whose interest plaintiff protested the race discrimination.

8.  The Court dismissed plaintiff's due process claim on a variety of bases, however , the Court also noted that "although the Amended complaint suggests the regulation [Chancellor's Regulation, D-130] is enforced in an arbitrary and discriminatory manner, plaintiff has not pled facts that OSI ignored conduct comparable to that which she allegedly engaged.

9.  The Court did  not dismiss plaintiff's New York City Human Rights claim.

10. Plaintiff now seeks to file a Second Amended Complaint.

11. The proposed Second Amended Complaint is attached hereto as Exhibit 1.

12.  As to the Title VI claim, plaintiff has added paragraphs 23-25.

13. These paragraphs state that the DOE receives federal funds pursuant to Title I of the Elementary and Secondary Education Act which provides funds to schools which have a high percentage of families from impoverished backgrounds.  The allegations go on to state that a school will qualify for Title I funds if they have a certain percentage of students who qualify for free or reduced lunch programs.   PSC is a Title I school because over 60% of the students who attend qualify for free or reduced lunch programs.   Because of this, PSC receives Title I funds for school-wide programs.

14. As to the issue of arbitrary or discriminatory enforcement of Chancellor's Regulation D-130, plaintiff has added several paragraphs.

15. As this Court should be aware, it was not OSI which determined that the conduct which precipitated the investigation of plaintiff potentially violated regulation D-130.  It was attorney Greenfield who made that determination as she is alleged to be the attorney which oversees

OSI. (See proposed Second Amended Complaint paragraph 62, and First Amended Complaint paragraph 60).

16. Among other behaviors which were "overtly political and supporting candidates which the DOE found acceptable, (See e.g. Complaint paragraph 124) plaintiff has identified in paragraphs 113- 121 (which is reiterated in Count I) a case in late 2014 in which attorney Robin Greenfield was involved, where the DOE issued an opinion that the holding of a meeting at P.S. 66 where Mayor DeBlasio appeared, and which was hosted by the Communications Workers of America, did not violate Chancellor's regulation D-130. Even though Mayor DeBlasio spoke of his labor bona fides to a group of workers, the SCI determined that the action was not "overtly political". In the process the SCI adopted the definition of "political organization" which appears in the Public Officers Law as the proper definition of "political organization" in Regulation D-130. The definition of "political organization" in the Public Officers law is limited to those organizations which nominate and run candidates for office.

17. Plaintiff has not added the First Amendment claim to this complaint but will be asking this Court to certify the issue for appeal while the other aspects of this case are pending.

18. Based on the forgoing, plaintiff requests this Court permit the filing of the attached Second Amended Complaint.

New York, New York
Dated: November 6, 2019

_Jeanne Mirer_
Jeanne Mirer

A.49

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JILL BLOOMBERG,

                 Plaintiff,

       v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                 Defendants.
-----------------------------------------------------------------x

17-cv-03136 (PGG)

**PROPOSED
SECOND AMENDED
COMPLAINT**

With Jury Demand

        Plaintiff, JILL BLOOMBERG, (hereafter "plaintiff" or "Principal Bloomberg"), by and through her counsel, Mirer, Mazzocchi & Julien PLLC, upon personal knowledge as to herself and upon information and belief as to other matters, alleges as follows:

### NATURE OF THE CLAIM

        **1.**     This Complaint raises fundamental constitutional and statutory issues regarding the authority of the Department of Education ("DOE" or, with former Chancellor Carmen Farina, the "defendants") and their application of Chancellor's Regulation D-130 ("D-130") which has to do with electioneering in public schools. Plaintiff, a public high school principal, alleges in this case that an unconstitutional application of D-130 was used to investigate and retaliate against her for speaking out at times as a private citizen on topics such as race discrimination against DOE studentsThe New York City Department of Education is charged with educating over one million students—70% of whom are Black or Latino.

        **2.**     More than sixty years after the Supreme Court declared "separate but equal is inherently unequal" in *Brown v. the Board of Education*, New York City's schools are more segregated today than they were when segregation was official state policy.

A.51

3.      Plaintiff Jill Bloomberg, principal of Park Slope Collegiate (hereafter "PSC"), one of four schools housed on the John Jay Campus in Brooklyn, was investigated by the DOE's Office of Special Investigations ("OSI"), which conducted an aggressive and wide-sweeping investigation into the protected activities of plaintiff, PSC employees, students, and their families. As a result of the investigation, plaintiff's and other PSC employees' rights to engage in First Amendment protected activities have been chilled and curtailed, plaintiff was disciplined, and another investigation by the Conflict of Interest Board ("COIB") was commenced against her, all in retaliation for her advocacy and organizing against race segregation taking place in the John Jay Campus sports programs.  Defendants' basis for commencing the investigation into plaintiff's activities was because she was alleged to have violated Chancellor's Regulation D-130 —a regulation designed to limit DOE employees from engaging in partisan electoral politics while on duty.

4.      Plaintiff brings this action pursuant to Section 601, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§2000d-1 and 42 U.S.C. §1983 pursuant to the Fourteenth Amendment's Due Process Clause. Plaintiff also asserts a pendent claim for retaliation under the New York City Human Rights Law ("NYCHRL"), Administrative Code of the City of New York §8-101 et seq.

5.      Plaintiff seeks appropriate equitable and declaratory relief as well as compensatory damages in order to redress the past deprivation of rights secured to her under Title VI, the Fourteenth Amendment and NYCHRL, and to compensate her for the emotional distress, including reputational harm, that she has suffered because of the DOE's unlawful conduct.

A.52

**JURISDICTION AND VENUE**

6.      This Court has original subject matter jurisdiction over plaintiff's federal and constitutional claims pursuant to 28 U.S.C. §§1331 and 1343, respectively, because they arise under the laws of the United States and are brought to recover damages for the violation of plaintiff's civil and constitutional rights.  Supplemental jurisdiction over the NYCHRL claim is exercised pursuant to 28 U.S.C. §1367.

7.      Venue is proper in this judicial district under 29 U.S.C. §1391(c) and 42 U.S.C. §2000e-5(f)(3) because defendants conduct business in and can be deemed to reside in this district and employment records relevant to the unlawful employment practices are maintained and administered here.

**PARTIES**

**Plaintiff**

8.      Principal Bloomberg has been employed by the DOE since September, 1998—the year she was hired as a teacher. In 2003, she received tenure as a teacher and in 2004, she became a principal, receiving tenure as a principal in 2007.

9.      During her entire 15-year career as a principal, plaintiff has been the principal of PSC.

10.      Plaintiff holds a B.A. in History from Northwestern University, an M.S.Ed. in Public Administration from Baruch College, CUNY, and is a doctoral candidate in Politics and Education at Teachers College, Columbia University in the Education Policy and Social Analysis program.

A.53

11.     Plaintiff has consistently received outstanding performance ratings at the end of each year that she has been employed with the DOE, both as a teacher and as a principal. She has always had an excellent rapport with colleagues, teachers, students and parents.

12.     Plaintiff, as a citizen and as a principal, has the ability to seek DOE's compliance with Title VI's antidiscrimination provisions.

**Defendants**

13.     Defendant DOE is a public school district and department of the government of New York City.

14.     Carmen Farina is the Former Chancellor of the DOE whose job was to oversee the Department of Education.  The DOE's regulations are codified in the Chancellor's Regulations which have been developed over the years.  Defendant Farina, on information and belief,  was involved in the decisions at issue in this case.

15.     The DOE is the largest school district in the United States, and oversees approximately 1,800 schools and 1.1 million students.

16.     The DOE has nearly 135,000 full-time employees.

17.     The DOE is a person within the meaning of 42 U.S.C. § 2000d, and an employer within the meaning of 42 U.S.C. § 2000d.

18.     The DOE maintains control, oversight, and direction over the operation of its schools, including, *inter alia*, all matters related to student enrollment, student programming and student after school programs.

19.     The DOE is responsible for establishing the terms, conditions, and other practices that bear upon the employment of all DOE employees, including plaintiff and other employees at PSC.

4

20.     PSC is a DOE school located in District 15 inside the John Jay Campus located at 237 7th Avenue, in the Park Slope neighborhood of Brooklyn, New York.

21.     During all relevant times, the DOE was plaintiff's employer within the meaning of the applicable statutes.

22.     At all times relevant the DOE was and is a recipient of significant federal funding for purposes of Title VI.

23.     More specifically the DOE receives federal funds pursuant to Title I of the Elementary and Secondary Education Act which provides funds to schools which have a high percentage of families from impoverished backgrounds.

24.     Schools qualifiy for Title I if a certain percentage of the students qualify for free or reduced lunch programs.

25.     Because over 60% of the students at PSC qualified for free or reduced lunch programs, PSC receives Title I funds for school wide programs.

26.     The protected activity that precipitated the investigation which is at the heart of plaintiff's claims took place in January and February, 2017. On March 2, 2017, an investigator with the OSI visited plaintiff's school and informed her that she was under investigation. Plaintiff was told, however, that the allegations against her and the subject of the investigation could not be disclosed to her.

27.     The protected activity involved plaintiff's written complaint to DOE officials, including the Public School Athletic League (PSAL) as well as her direct supervisor, in which she cited a discriminatory DOE policy that both segregated and favored White students over Black and Latino students. The job of Principal includes requesting new teams from PSAL which plaintiff did many times through the PSAL application process. The job of the Principal

5

A.55

does not include appealing to the DOE to change discriminatory policy or practice which is what plaintiff was doing when plaintiff sent an email to Eric Goldstein the CEO of the Office of School Support Services as well as Michael Prayor, the Superintendent of District 15 (where PSC is located), in which plaintiff complained about the PSAL policy of allowing segregated and unequal allocation of sports teams and resources to a disproportionately White school co-located with PSC and other schools (that are comprised of mainly Black and Latino students) within the John Jay Campus. Plaintiff requested that the sports teams be united, and no longer segregated so that the inequality of the segregation would end.

28.    Despite years of efforts to promote integration within the DOE, plaintiff's January, 2017 complaint was the first time plaintiff directly accused the DOE of unlawful race discrimination and segregation. To put these events in some perspective, plaintiff provides background facts below.

29.    In 2015 similar complaints against PSAL's policy of racial discrimination by other DOE employees have resulted in similar adverse employment actions to them.

## BACKGROUND FACTS

### Race Segregation in Park Slope's Public Schools

30.    PSC is a public secondary school located in District 15 in Park Slope Brooklyn serving grades 6 through 12.

31.    PSC is a majority minority school with an 85% Black and Latino student population in 2014.

32.    Park Slope Brooklyn is an increasingly affluent neighborhood in Brooklyn with a majority White population.

6

A.56

33.      Despite the racial demographics of Park Slope and District 15 generally, PSC remains a majority minority school in a majority White district.

34.      Since the outset of her tenure at PSC, Principal Bloomberg has encouraged desegregation of the school and opposed measures that reinforce and perpetuate *de facto* segregation, such as the creation of White enclaves within Black and Latino schools through the institution of, *inter alia*, student tracking programs and gifted and talented programs, both having the effect of further segregating students by race. Moreover, and in this spirit, plaintiff opposed the entry of an ostensibly selective school onto the John Jay Campus on the basis that it would perpetuate segregation by attracting a disproportionately White student body, thus re-segregating the John Jay Campus.

## 2010-2011: Plaintiff's Opposition to Re-Segregation With the Entry of Millennium Brooklyn on the John Jay Campus And First DOE Warning

35.      In the Autumn of 2010, the DOE informed plaintiff that Millennium Brooklyn, an offshoot of the prestigious and predominantly White Millennium High School in Manhattan, would be co-locating in the John Jay Campus. Plaintiff was further informed that the arrival of Millennium Brooklyn was great news for the other schools at John Jay Campus because it would come with $600,000 in funding for refurbishing the building, funds that were unavailable to PSC before a more White school was assigned to the John Jay building.

36.      Nonetheless, plaintiff feared that the offshoot of Millennium Manhattan would continue to disproportionately admit White students, and thus create an all-or majority White enclave on the John Jay Campus.

37.      Seeing the promised funding as tied to the creation of such a racial enclave, students, parents and faculty from PSC and members of the local community surrounding the John Jay Campus organized a peaceful protest.

7

A.57

38.    On the evening of January 19, 2011, at a Panel for Education Policy ("PEP") meeting with DOE officials, parents, students and members of the community in attendance, and where the PEP was scheduled to vote on the placement of Millennium Brooklyn in the John Jay Campus, the public had the opportunity to voice its concerns with the new school's placement. When it was plaintiff's turn to speak she stated that the placement of Millennium Brooklyn was "an example of putting the interests of upper income white families above those of low-income families of color." Plaintiff's microphone was shut off in the middle of her statement, and she led the crowd in chanting "Integration Yes, Segregation No."

39.    Following the January 19, 2011 PEP meeting, plaintiff was called into a disciplinary conference with her direct supervisor, who admonished her for her statements, and stated, "You are not allowed to say that the DOE is racist." However, plaintiff was not formally disciplined for her statements.

**Fall 2011-Spring 2014: Plaintiff's Successful Desegregation Efforts**

40.    Over the next three years, plaintiff continued to be an outspoken advocate against segregation within the DOE. For example, on June 1, 2012, plaintiff sent a written complaint to defendant complaining that the DOE's plan to install surveillance cameras in the school building would have an adverse impact and disproportionally affect students of color.

41.    On March 25, 2014, plaintiff participated in a panel called "Integration Matters" with Pedro Noguera and David Tipson, two well-known figures in the anti-segregation movement. At this panel, plaintiff discussed her efforts to promote integration in her school and the challenges faced due to lack of systematic support. The panel was well received, and approximately 300 people were in attendance.

A.58

42.     Because plaintiff's method of promoting integration without student tracking was considered by many a success story in desegregation, on May 16, 2014, plaintiff's integration model at PSC was highlighted in a story covered by CBS news; and on June 23, 2014, the story was covered by Chris Hayes on MSNBC.

**2014-2015: Plaintiff Encourages Participation in Civil Rights Activism**

43.     In the Fall of 2014, plaintiff, the students, faculty and parents of PSC gathered in front of the John Jay Campus after school and marched to protest the police killings of Michael Brown and Eric Garner.

44.     In the evening of October 10, 2014, the student government of PSC, with the support of the PTA, organized a Town Hall meeting in the school cafeteria to discuss the NYPD's poor treatment of John Jay Campus students (in response to a highly publicized incident of the NYPD telling a John Jay Campus student to "get out of the neighborhood"), as well as John Jay Campus school safety agents' treatment of PSC students at dismissal in general. Several senior schools safety officials were in attendance, and plaintiff supported the students by arguing that they should be permitted to stay on campus after school for as long as they liked. At the end of the meeting, the school safety personnel reluctantly agreed to back down.

45.     Following the non-indictment of the police officers in the Michael Brown and Eric Garner killings, large mass demonstrations across the United States and New York City erupted.  Many students at PSC were upset by the two non-indictments. At the DOE's suggestion, plaintiff organized a school assembly that was to take place December 5, 2014. Plaintiff asked the Social Studies teachers to present short examples of civil rights protests from history as a way to put the current demonstrations into context. Plaintiff made the assembly

9

A.59

optional to students and teachers, and permitted the Physical Education teacher to open the gym during the assembly for those who did not wish to attend the assembly.

46.     The morning of December 5, 2014, before the assembly, plaintiff's direct supervisor Superintendent Watts called plaintiff and, contrary to the DOE's previous suggestion to hold the assembly, attempted to dissuade plaintiff from holding the assembly, telling plaintiff that the assembly was not forbidden, but that the PSC administration had to remain "neutral." Plaintiff informed Superintendent Watts that the purpose of the assembly was to provide the students with a historical context of past violations of African Americans' Civil Rights, and how they have historically been addressed, adding—"We will not be neutral when it comes to racism."

47.     On February 27, 2015, plaintiff organized a Black History Month assembly, and invited a student's grandfather to speak about the "Freedom Summer" campaign during the Civil Rights era, and the high profile murder of his brother, Michael Schwerner, and two other civil rights activists, Chaney and Goodman, who were killed by the Ku Klux Klan in Mississippi in 1964.

48.     On March 27, 2015, a PSC student who was Black was detained and handcuffed by school safety agents in the morning after passing through the school metal detectors with a metal pin in his broken eyeglasses that he had used to temporarily hold them together, as the pin was deemed a "weapon." Plaintiff advocated for the student and demanded that the student be released, but soon after the school safety agents released the student to plaintiff's office, the NYPD stormed in and arrested him. Students and staff expressed outrage at this treatment because they felt that the brutality and mistreatment of the student were a direct result of the policy of daily scanning which disproportionately impacts students of color within the DOE and

that if the student had been a White student from Brooklyn Millennium he would not have been treated in the same manner. After school, the PSC students organized a demonstration outside of the school to protest the unfair treatment of their classmate and called for removal of the metal detectors.

49.    On May 1, 2015, plaintiff was invited to speak at a panel called "Restorative Approaches" at John Jay College of Criminal Justice. Many high level DOE officials were in attendance. During the panel, plaintiff spoke out against metal detectors in schools and harsh punitive disciplinary policies that adversely affect students of color.

50.    On May 4, 2015, Superintendent Watts came to PSC to speak with plaintiff, and advised her that her comments at the May 1, 2015 panel were not well received by Chancellor Farina. She suggested that because plaintiff was a DOE principal, she should remain "neutral about political issues" and not be openly critical of DOE policies.

**2015-2016: Plaintiff's Continued Advocacy for an Integrated Public School System**

51.    On September 25, 2015, plaintiff and four PSC students were invited to Washington D.C. to participate in a panel organized by the National Coalition for School Diversity to speak about school integration.

52.    On February 26, 2016, plaintiff scheduled another Black History Month assembly.

53.    On March 8, 2016, plaintiff was invited to speak on a panel organized by the Brooklyn Historical Society to discuss segregation in New York City public schools, and solutions towards integration. At the panel, plaintiff stated, "segregation did not come about organically, so we cannot expect it to be dismantled organically," in direct contrast to Chancellor Carmen Farina's announcement in favor of "organic integration."

54.     During the 2015-2016 school year, many PSC students participated in an extra-curricular Saturday program called "Integrate NYC for Me," and, together with the organization "Colectivo Amaranta," the students participating in this program explored ways to artistically express solutions that would promote an integrated society and further integration within the DOE. In the end, with the input of the PSC faculty, students, and PTA, they jointly decided to paint a mural, and spent hours creating a beautiful and colorful mural, which was unveiled to parents and faculty on Saturday, May 14, 2016. The mural depicted students in the foreground entering the school through a large metal detector, and a painting of the PSC student who was arrested on March 27, 2015. In the background of the mural, students were marching in protest and holding picket signs with slogans such as "We are Students not Criminals" and "Scholars Not Suspects." In the far corner, a group of students pushed the metal detector off a cliff. Spread across the front of the mural was a large banner that said "Unity in Diversity; An Injustice to One is an Injustice to All."

**2016-2017: Plaintiff's Official Opposition to DOE's Unlawful Violations of Title VI**

55.     In the year 2016-2017, plaintiff's advocacy against segregation and race discrimination took on the form of more serious complaints against the DOE for unlawful discrimination, and defendant's opposition to plaintiff's protests increased.

56.     On November 1, 2016 the John Jay Campus girls' volleyball coach sent a letter to plaintiff about how the team had been singled out, humiliated and treated like criminals by the school safety agents at another, predominantly White school during the most important game of the season.

57.     On November 29, 2016, plaintiff sent a letter to Ramon Garcia, Assistant Commissioner of the School Safety Division, NYPD, and other DOE officials complaining about

the girls' volleyball team incident and demanded an apology to the students, stating, "That our students felt the indignity of racism while entering one of our schools is an outrage."

58.     On January 10, 2017, plaintiff sent a damning complaint to Eric Goldstein, CEO of the DOE sports programs, and Superintendent Michael Prayor, accusing the DOE of race discrimination and segregation within the sports program in her building. Although not part and/ or parcel of plaintiff's duties as principal of PSC, nor in any way related to her duties, plaintiff complained about the fact that the John Jay Campus was operating two separate and unequal sports programs. That is, there was one program for Millennium Brooklyn to share with Millennium Manhattan, and another for the remaining schools at John Jay Campus. Plaintiff sought PSAL's help in uniting and thereby desegregating and equalizing the teams. Moreover, and in support of her assertion that the programs were also unequal, plaintiff included the following graph, highlighting the fact that the Millennium sports program, consisting of a high percentage of White students, had only 1,261 students yet received 17 sports teams, while the John Jay Campus sports program, consisting of a high percentage of Black and Hispanic students, had 1,859 students, yet was only provided with 9 sports teams and that the teams were not allowed to play together, thus creating a condition not only of racially separated, but also of unequal opportunities in sports programs.

| School or Program | Number of PSAL Teams | Enrollment (SY 15-16) | % Black & Hispanic |
|---|---|---|---|
| JJL | | 357 | 90.4 |
| SSJ | | 222 | 87.0 |
| PSC | | 356 (HS only) | 85 |
| BHSA | | 924 | 90.7 |
| **John Jay Campus PSAL** | **9** | **1859** | |
| MBHS | | 620 | 51.5 |
| MHS | | 641 | 25.2 |

13

A.63

| Millennium High School PSAL | 17 | 1261 | |
|---|---|---|---|

59.     Plaintiff's primary protest was the segregation of the programs based on race. But she also protested the fact that the John Jay Campus students in the predominantly White sports program received one team for every 74 students whereas students at predominantly Black and Hispanic sports program received one team for every 204 students.

60.     Plaintiff received no meaningful response to her January 10, 2017 letter requesting that the two programs be combined.

61.     Because the DOE failed to take meaningful action to cure the segregation of the sports programs at the John Jay Campus, on February 13, 2017, the PSC PTA organized a leafleting action where flyers were distributed on the public sidewalk outside of the John Jay Campus to inform the community about the race discrimination and segregation that plaintiff had complained about on January 10, 2017 (the "Title VI Complaint"). The flyers were created using the Title VI Complaint and stated in large bold letters "Separate is Never Equal," and included the above graph.

62.     Upon information and belief, including information provided by a former OCR employee, all Title VI complaints made to DOE officials are immediately referred to the Office of Civil Rights ("OCR"). Furthermore, the person directly responsible for responding to OCR complaints on behalf of the DOE is Robin Greenfield, the Executive Deputy Counsel for Employment and General Practice, within the Office of the General Counsel. Ms. Greenfield's office also oversees the Office of Special Investigations ("OSI").

A.64

63.     Based on DOE policy and upon information and belief, plaintiff's Title VI Complaint, which was made on January 10, 2017, was referred to OCR by at least on or about January 15, 2017.

**March 2017: Defendants' Allegation that Plaintiff Violated Chancellor's Regulation D-130 and Subsequent OSI Investigation**

64.     OSI, being part of the DOE's Office of General Counsel, has the primary function of investigating alleged violations of the Chancellor's Regulations.

65.     Within six weeks of plaintiff's Title VI Complaint, and two weeks after the February 13, 2017 leafleting action, on March 2, 2017, an investigator from OSI named Michelle Archie came to PSC and informed plaintiff that she was under investigation, but refused to inform her of the reason.

66.     Archie requested to speak with Assistant Principal Carla Laban. In this conversation, Archie informed Laban that the investigation of plaintiff related to "communist activities taking place at the school." Archie then showed Laban a list of names, and asked Laban to identify who from the list she had ever seen "engaging in communist activities." Laban informed Archie that she did not know what was meant by "engaging in communist activities" and therefore was unable to answer the question.

67.     Archie's list of names contained the name of plaintiff and four current PSC teachers.  It also contained names of people who had no present connection to the school including six former PSC teachers, plaintiff's family members, a few employees from an after-school sports and arts program, and a few former students who had graduated long ago.

68.     At that time plaintiff believed, and still believes, that the OSI investigation against her was retaliation for her complaint about the segregated sports programs.

69.    On March 16, 2017, at an after school PTA meeting with several members of staff present, Laban announced that the OSI was investigating plaintiff, and that the OSI investigator had asked her whether she had ever seen plaintiff and/or others engaging in communist activities at the school.

70.    On March 22, 2017, undersigned counsel sent a letter to defendant requesting they cease and desist from what counsel in good faith alleged to be the retaliatory investigation and stated litigation would be filed if the investigation was not halted, given the "chilling effect" it was having on plaintiff and members of the school community. Undersigned counsel's letter referenced this country's shameful history of labeling people who promoted integration as "communists" and noted that the DOE should not be repeating the unfortunate mistakes of this history.

71.    In response, on March 27, 2017, Robin Greenfield claimed that the OSI investigation was based on a complaint that had been lodged in May, 2016.

72.    Undersigned counsel responded on March 28, 2017 that the DOE's explanation did not undercut plaintiff's belief in the retaliatory nature of the investigation, as it was suspicious that a complaint that was not seen as meritorious enough to open an investigation in May, 2016 would suddenly become viable 10 months later.

73.    The March 28, 2017, letter from undersigned counsel also requested the DOE to identify the specific regulation that plaintiff had allegedly violated and further details regarding the alleged practices thought to have violated that specific regulation.

74.    In response, on April 6, 2017, Greenfield continued to make the "McCarthyite" accusation by informing plaintiff that she and two teachers at PSC stood accused of being members of a communist organization known as the Progressive Labor Party and that they had

A.66

been accused of actively recruiting students into the organization during school hours, and that they invited students to participate in marches for Communism.  Greenfield advised plaintiff that this conduct constituted a violation of Chancellor's Regulation D-130 ("Political Activities in School Buildings").

75.      However, according to the OSI's August 25, 2017 Investigative Report (the "OSI Report"), *see infra*, at the time Greenfield made the April 6, 2017 representations regarding the nature of the allegations against plaintiff, OSI investigators had already twice interviewed the confidential complainant who filed the original May 2016 compliant referred to in Greenfield's April 6, 2017 letter, and as of March 13, 2017, the OSI had already determined that the confidential complainant had no evidence to support the May 2016 accusation.

76.      The April 6, 2017 letter stated that more but unspecified evidence was presented to the DOE through the Special Commissioner of Investigation ("SCI") in December, 2016, but this also did not explain why an investigation was not opened for another three months, raising the same concerns that allegations which were not considered meritorious in May or December 2016 suddenly became meritorious in March 2017, after plaintiff's and the PTA's complaints in January and February 2017 about the segregated sports programs.

77.      Greenfield also warned in the April 6, 2017 letter that plaintiff, having informed several members of the school community that she sought counsel to challenge the investigation, could be viewed as interfering with the investigation which was grounds for removal and dismissal.  Defendant has thus commenced another investigation against plaintiff with SCI for "interfering with an investigation."

78.      That is defendant sought to bootstrap a disciplinary action onto an investigation that is retaliatory and improper *ab initio*.

17

A.67

79.     The DOE has admitted that on January 25, 2017, the DOE and OSI received the updated information from the confidential complainant. Because Robin Greenfield would have received the information about plaintiff's January 10, 2017 Title VI Complaint on at least January 15, 2017, as she is the person responsible for receiving OCR complaints (including all Title VI complaints), and she also received the information regarding the complaints from OSI, she had specific knowledge of both the Title VI Complaint and the OSI complaints prior to the time the investigation was officially commenced.

80.     Thereafter and for several weeks prior to the initial filing of the instant complaint, plaintiff's counsel along with Arthur Eisenberg, the Legal Director of the New York Civil Liberties Union ("NYCLU") had discussions with General Counsel for the DOE Howard Friedman regarding the issue of whether Chancellor's Regulation D-130 could apply to the allegations against plaintiff. It was hoped that the investigation could be held in abeyance pending a meeting of all concerned could occur and perhaps some agreements made to address the matter.  Due to travel schedules of both plaintiff's counsel and Mr. Eisenberg it was hoped that the meeting would occur in the first week of May, 2017.  The investigation was held in abeyance for a few weeks.

81.     However, in the late afternoon of April 27, 2017, Mr. Freidman stated that the DOE would no longer hold the OSI investigation in abeyance.

**Court Proceedings on the Initial April 28, 2017 Complaint**

82.     The initial Complaint was then filed on April 28, 2017, seeking a temporary restraining order and preliminary injunction of the investigation pending the outcome of the litigation.

83.     The Court, rather than issuing a TRO, gave defendants until noon on May 1, 2017 to respond and thereafter held a hearing at 3:00 p.m. on that date.

84.     In response to plaintiff's motion for a preliminary injunction, defendants included an affirmation of DOE attorney Charity Guerra (the "Charity Guerra Affirmation"), which included the specific details of the December 20, 2016 allegations against plaintiff. They were stated as follows:

    a.  That plaintiff's husband filmed a documentary for the Len Ragozin Foundation an organization alleged to be associated with the Progressive Labor Party;

    b.  That the Confidential Complainant stated that plaintiff's husband is the president of the Len Ragozin Foundation;

    c.  Students and staff were included in the documentary without their authorization;

    d.  That plaintiff engaged in a conflict of interest when the documentary was screened at PSC and a $20 fee admission was charged;

    e.  That academic policy is being violated at the school because a mandated course was not being taught;

    f.  A bake sale was held to raise funds for a May Day march;  and

    g.  Students who voice opinions different from those of plaintiff are not allowed to express them.

85.     However, that the DOE's stated rationale for commencing the D-130 investigation against plaintiff is a pretext for retaliation is demonstrated by the contradictory rationales provided by Ms. Guerra and the OSI. According to the August 25, 2017 OSI Report, the OSI's stated rationale for investigating whether plaintiff had violated D-130 is because the OSI received documentation on January 25, 2017 indicating that a May Day bakesale had taken place at PSC. The OSI Report omits any reference whatsoever to the Len Ragozin Foundation's alleged connection with the PLP as a basis for commencing the D-130 Investigation.

19

A.69

86.    Moreover, also in contradiction to the information provided to the Court in Ms. Guerra's declaration, the OSI Report explicitly contradicted the claim that students with different opinions than plaintiff's were not allowed to express them since as of March 13, 2017 the OSI's interviews with the confidential complainant showed she had no evidence to support her claims.

87.    During the May 1, 2017 hearing, the Court invited plaintiff to respond to the defendants' brief by Tuesday May 2, 2017, and directed her to respond to various questions posed by the Court, one of which was whether the DOE's allegations against plaintiff, if true, established a violation of Chancellor's Regulation D-130. The Court also stated defendants would have the opportunity to reply if they asked, but the Court intended to issue an opinion from the bench on May 3, 2017 at 5:00 p.m.

88.    On May 2, 2017 plaintiff filed a brief addressing the questions raised by the Court as well as providing, *inter alia*, a supplemental affidavit of plaintiff.

89.    In plaintiff's supplemental affidavit, she addressed each of the allegations in the Charity Guerra Affirmation. Plaintiff included supporting documentation and her own sworn testimony establishing that:

    a.  The Len Ragozin Foundation is a public charity which supports the Arts. Plaintiff attached the "About" page from Len Ragozin website as proof;

    b.  While plaintiff's husband is president of the foundation, as a public charity the Foundation is not engaged in electoral politics;

    c.  Plaintiff's husband did not make the documentary which is called "Profiled". The documentary was screened at the PSC Campus in June of 2016. Plaintiff attached a document to her affidavits showing that the filmmaker is Kathleen Foster;

    d.  Plaintiff also stated that whether students and/or staff were in the documentary without their authorizations, it is the responsibility of the filmmaker to have handled those matters, and that plaintiff advised her of such obligation. Plaintiff further noted that as she was not involved in the making of the film, and no investigation of her would illuminate the issue of authorizations;

e.  The film was screened pursuant to a permit which was granted by the DOE to the Len Ragozin Foundation.  Plaintiff provided the Court with a copy of the permit;

f.  Plaintiff further attached documentation which showed that that the permit was granted by Karen Seara in the Chief Engineer's office based on an extended use application which was filed in May of 2016. Special requests on the application included the right to sell goods and ask for donations.  There was no violation of the conflict of interest policy as the sponsors were permitted to sell goods and ask for donations to support the distribution of the film;

g.  Plaintiff further stated there is no course which is mandated which is not taught at PSC.  The DOE regularly reviews and approves the curriculum through an audit of transcripts and PSC has always been found to be teaching the required courses for student graduation;

h.  Plaintiff denied that there was ever a bake sale for a May Day march; and

i.  Plaintiff also stated that her students disagree with her often and with much confidence.

90.    The allegations presented by defendants to the Court as supplemental information regarding the May 2016 SCI complaint were false, on their face. The DOE could have easily discovered all of the allegations regarding the Len Ragozin Foundation and the screening of the movie "Profiled" without opening an OSI investigation into plaintiff's activities and disrupting the entire school. The OSI Report's complete omission of these facts is also proof that the DOE knew they were false.

91.    Plaintiff also argued that none of these allegations or the original allegations implicate D-130 so even if they were true there would be no violation of D-130.  Plaintiff also argued that a more expansive reading of D-130 would violate plaintiff's First Amendment rights and was unconstitutionally vague and in violation of her rights under the Fourteenth Amendment.  That is, the OSI investigation was based on an allegation that plaintiff has beliefs that are shared with some organizations which are considered to be "communist", such as being opposed to racism and segregation.

21

A.71

92.    There are many historical parallels to persons who have advocated for civil rights and against racism being automatically considered subversive or communist.

93. Plaintiff is aware of many instances where the DOE has endorsed political activities such as protests against Donald Trump, Voter Registration drives, marches regarding climate    change,    and    many    others.    (See,    e.g.,    URL http://www.amny.com/news/politics/nyc-students-protest-trump-s-ban-on-refugees-immigrants-1.13074563).

**Post Denial of Injunctive Relief Actions by OSI and DOE Show DOE had No Evidence to Support An Investigation Under Chancellor's Regulation D-130 in the First Instance and Yet Continued the Investigation after Knowing There was no Supporting Evidence**

90.    On May 3, 2017 the Court denied plaintiff's preliminary injunction claiming that plaintiff had not shown either a likelihood of success on the merits or irreparable harm on her retaliation claims.

91.    During oral argument, plaintiff argued, *inter alia*, that D-130 did not apply to the allegations made against her and that the investigation was in fact an infringement of her due process rights, as it was unclear what conduct was prohibited by the regulation. In support, plaintiff provided affidavits from several teachers who stated that they were afraid to denounce racism and segregation; were afraid to wear "Black Lives Matter" t-shirts to school; and were afraid to teach lessons about the Cold War, because no one understood the breadth of D-130.

92.    The Court informed the parties that the constitutionality of the application of D-130 to this issue was not before the Court, as the complaint only alleged retaliation, and accordingly, did not render a decision as to the constitutionality of D-130.

A.72

93.     Plaintiff stated her intention to amend the complaint to add a claim that the DOE's application of D-130 against her was a violation of her Due Process rights under the Void for Vagueness Doctrine.

94.     When the fact that as of March 13, 2017 OSI investigators knew the confidential complainant had no evidence to support any of her allegations is combined with plaintiff's evidence at the injunction hearing which refuted many of the allegations of the confidential complainant with respect to the Len Ragozin Foundation and the making and screening of the movie "Profiled", the DOE and OSI were on notice that the allegations against plaintiff were untrue, and yet they nonetheless insisted that the investigation be continued .

95.     After the Court denied plaintiff's requested relief, defendant DOE proceeded with a wide-ranging investigation that included captive audience interrogations of students without their parents' consent,  in which they were peppered with questions having nothing to do with anything that could even conceivably be deemed a violation of D-130. This has been in violation of the DOE's obligation to pursue the investigation in a narrowly tailored fashion.

96.     Specifically, on May 16, 2017, two investigators from OSI and the District Superintendent Michael Prayor came to PSC, and pulled several students from their classes. The students that were targeted by the OSI were the most outspoken students, the children of outspoken PTA members, and children of DOE employees.

97.     Plaintiff was asked to accommodate the OSI in their interrogation of students, and she cooperated fully. However, she believed that the students' rights were being violated because their parents were not contacted. She asked them if they intended to contact the students' parents, and was advised "yes, we will tell them that they can call their parents if they would like to."

Plaintiff did not protect the students more aggressively for fear of retaliation, as she feared any protest on her end would be considered "obstruction" of the investigation, and grounds for further discipline.

98.      The OSI, without the consent of their parents, required these students to provide answers to their questions. Many students requested the opportunity to first speak with their parents, but were not permitted to do so.

99.      At the end of their interrogations, the students were seen crying at the school.  On information and belief, the students felt violated because a large portion of the OSI's questions related to their parents' political associations.

100.     On information and belief, none of the OSI's questions to the students related to anything that could be considered a violation of D-130.

101.     On August 25, 2017, the OSI issued the OSI Report, (Attached as Exhibit 1), which acknowledged that as of March 13, 2017, (a good six weeks before the DOE through its general counsel refused to put off the investigation thus precipitating the filing of the injunctive relief) the **OSI was aware that the confidential complainant had no evidence to support the assertion that plaintiff was a member of the PLP and was actively recruiting students to join the organization. Instead, the OSI Report stated that the investigation into whether plaintiff had violated D-130 was commenced based on an allegation that a May Day bakesale had taken place at PSC.**

102.     The OSI Report detailed how the investigation focused on the political activities of plaintiff, PSC employees, students, and family members, with a particular focus on whether anyone had attended May Day and/or Black Lives Matters rallies.

24

A.74

103.     The OSI Report ultimately determined that the OSI did not substantiate the initial allegation that plaintiff had violated D-130. Implicit in this finding was a chilling message to plaintiff that had the OSI determined that a May Day bakesale had taken place, it would have determined that plaintiff had violated D-130. This message was chilling because plaintiff has no way of knowing what other types of activities the DOE considers to be proscribed by D-130.

104.     Moreover, although the OSI investigation focused almost exclusively on the activist and civic activities of plaintiff, other PSC employees, students and their familes, the OSI nonetheless substantiated that plaintiff was guilty of conduct that essentially amounted to three alleged clerical mistakes—not conduct that would merit the commencement of an OSI investigation or discipline.

105.     The OSI Report further noted that based on the OSI's findings, an investigation by the COIB against plaintiff had been commenced.

106.     On October 3, 2017, as a result of the OSI Report, plaintiff was disciplined with a written reprimand.

107.     The issue of segregation and discrimination against students of color with respect to the allocation of sports teams by the PSAL has been an issue which other DOE employees have spoken out about and have been punished for their advocacy. Specifically, in plaintiff's second affirmation to the Court in support of her motion for preliminary injunction, plaintiff provided three articles to the Court which documented the actions taken against certain DOE personnel who had publicly revealed racial disparities in allocation of sports teams by the PSAL in 2015.

108.     On June 21, 2018 several students and parents filed suit in the Supreme Court of New York County  against the DOE, the PSAL and the Athletic Director alleging class claims of

racial discriminaiton in the allocation of sports teams throughout the New York City School System.  (See. *L.P. et al v New York City DOE et.al.*  Index No. 155825/2018).

### D-130 Has Been Enforced In An Arbitrary and Discriminatory Manner Showiug It is Not Unambiguous

109.     Plaintiff affirmatively avers that she has violated no school policy or Chancellor's Regulation. She further avers that her conduct opposing racism and segregation in schools is not prohibited by any Chancellor's Regulation. Moreover, even if plaintiff were to concede that a DOE employee's involvement with the Progressive Labor Party was covered by Chancellor's Regulation D-130, plaintiff has made it explicitly clear to defendants that she is not a member of the Progressive Labor Party. Thus, the reasons for this OSI investigation cannot be based on legitimate factors.

### It is Not Credible that Defendants Believed the Allegations Against Plaintiff Constituted A Violation of D-130

110.     The OSI Report stated that the reason the OSI launched an investigation into whether plaintiff had violated D-130 was because of an allegation that a May Day bakesale had taken place at PSC.

111.     That is, defendants would have plaintiff believe that their position is that a May Day bake sale is political activity proscribed by Chancellor's Regulation D-130.

112.     Chancellor's Regulation D-130 is titled "USE OF SCHOOL BUILDINGS BY CANDIDATES, ELECTED OFFICIALS AND POLITICAL ORGANIZATIONS, AND CONDUCT OF SCHOOL EMPLOYEES AND OFFICERS WITH RESPECT TO POLITICAL CAMPAIGNS AND ELECTIONS", and on its face is clearly limited to partisan political activities, and does not prohibit the conduct of DOE employees related to the free expression of their ideological beliefs.

**113.** On another occasion in 2014, the term "political organization" in Regulation D-130 was interpreted to have a meaning strictly connected to partisan electoral politics.

**114.** One of the people involved in the case on that occasion was Attorney Robin Greenfield who was aware or should have been aware of the 2014 interpretation in 2017 when she claimed the activities plaintiff is alleged to have engaged in violated regulated Chancellor's Regulation D-130.

**115.** The complaint at issue in 2014 was filed in connection with a rally held by the Communications Workers of America at P.S. 66 which featured Mayor DeBlasio speaking to the CWA workers. At the rally which was aimed at giving workers at Cablevision to air their grievances to the Mayor, his prepared remarks touted his bona fides regarding support for organized labor.

**116.** A complaint about this event from a former DOE official prompted the Special Commissioner of Investigations (SCI) to investigate this matter.

**117.** The Special Commissioner of Investigations for the New York City School District ("SCI") is the independent body charged with investigating and rendering determinations as to whether the Chancellor's Regulations have been violated,

**118.** Although D-130 states that "no rallies, forums, programs, etc. on behalf of or for the benefit of any elected official, candidate, slate of candidates of political organization/committee may be held in a school builing after school/hours, the SCI claimed it could not determine whether the meeting at P.S. 66 was "political activity" as restricted by the Chancellor's regulations, because the Mayor's remarks were not "overtly political".

27

A.77

119.    It did so by acknowledging that although the term "political organization" in D-130 is not defined in the Education Law,  the term is defined in the Public Officers Law and the DOE relied on that definition.

120.    In the Public Officers Law "political organization" means any party or independent body as defined in the election law or any organization that is affiliated with or a subsidiary of a party or independent body".   According to election law an "independent body" is any organization or group of voters which nominates a candidate or candidates for office to be voted for in a general election.

121.    Under this definition the DOE determined that a "political organization" was not any organization with a political point of view but rather one which is a political party or independent body which nominates candidates for office.

122.    In addition, the Chancellor's office has also issued statements that support a limited construction of D-130. In his formal capacity as Chancellor, Joel Klein stated that the rationale for enacting D-130 was to promote the DOE's interest in protecting the "rights of students to learn in an environment free of partisan political influence" because "[p]artisan political activity by staff in the presence of students . . . sends the message that the view expressed carries the support of the school system."

**The DOE's Unfair and Arbitrary Administration of D-130 Demonstrates a Pretext and an Intent to Retaliate Against Plaintiff and Regulate Her Viewpoint**

123.    That the DOE's application of D-130 against plaintiff is an unconstitutional attempt to retaliate against her and discriminate against her viewpoint is demonstrated by several instances where DOE employees have engaged in partisan Democratic Party political activities at DOE schools for campaigning purposes. Yet in all of those instances, the DOE's official position has been that those activities *did not* violate D-130.

124.    One of those instances occurred in the Fall of 2017, when a principal of a DOE school used school resources to recruit students, during school hours, to join the de Blasio campaign. He posted on his school's website and Facebook page the contact information for the de Blasio Campaign's regional organizer so students could "make phone calls, knock on doors, and talk to people in high traffic areas… to get the word out about Bill de Blasio." Another post encouraged students to "Get involved in politics with this great opportunity to work with the mayor Bill De Blasio in his campaign!" Yet the DOE insisted that no rules were broken despite D-130's explicit proscription that "No Department of Education duplicating, communication, electronic or other equipment may be used to produce, reproduce, record, or disseminate information on behalf of any candidate, candidates, slate of candidates or political organization/committee." (See URL http://nypost.com/2017/10/25/school-persuaded-students-to-volunteer-for-de-blasio-campaign/).

**Plaintiff's Constitutional Rights Continue to be Harmed by Defendants Continued Broad Reading of D-130 to Regulate Her Viewpoint**

125.    On November 14, 2017, plaintiff was required to attend an investigative hearing after PSC employee Alissa Lembo falsely accused her of harassment through a mechanism exclusively reserved for employee complaints about supervisor harassment. At the investigatory proceeding, Alan Lichtenstein, defendant Chancellor Farina's designee (who was selected to investigate the matter), asked plaintiff about her personal political beliefs as well as all of the allegations made by Ms. Siegel and Ms. Lembo to the OSI that had already been investigated and found unsubstantiated by the OSI.

126.    None of Mr. Lichtenstein's questions involved harassment or intimidation on the part of plaintiff. Mr. Lichtenstein's questions made it clear to plaintiff that the DOE's reception of her personal viewpoints were motivating the investigation of an otherwise frivolous claim of

A.79

harassment, and it was clear that Mr. Lichtenstein felt authorized to ask such questions based on the Chancellor's and the DOE's unconstitutionally broad reading of D-130 to proscribe plaintiff's political viewpoints.

**Defendants' Arbitrary and Unfair Administration of D-130 To Retaliate Against Plaintiff and Regulate her Viewpoint Has Caused a Chilling Effect That Is Ongoing**

127.    Defendant's improper attempt to turn its unlawful retaliation into grounds for dismissal by the arbitrary application of D-130 has resulted in an ongoing chilling effect on the school community. Based on the OSI investigator's focus into whether plaintiff, PSC employees, students and their families had attended May Day rallies and Black Lives Matters rallies, plaintiff and other PSC employees are afraid of engaging in First Amendment protected activities that could be deemed "political expression" that could subject them to discipline by the DOE's discriminatory administration of D-130 against them.

128.    Plaintiff's fear to engage in First Amendment protected activity has been exacerbated by the fact that the DOE does not view Partisan electoral campaigning and the recruitment of students in schools, during school hours, and using school resources, as violations of D-130. But vague and untrue allegations of recruitment to an organization which does not run candidates for office is the basis for a full-scale intrusive and intimidating investigation.

129.    For example, since the events in 2017, out of fear that the DOE will again retaliate against her and accuse her of violating D-130, plaintiff continues to refrain from engaging in First Amendment protected activities, including both speech as a private citizen on matters of public concern, as well as conduct that should not be proscribed by D-130 (but that defendants may consider a violation given the fact that they consider a May Day bakesale to be a violation of D-130).

A.80

**130.** These specific instances have so far included, *inter alia*: plaintiff refrained from making a public statement to the news media about the tragic events in Charlottesville; plaintiff refrained from making a public statement to the news media criticizing the de Blasio administration's integration initiative; plaintiff refrained from attending a panel discussion about desegregating public schools; plaintiff refrained from organizing an opening assembly to reaffirm the school's commitment to integration and anti-racism; plaintiff refrained from continuing to push for an integrated PSAL sports program at the John Jay Campus; plaintiff refrained from attending a Black Lives Matters rally; and many other similar protected activities that plaintiff would otherwise engage in as an active participant.

**131.** Furthermore, due the OSI investigation and the risk that it posed for her job, plaintiff's right to speak out against the DOE's unlawful treatment of students was chilled on May 16, 2017, barring her from protesting violations of her students' constitutional rights to not be interrogated by OSI investigators without parental knowledge or consent.

**132.** Moreover, the ultimate discipline of plaintiff, the commencement of a COIB investigation, and the Chancellor's Designee's investigation questions about plaintiff's political affiliation during the hearing on the harassment charge by Lembo have severely chilled plaintiff from engaging in activities protected by the First Amendment that she would otherwise be engaging in.

**133.** The retaliatory OSI investigation itself, and the way it was broadly conducted, continues to cause harm as it has dissuaded reasonable DOE employees from engaging in protected activities, such as supporting a charge of discrimination and speaking out on issues of public concern.

**134.**     Moreover, now that students have been targeted, they are afraid of speaking out against racism, and their parents are afraid of participating in the PTA or protected activity for fear of subjecting their students to humiliating and intimidating interrogations.

**135.**     In fact, SCI director Richard Condon has acknowledged the chilling effect at PSC that was caused by the OSI investigation. On October 26, 2017, in an interview with the New York Times, Mr. Condon acknowledged that the investigation into plaintiff was an example of an investigation that left a culture of fear at a school, noting that it was "fairly disruptive" to her school.

**136.**     Because it is unclear what exactly is covered by D-130, plaintiff and other PSC employees have been dissuaded from speaking out against race discrimination for fear of being required to disclose their own political affiliations and/or ideological beliefs, or being required to inform the DOE of the political associations and/or ideological beliefs of others.

## FIRST CLAIM FOR RELIEF
### (the OSI Investigation Violates Plaintiff's Due Process Rights under the Fourteenth Amendment As It Is Evidence of Its Enforcement In and Arbitrary and Discriminatory Manner)

**137.**     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

**138.**     In the introduction of Chancellor's regulation D-130  the DOE sets forth the scope of activity governed by the regulation stating they govern, (1) the use of, or access to school buildings by elected officials, candidates for elective office, **or organizations working on behalf of such officials or candidates,** both during school hours, and non-school hours; (2) use of school facilities, equipment, and supplies for political purposes by school employees, personnel, or staff members and officials, and (3) conduct of school employees, personnel, or staff members and officials with respect to political campaigns and elections.

32

A.82

139.    With respect to Conduct of Employees, the regulation states in relevant part at Subsection C: "(1) While on duty or in contact with students, all school personnel shall maintain a posture of complete neutrality with respect to all candidates.  Accordingly, while on duty or in contact with students, school personnel may not wear buttons, pins, articles of clothing, or other items advocating a candidate, candidates, slate of candidates or political organization/committee and (2) Personnel may not be involved in any activities including fundraising, on behalf of any candidate, candidates, slate of candidates or political organization/committee during working hours."

140.    All portions of the regulation expressly refer exclusively to partisan electoral politics, and the Courts that have addressed this issue refer to partisan politics as well. *Weingarten v. Board of Education*, 680 F.Supp.2d 595 (S.D.N.Y. 2010).

141.    It is apparent on the face of this regulation that when in Section C (2) there is a reference to "political organization"/ "committee", such reference is to organizations referred to in the Introduction, which expressly mentions **organizations working on behalf of such officials or candidates.**  There is no reference to conduct beyond any other type of "political organization" not involved in electoral partisan politics.

142.    The DOE has consistently involved itself and its school employees and students to political activity such as protests against Donald Trump, Voter Registration drives, marches regarding climate change, and many others. (See URL http://www.amny.com/news/politics/nyc-students-protest-trump-s-ban-on-refugees-immigrants-1.13074563).

143.    Specifically in 2014 the SCI, with the input of attorney Robin Greenfield, who was involved in applying Chancellor's regulation D-130 to the allegations against plaintiff, determined that a political rally at a school where Mayor De Blasio spoke did not violate

A.83

Chancellor's regulation D-130 because the DOE adopted the definition of "political organization" in the Public Officers Law.   The   Public Officers Law describes political organization as one which nominates persons for elected office.

144.   The defendant DOE's inconsistent interpretation of the term "political organization" with respect to the political event at P.S. 66 with Mayor DeBlasio and the interpretation it urged on the Court is evidence of arbitrary and discriminatory enforcement of this regulation.

145.   Any effort to extend Chancellor's Regulation D-130 to make improper thebeliefs or advocacy of beliefs that might also be held by and ideological organizations which does not run candidates and are not engaged in electoral politics **contravene** the First and Fourteenth Amendment to the United States Constitution.

146.   Given its arbitrary and discriminatory application to plaintitt, the DOE's application of D-130 does not give notice to a reasonable person in plaintiff's shoes that the conduct plaintiff is under investigation for is a violation of this policy.  Plaintiff and other DOE employees do not know what conduct is prohibited by D-130, and therefore, the DOE is able to take this opportunity to abuse its power and freely retaliate against plaintiff and other DOE employees who engage in protected activity.

147.   To the extent defendants assert D-130 is the basis for this investigation, it must be held unconstitutional on the ground that it is void for vagueness and violates plaintiff's right to due process under the Fourteenth Amendment, see *Kramer v. New York   Department of Education* 715 F.Supp 2d 335 (E.D.N.Y. 2010).

A.84

148.    By engaging in an unrestricted investigation of plaintiff in order to discipline her for violating a Chancellor's Regulation that does not prohibit her conduct, the DOE has violated plaintiff's Fourteenth Amendment Rights.

149.    Plaintiff's constitutional rights have been harmed by defendants' application of D-130 against her because, *inter alia*, (1) plaintiff's First Amendment Rights have been severely chilled as a result of the retaliatory, unfair and arbitrary administration of D-130 to commence an OSI investigation against her; (2) The sweeping manner in which the OSI investigation was conducted chilled plaintiff's First Amendment Rights; (3) The D-130 investigation resulted in plaintiff's discipline; (4) the DOE's broad reading of D-130 as applied to plaintiff has allowed defendants to continue to regulate plaintiff's viewpoints through use of other investigatory mechanisms that could lead to plaintiff's discipline; (5) The DOE's failure to consider clear violations of D-130 as violations of D-130 have severely chilled plaintiff's First Amendment Rights, as they demonstrate the DOE's true motive is to regulate plaintiff's viewpoint; (6) The DOE's continued use of other investigatory mechanisms to question plaintiff on her political beliefs.

150.    Plaintiff is therefore entitled to all relief the Court deems proper, including but not limited to equitable relief, compensatory damages, economic damages and punitive damages.

## SECOND CLAIM FOR RELIEF
### (Retaliation Against Plaintiff in Violation of Title VI)

151.    Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

152.    Title VI prohibits intentional discrimination by federally funded programs.

153.    Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the

35

A.85

benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

154.    The New York City DOE receives Federal Financial Assistance including funding under Title I of the Elementary and Secondary Education Act which provides funds to schools which have a high percentage of families from impoverished backgrounds.

155.    Schools qualifiy for Title I if a certain percentage of the students qualify for free or reduced lunch programs.

156.    Because over 60% of the students at PSC qualified for free or reduced lunch programs, PSC receives Title I  federal funds for school wide programs.

157.    Private individuals may sue to enforce Section 601 and obtain both injunctive relief and damages. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001).

158.    A private action for damages under Section 601 exists only if an "appropriate person" had actual knowledge of the alleged discrimination and was deliberately indifferent to it. *Rubio v. Turner Unified Sch. Dist.* No. 202, 523 F. Supp.2d 1242, 1250-51 (D. Kan. 2007); see *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

159.    Constructive notice is insufficient. See *Gebser,* 524 U.S. at 285.

160.    An "appropriate person" is one who has authority to take corrective action to end the discrimination. *Rubio*, 523 F. Supp.2d at 1250-51; see *Gebser*, 524 U.S. at 290.

161.    Determining who is an appropriate person under Title VI is a fact-based inquiry, but a school official with authority to halt known abuse by measures such as transferring the harassing student to a different class, suspending her or curtailing her privileges would qualify. *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir. 1999). The knowledge of the wrongdoer herself is "not pertinent to the analysis." *Gebser*, 524 U.S. at 291.

A.86

**162.**    Plaintiff is a person with standing to and who did in January and February 2017 take action to enforce the terms of Title VI.

**163.**    Defendant was aware of her activities as her complaint was addressed to leaders in the DOE.

**164.**    Defendants violated Title VI by retaliating against plaintiff by instituting a punitive investigation against her based on her alleged "communist activities" because she complained of the DOE's race discrimination against its students.

**165.**    As a result of this retaliation plaintiff has suffered damages to her reputation by inappropriately being put under a cloud of suspicion and having her job threatened.

### THIRD CLAIM FOR RELIEF
**(Retaliation Against Plaintiff in Violation Plaintiff's Rights Under the New York City Human Rights Law)**

**166.**    Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

**167.**    Plaintiff's January and February 2017 speaking out both orally and in writing opposing DOE policies which she believed to be discriminatory towards the students in PSC and the other schools in the John Jay building in comparison with the favorable treatment of the students at the Millenium Schools,  on the basis of race is protected activity under the New York City Human Rights Law (NYCHRL) Administrative Code of the City of New York §8-101 et seq. which prohibits race discrimination against students in public schools.

**168.**    New York City Human Rights Law also prohibits retaliation in any manner against persons who oppose discrimination under the NYCHRL.

37

A.87

**F.**     A declaration that defendant retaliated against plaintiff in violation of Title VI and that defendant has retaliated against plaintiff for exercising her rights under the First Amendment to the United States Constitution and has violated her rights under the New York City Human Rights Law.

**G.**     Injunctive relief, temporarily, preliminarily and permanently barring the retaliatory OSI investigation against plaintiff;

**H.**     Injunctive relief preliminarily and permanently barring disciplinary action against plaintiff for opposing an illegally retaliatory OSI investigation.

**I.**     An award of compensatory damages for emotional distress and suffering for defendant' violations of Title VI, the Fourteenth Amendments, and the New York City Human Rights Law;

**J.**     An award of all allowable damages for defendant' violations of Title VI, the First and Fourteenth Amendments, and the New York City Human Rights Law;

**K.**     An award of attorney's fees and costs;

**L.**     Such relief as is authorized by federal law;

**M.**     Such other relief as the Court deems just and proper;

## **<u>JURY TRIAL</u>**

Plaintiff demands a jury trial for all causes of action and claims for which she has a right to a jury trial.

Dated: New York, New York
    November 6, 2019

Respectfully submitted,

MIRER MAZZOCCHI & JULIEN  PLLC

A.88

Jeanne Mirer
1 Whitehall Street, 16th Floor
New York, NY 10004
Tel. (212) 231-2235
Fax (212) 409-8338
*Attorneys for Plaintiff*
maria@mmsjlaw.com

A.89

Docket No. 17-CV-3136 (PGG)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

                                        Plaintiffs,

            -against-

THE NEW YORK CITY DEPARTMENT EDUCATION
and CARMEN FARINA,

                                        Defendants.

**MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION TO
AMEND THE COMPLAINT**

**_JAMES E. JOHNSON_**
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, Rm. 2-123*
*New York, N.Y.  10007*

*Of Counsel:  Joseph Anci*
*Tel:  (212) 356-1106*

A.90

A.91

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Acheampong v. N. Y. City Health & Hosps. Corp.,
  2015 U.S. Dist. LEXIS 37933 (S.D.N.Y. Mar. 25, 2015) ........................................................7

Ashcroft v. Iqbal,
  556 U.S. 662 (2009) ............................................................................................................4

Bell Atlantic Corp. v. Twombly,
  550 U.S. 544 (2007) ............................................................................................................4

Bloomberg v. N.Y. City Dep't of Educ.,
  2019 U.S. Dist. LEXIS 163508 (S.D.N.Y. Sept. 24, 2019) ..............................................6, 7, 8

Chimarev v. TD Waterhouse Investor Servs.,
  233 F. Supp. 2d 615 (S.D.N.Y. 2002) ....................................................................................4

Electronics Communs. Corp. v. Toshiba Am. Consumer Prods.,
  129 F.3d 240 (2d Cir. 1997) .................................................................................................4

F.O. v. New York City Dep't of Educ.,
  899 F. Supp. 2d 251 (S.D.N.Y. 2012) ....................................................................................5

Foman v. Davis,
  371 U.S. 178 (1962) ............................................................................................................3

Fox v. Bd. of Trustees of the State Univ. of N.Y.,
  42 F.3d 135 (2d Cir. 1994) ..................................................................................................5

K.C. v. N.Y. City Educ. Dep't,
  2015 U.S. Dist. LEXIS 134043 (S.D.N.Y. Sept. 30, 2015) .....................................................6

Lucente v. Int'l Bus. Machs. Corp.,
  310 F.3d 243 (2d Cir. 2002) .................................................................................................3

Marchi v. Bd. of Coop. Educ. Servs. of Albany,
  173 F.3d 469 (2d Cir. 1999) .................................................................................................6

New York City C.L.A.S.H v. City of New York,
  315 F. Supp. 2d 461 (S.D.N.Y. 2014) ....................................................................................6

Sulehria v. New York,
  2014 U.S. Dist. LEXIS (S.D.N.Y. Sep. 19, 2014) ....................................................................7

A.92

Taylor v. Vt. Dep't of Educ.,
    313 F.3d 768 (2d Cir. 2002)........................................................................6

Yaba v. Cadwalader, Wickersham & Taft,
    931 F. Supp. 271 (S.D.N.Y. 1996) ........................................................3

**Other Authorities**

U.S. Const, art. III, § 2, cl. 1 .............................................................................5

**PRELIMINARY STATEMENT**

Plaintiff seeks leave from this Court to file a second amended complaint in this action in order to assert additional facts in an attempt to resurrect her previously dismissed Fourteenth Amendment Due Process and Title VI retaliation claims.  Defendants New York City Department of Education ("DOE") and Carmen Farina ("Farina") oppose plaintiff's motion for leave to amend a second time on the ground that these proposed amendments are futile.  None of the additional allegations in the proposed pleading state a plausible claim for any of the previously dismissed causes of action, and these claims would not withstand a motion to dismiss pursuant to Rule 12.  Accordingly, plaintiff's application for leave to file a second amended complaint should be denied.

**PROCEDURAL HISTORY**

Plaintiff filed her Complaint and motion for a temporary restraining order and preliminary injunction on April 28, 2017.  See ECF Document Nos. 1-10.  On April 28, 2017, the Court ordered that defendants submit an opposition to plaintiff's motion for a preliminary injunction by 10:00 a.m. on May 1, 2017 and that the parties appear for a hearing on plaintiff's motion at 3:00 p.m. on that date.  See ECF Document No. 12.  On May 1, 2017, defendants submitted a memorandum of law in opposition to plaintiff's motion for a temporary restraining order and the declaration of Charity Guerra, Executive Deputy Counsel for Administrative Trials, Compliance and Operations for DOE.  See ECF Document Nos. 11, 17.  Plaintiff submitted supplemental briefs and affidavits on May 2, 2017, See ECF Document Nos. 21-23, and defendants' submitted supplemental materials on May 3, 2017.  See ECF Document No. 27, 28. On May 3, 2017, the Court issued a decision denying plaintiff's motion for a temporary restraining order and preliminary injunction.  See ECF Document No. 29.

A.94

Plaintiff filed an Amended Complaint on May 23, 2017. <u>See</u> ECF Document No. 38.  Defendants filed a motion to dismiss the plaintiff's Fourteenth Amendment, Title VI Retaliation and First Amendment claims pursuant to Rule 12 (b)(6), and that motion was fully briefed on September 6, 2018 along with plaintiff's motion for judgment on the pleadings pursuant to Rule 12 (c).  <u>See</u> ECF Document Nos. 77-87.  On September 24, 2019, the Court issued an Opinion and Order granting Defendants' motion in its entirety.  <u>See</u> ECF Document No. 89.  Plaintiff's cross-motion for judgment on the pleadings was deemed withdrawn.  <u>Id</u>.

Defendants' filed their Answer to plaintiff's remaining claim – retaliation pursuant to the New York City Human Rights Law – on October 15, 2019.  <u>See</u> ECF Document No. 92.  On November 6, 2019, plaintiff filed a notice of motion to amend, affirmation in support, and proposed second amended complaint.  <u>See</u> ECF Document Nos. 93, 94.

Defendants now submit this opposition to plaintiff's motion to amend.

<u>**STATEMENT OF FACTS**</u>

In the Court's September 24, 2019, plaintiff received permission from the Court to file the instant motion seeking leave to file a second amended complaint, along with a proposed second amended complaint.  <u>See</u> ECF Document No. 92.  The proposed pleading seeks to add allegations and re-plead two of her three dismissed claims – Title VI Retaliation and Fourteenth Amendment Due Process.  <u>See generally</u> Affirmation of Jeanne Mirer in Support Plaintiff's Motion to File a Second Amended Complaint dated November 6, 2019 ("Mirer Aff."), ECF Document No. 94.

In an attempt to resurrect her Title VI Retaliation claim, plaintiff has added three paragraphs which purport to establish that DOE received federal funding.  <u>See</u> Mirer Aff at ¶ 12-13.  These paragraphs simply state that DOE receives federal funds pursuant to Title I based on a

percentage of DOE students who qualify for free or reduced lunch programs.  See Exhibit 1 to the Mirer Aff. at ¶¶ 23-25.

Regarding her dismissed Fourteenth Amendment claim, plaintiff alleges that she has added "several paragraphs" to demonstrate arbitrary or discriminatory enforcement of Chancellor's Regulation D-130 ("D-130").  See Mirer Aff. at ¶ 14.  In these paragraphs, plaintiff makes reference to occasions, that preceded this action by three years, wherein DOE allegedly took a contrary position on D-130 to the position alleged in this action.  See Mirer Aff. at ¶ 16.

As detailed below, none of these new allegations are sufficient to satisfy the pleading requirements for Title VI Retaliation or Fourteenth Amendment Due Process claims.  Accordingly, plaintiff's motion to amend should be denied in its entirety.

## ARGUMENT

## POINT I

## PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT SHOULD BE DENIED BECAUSE THE PROPOSED AMENDMENTS ARE FUTILE

**A.**        **The Legal Standard**

Where a party has previously amended her pleading, he "may amend . . . only with the opposing party's written consent or with the court's leave."  Fed. R. Civ. P. 15(a)(2).  "[T]he grant or denial of an opportunity to amend is within the discretion of the District Court.  Foman v. Davis, 371 U.S. 178, 182 (1962).  "When leave to amend would be futile, that is a sufficient reason to deny the plaintiff leave to amend."  Yaba v. Cadwalader, Wickersham & Taft, 931 F. Supp. 271, 274 (S.D.N.Y. 1996).

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  Lucente v. Int'l Bus. Machs. Corp.,

A.96

310 F.3d 243, 258 (2d Cir. 2002); see also Chimarev v. TD Waterhouse Investor Servs., 233 F. Supp. 2d 615, 617 (S.D.N.Y. 2002). ("A proposed claim is futile . . . if it is . . . legally insufficient on its face.").  Under to Rule 12(b)(6), a complaint may be dismissed pursuant to Federal Rule 12(b)(6) where it fails to plead enough facts "to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The facts set forth in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  A court may not "assume that the plaintiff can prove facts that [she] has not alleged." Electronics Communs. Corp. v. Toshiba Am. Consumer Prods., 129 F.3d 240, 243 (2d Cir. 1997).

**B.      Plaintiff's Additional Allegations Do Not Establish A Fourteenth Amendment Due Process Claim**

Plaintiff's Due Process claim stems from an investigation that was commenced by DOE against plaintiff for alleged violations of D-130.  See Exhibit 1 to Mirer Aff. at ¶¶ 65-66, 71-74.  In her proposed second amended complaint, plaintiff adds paragraphs alleging that DOE previously interpreted the term "political organization" of D-130 differently, which, she argues, demonstrates that the regulation vague and violates her Due Process rights.  See Exhibit 1 to Mirer Aff. at ¶¶ 113-122.  However, these unsupported allegations, even if true, would not justify the addition of a Due Process claim to this action

1.      Plaintiff's D-130 Claims Are Moot

Plaintiff readily concedes that DOE determined that the allegation that plaintiff violated D-130 was unsubstantiated.  See Exhibit 1 to Mirer Aff. at ¶ 103.  Accordingly, plaintiff has not been found to have violated D-130, she has not been disciplined for violating D-130, and, therefore, no case or controversy exists for plaintiff's Due Process claims.

A.97

The mootness doctrine is rooted in the "case or controversy" requirement of Article III of the Constitution, which describes "the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." U.S. Const. art. III, § 2, cl. 1. A case is moot, and the federal court is divested of jurisdiction over it, "when the parties lack a legally cognizable interest in the outcome." Fox v. Bd. of Trustees of the State Univ. of N.Y., 42 F.3d 135, 140 (2d Cir. 1994) (internal quotation marks and citations omitted). "'A case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." F.O. v. New York City Dep't of Educ., 899 F. Supp. 2d 251, 254 (S.D.N.Y. 2012) (quoting Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 647 (2d Cir. 1998)).

Here, plaintiff alleged harm resulting from an investigation into her alleged conduct that violated D-130. Plaintiff admits that the investigation concluded with a determination that she did not violate D-130 under any interpretation of the regulation. See Exhibit 1 to Mirer Aff. at ¶ 103. Indeed, plaintiff's proposed Due Process cause of action states that, "To the extent defendants assert D-130 is the basis for this investigation, it must be held unconstitutional on the ground that it is void for vagueness and violates plaintiff's right to due process under the Fourteenth Amendment, *see Kramer v. New York Department of Education* 715 F.Supp 2d 335 (E.D.N.Y. 2010)," and, "By engaging in an unrestricted investigation of plaintiff in order to discipline her for violating a Chancellor's Regulation that does not prohibit her conduct, the DOE has violated plaintiff's Fourteenth Amendment Rights." See Exhibit 1 to Mirer Aff. at ¶¶ 147-148. Clearly, plaintiff's Due Process claim is tied to an active, ongoing investigation. In fact, at the commencement of this action, plaintiff sought to restrain DOE from continuing with the investigation. See Exhibit 1 to Mirer Aff. at ¶¶ 82-93. Now that the

investigation has been concluded, and the D-130 claims against plaintiff have been determined to be unsubstantiated, no case or controversy exists and plaintiff's Due Process claim based on D-130 are moot.  Additionally, plaintiff is unable to demonstrate that her D-130 claims are reasonably capable of repetition and any allegation to that effect would be premature or based entirely on pure speculation and conjecture. See K.C. v. N.Y. City Educ. Dep't, 2015 U.S. Dist. LEXIS 134043 at *39 (S.D.N.Y. Sept. 30, 2015).

Further, even if the mootness doctrine did not apply, plaintiff could not establish a viable Due Process claim in light of the Court's September 24, 2019 Order stating that D-130 "unambiguously encompasses the reported conduct that instigated OSI's investigation," "provides adequate notice of the conduct it prohibits," and that "a reasonable person would surely understand that 'a communist organization known as the Progressive Labor Party' is a 'political organization'." See Bloomberg v. N.Y. City Dep't of Educ., 2019 U.S. Dist. LEXIS 163508 at *35-38 (S.D.N.Y. Sept. 24, 2019).

2.     Plaintiff Does Not Plead A Viable Due Process Claim

The allegations submitted by plaintiff in her proposed second amended complaint do not satisfy the pleading requirement for a Due Process claim, which requires that: (1) if a Regulation only imposes civil penalties, "the standards governing the vagueness doctrine are relaxed", see New York City C.L.A.S.H v. City of New York, 315 F. Supp. 2d 461, 484 (S.D.N.Y. 2014); (2) the standards of vagueness are considerably more relaxed when the government is acting as employer, see Marchi v. Bd. of Coop. Educ. Servs. of Albany, 173 F.3d 469, 480 (2d Cir. 1999); and (3) when a regulation is ambiguous, the court must defer to the agency's interpretation of its own regulation, unless that interpretation is plainly erroneous, see Taylor v. Vt. Dep't of Educ., 313 F.3d 768 (2d Cir. 2002).

A.99

As set forth in the Court's September 24, 2019 Order, D-130 is not vague, a reasonable person would understand its contents, or that the DOE's interpretation of D-130 was erroneous.  See Bloomberg v. N.Y. City Dep't of Educ., 2019 U.S. Dist. LEXIS 163508 at *35-38.  Further, in its decision the Court stated, "Although the Amended Complaint suggests that the Regulation is enforced in an arbitrary and discriminatory manner, Plaintiff has not pled facts demonstrating that OSI ignored conduct comparable to that in which she allegedly engaged."  Id at 38.  Despite this explicit instruction, plaintiff has still failed to plead any facts demonstrating that OSI or DOE ignored conduct comparable to what she was alleged to have engaged in.

For these reasons, plaintiff's Fourteenth Amendment Due Process claim would not withstand a motion to dismiss.  Accordingly, this claim is futile and plaintiff's motion to amend to add a Fourteenth Amendment Due Process claim must be denied.

**C.        Plaintiff's Additional Allegations Fail To State A Title VI Retaliation Claim**

In order to state a cause of action pursuant to Title VI, a plaintiff must "plausibly allege" that the defendant received federal funding, identify the primary objective of the federal funding, and identify that the alleged discrimination or retaliation was related to the primary objective of the program or subject benefiting from federal funding.  See Moore, 2017 U.S. Dist. LEXIS at 43-44; see also Sulehria v. New York, 2014 U.S. Dist. LEXIS  at *5 (S.D.N.Y. Sep. 19, 2014) (citing Ass'n Against Discrimination in Emp't, Inc. v. City of Bridgeport, 647 F.2d 256, 276 (2d Cir. 1981)); Acheampong v. N. Y. City Health & Hosps. Corp., 2015 U.S. Dist. LEXIS 37933 at *14 (S.D.N.Y. Mar. 25, 2015) (quoting Commodari v. Long Isl. Univ., 89 F. Supp. 2d 353, 378 (E.D.N.Y. 2000)).

In its September 24, 2019 Order, the Court held that, in the Amended Complaint, plaintiff did not sufficiently plead a "logical nexus" between the use of any federal funds and the

A.100

alleged discriminatory practice about which she complained – alleged discrimination in the allocation of sports teams to PSC.   See Bloomberg v. N.Y. City Dep't of Educ., 2019 U.S. Dist. LEXIS 163508 at *32.   Indeed, the Court expressly indicated that plaintiff would have to had pled her claim in such a manner.  Id.

Plaintiff has still failed to cure this defect.  Here, plaintiff adds statements that DOE receives federal funds pursuant to Title I based on students who qualify for free or reduced lunch programs.  See Exhibit 1 to Mirer Aff. at ¶¶ 23-24.   Plaintiff then makes the conclusory statement that "[b]ecause over 60% of the students at PSC qualified for free or reduced lunch programs, PSC receives Title 1 funds for school wide programs."  See Exhibit 1 to Mirer Aff. at ¶ 25.

None of these statements are sufficient to satisfy the pleading requirement for a Title VI Retaliation claim as specifically outlined by the Court in its September 24, 2019 decision.  These statements relate to free and reduced lunch programs, neither of which are at issue in this action, nor are they programs about which plaintiff allegedly complained were discriminatory.  See generally Exhibit 1 to Mirer Aff.  Nowhere in the proposed second amended complaint does plaintiff allege any logical nexus between any federal funds received by DOE and sports programs allocated to PSC.  Id.

For these reasons, plaintiff's Title VI Retaliation claim would not withstand a motion to dismiss.  Accordingly, this claim is futile and plaintiff's motion to amend to add a Title VI retaliation claim must be denied.

A.101

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that plaintiff's motion for leave to file a second amended complaint be denied in its entirety, and that defendants be awarded costs and disbursement, together with such other and further relief as this Court may deem just and proper.

Dated:        New York, New York
              December 6, 2019

**JAMES E. JOHNSON**
Corporation Counsel of the
  City of New York
Attorney of for Defendants
  100 Church Street, Room 2-123
New York, New York 10007
(212) 356-1106
janci@law.nyc.gov

By:     _____/s_____

              Joseph Anci
              Senior Counsel

A.102

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

                          Plaintiff,                              **ORDER**

        - against -                                        17 Civ. 3136 (PGG)

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                          Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

                It is hereby ORDERED that the conference in this action previously scheduled for

December 12, 2019 is adjourned sine die.

Dated:  New York, New York
             December 11, 2019

                                            SO ORDERED.

                                            _____
                                            Paul G. Gardephe
                                            United States District Judge

A.103

# MIRER MAZZOCCHI & JULIEN, PLLC

ATTORNEYS AT LAW
1 WHITEHALL STREET
16TH FLOOR
NEW YORK, NEW YORK 10038

JEANNE MIRER
KRISTINA MAZZOCCHI

TELEPHONE: (212) 231-2235
JMIRER@MMSJLAW.COM

RIA JULIEN

December 17, 2019

**VIA ECF**

Hon Paul G. Gardephe
United States District Judge
Southern District of New York
Thurgood Marshall United
States Court House
Room 705
40 Foley Square
New York, New York 10007

Re:  *Bloomberg v. NYCDOE, et al.*
     **17-cv-03136 (PGG)**

Dear Judge Gardephe:

This office represents Plaintiff Jill Bloomberg in the above entitled case. I write with consent of Defendants' Counsel.   Plaintiff and Defendants' agree to extend the time for filing Plaintiff's Reply to Defendants' Memo of Law in Opposition to Plaintiff's Motion to Amend the Complaint to January 10, 2020.

Thank you for your consideration in this matter.

SO ORDERED:

Paul G. Gardephe, U.S.D.J.
Dec. 17, 2019

Respectfully submitted,

Jeanne Mirer

Cc: Joseph Anci

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JILL BLOOMBERG,

                                                             17-cv-03136 (PGG)

                Plaintiff,

   v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                Defendants.
------------------------------------------------------------------x

# REPLY MEMORANDUM OF LAW
# IN SUPPORT OF PLAINTIFF'S MOTION
# TO FILE HER AMENDED COMPLAINT

**Mirer, Mazzocchi & Julien PLLC**
**Attorneys for Plaintiff**
**1 Whitehall Street , 16th Floor**
**New York, New York 10004**
**212-231-2235**

A.105

**<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

Table of Authorities……………………………...………………………………………………ii

Preliminary Statement…………………………………………………………...…………… 1

Point I  Plaintiff's Proposed Amended Complaint States a Plausible Claim that Plaintiff Suffered a Violation of her Rights Under Title VI. ……………………….........................................…... 1

Point II  Plaintiff's Proposed Amendments Regarding Her Due Process Claim Render the Claim Viable as they Show the Lack of Support of this Claim …............……….....................................………………….... 4

A. Plaintiff's Due Process Claim is Not Moot …......………………………4

B. Plaintiff has a Viable Due Process Claim................................................6

Conclusion...........................…..………………………….............………………….......... 8

A.106

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Hickey v Myers</u>
852 F. Supp. 2d 257 (N.D.N.Y 2012) ---------------------------------------------------------------2

<u>Alexander v Sandoval</u>
532 U.S. 275, (2001) -------------------------------------------------------------------------------2

<u>Peters v Jenney</u>
326 F.3d 307 (4ᵗʰ Cir 2003) ----------------------------------------------------------------------2

<u>Verdi v City of New York</u>
306 F. Supp. 3d 532 (S.D.N.Y 2018) ----------------------------------------------------------2,3

<u>Association Against Discrimination in Employment v City of Bridgport</u>
647 F.2d 256 (2d Cir 1981) ----------------------------------------------------------------------2

<u>City College v Bell</u>
465 U.S. 555 (1984) -------------------------------------------------------------------------------3

<u>F.O. v New York City Dep't of Education</u>
899 F. Supp.2d 251 (S.D.N.Y 2012) -----------------------------------------------------------4,5

A.107

## PRELIMINARY STATEMENT

In Defendants' Opposition to Plaintiff's Motion to Amend her Complaint, Defendants set forth some of the procedural history of this case.    In accordance with the Court's Order of September 24, 2019, and stipulations of counsel, Plaintiff was given until November 6, 2019 to file her motion to amend along with a proposed Second Amended Complaint. (SAC) Both were filed on November 6, 2019. (ECF Dkt Nos. 93-94) On December 6, 2019 Defendants filed a Memorandum of Law to in Opposition to Plaintiff's Motion to Amend.  (ECF Dkt No. 99)

Defendants Opposition states that Plaintiff's attempts to address the pleading deficiencies stated as the basis for the dismissal of Plaintiff's Title VI, and  Fourteenth Amendment Due Process claims are futile and urges the Court to deny the motion.  Plaintiff disagrees and urges this Court to grant her motion.

Although Defendants address the issue of Plaintiff's Fourteenth Amendment Due Process claim first, Plaintiff will address the arguments regarding Title VI first.

## I.  PLAINTIFF'S PROPOSED AMENDED COMPLAINT STATES A PLAUSIBLE CLAIM THAT PLAINTIFF SUFFERED A VIOLATION OF HER RIGHTS UNDER TITLE VI.

In Plaintiff's proposed amended complaint, she added paragraphs 23-25 to state that Park Slope Collegiate (PSC) where she is the Principal receives federal financial assistance on a schoolwide basis through Title I of the Elementary and Secondary Education Act.  These funds are provided through the New York City Department of Education.  By these allegations Plaintiff showed the students at PSC were beneficiaries of federal funds given to the school system.

Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, states:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

1

A.108

In the present case, Plaintiff alleged that she complained that the students at PSC were subject to race discrimination through the separate and unequal allocation of sports teams to PSC and thus were being discriminatorily denied these benefits in violation of Title VI.  She alleged that Title VI applied because the New York City Public Schools is the recipient of federal funds. Her Title VI complaint alleges she suffered retaliation for raising this issue of racial discrimination. Plaintiff did not bring her case as an employment discrimination case where 42 U.S.C. §2000d-3 requires the federal financial assistance given to the entity to be for the purposes of employment.

As noted in *Hickey v Myers,* 852 F. Supp. 2d 257 (N.D.N.Y 2012): "It is well established that "private individuals may sue to enforce . . . Title VI and obtain both injunctive relief and damages." *Alexander v Sandoval,* 532 U.S. 275, (2001) A plaintiff may bring a claim under Title VI for retaliation for opposing practices that one reasonably believes constitute intentional discrimination under Title VI, *Peters v Jenney* 326 F.3d 307 (4th Cir 2003).  In line with this,  and as noted by the Court in *Verdi v City of New York,*  306 F. Supp. 3d 532 (S.D.N.Y 2018), (which relied on *Hickey*)  defendant's argument that the plaintiff must prove that a "primary objective" of the school's federal funding was to provide employment was rejected.  The Court in *Verdi* stated: "Plaintiff does not allege employment discrimination but instead alleges that he was retaliated against because he spoke out against racial discrimination in the school's admission policy. This argument does not implicate *§2000d-3*."

This Court's September 24th, ruling found the analysis in *Verdi* to be persuasive. Nonetheless, Defendants herein continue to argue that Plaintiff must "plausibly allege" that the retaliation against her   was related to the "primary objective" of the program or subject benefiting from federal funding citing cases which arise under section 42 U.S.C. §2000d-3. see e.g. *Association Against Discrimination in Employment v City of Bridgeport* 647 F.2d 256 (2d Cir 1981).

2

A.109

Defendants also argue that "plaintiff must show a logical nexus between federal funds received by the DOE and the sports programs allocated to PSC." (Defendant's Memo p. 8). By this argument, Defendants have reverted to requiring Plaintiff to show "program specific" federal funds to PSAL were used for the alleged discrimination when this narrow reading of Title VI is prohibited by the Civil Rights Restoration Act of 1987. This Act overturned Grove *City College v Bell*, 465 U.S. 555 (1984), thereby eliminating "program specific" federal funding for purposes of a claim under Title VI. The new definition specifies that entire entities receiving federal funds--whether governmental entities, school systems, or universities--must comply with Title VI, rather than just the particular program or activity that actually receives the funds. See 42 U.S.C. 2000d-4a[1]

This Court's September 24th, opinion relied on *Verdi v New York City*, *supra*, wherein the Court stated:

> At the heart of a Title VI retaliation claim could be the very individuals whom the statutory scheme was intended to protect, so it is important to distinguish between garden variety retaliation-for-complaining-about-employment-discrimination claims, on the one hand, and retaliation claims in which the complainant's employment is affected based on complaints regarding nonemployment discrimination against others, on the other.

In *Verdi, supra* the Court allowed the Plaintiff to amend his complaint which had only stated that the New York City Department of Education was the recipient of federal funds, to allege facts from which the Court can infer that the discrimination that he opposed was against individuals who were intended beneficiaries of that funding. In the present case the issue is racial discrimination against the students at Park Slope Collegiate in the way benefits of sports teams were allocated by the New York City Department of Education, a recipient of federal financial

---

1   This section of the law defines program or activity to mean all of the operations of various entities of government including school districts any parts of which is extended federal financial assistance. Plaintiff wonders whether the Court in *Verdi* was aware of the Civil Rights Restoration Act as it does make it clear that finding federal financial assistance to the New York City Department of Education means that all parts of the school system receives federal financial assistance.

3

assistance.  It was this racial discrimination which Plaintiff protested.   She did so on behalf of students at Park Slope Academy.  These students are the beneficiaries of Title I funding who have a right not to be discriminated against by any part of the Department of Education.

Defendants do not dispute that the New York City Board of Education receives federal financial assistance.  Plaintiff's proposed amended complaint shows in paragraphs 23 to 25 that PSC receives Title I funds for "schoolwide" programs.   These proposed amendments, Plaintiff submits, address the concerns raised by the Court in the September 24th, Opinion.  The proposed amendments which allow Plaintiff to proceed under Title VI are, thus, not futile.

## II.   PLAINTIFF' PROPOSED AMENDMENTS REGARDING HER DUE PROCESS CLAIM RENDER THE CLAIM VIABLE AS THEY SHOW THE LACK OF SUPPORT THIS CLAIM.

### A.  Plaintiff's Due Process Claim is Not Moot

Defendants cite to *F.O. v New York City Dep't of Education* 899 F. Supp.2d 251 (S.D.N.Y 2012), for the proposition that "a case becomes moot when the interim relief or events have eradicated the **effects** of the defendant's act or omission and there is no reasonable expectation that the alleged violation will recur." [2]

Defendants assert that because the charges against Plaintiff based on that regulation were not substantiated, any claim arising out of the impact of Chancellor's Regulation D-130 on her is now moot. The finding that the charges against Plaintiff under D-130 were not substantiated however does not eradicate the **effects** of the Defendants' actions or omissions, to wit: the impact of the

---

[2] This case arose under the Individuals with Disabilities in Education Act and involved a dispute over whether the plaintiff the student would be provided with the services of a paid health paraprofessional for the pendency of this action during the 2010-11 school year, which had ended by the time the case was filed in Court and where during the pendency of the administrative appeal the Department of Education had provided those services.   Thus, at the time the case came to Court the plaintiff's request for interim relief was moot and the case was dismissed.

4

A.111

investigation and its aftermath on Plaintiff. The investigation based on Regulation D-130 had significant effects on Plaintiff. She was stigmatized and continued to be chilled in the pursuit of her work, based on not knowing whether she would continually be charged with a D-130 violation for expressing her views. She was subjected to extreme stress throughout the investigation. The emotional distress she suffered watching students be interrogated and being powerless to stop it, caused her to feel powerless and depressed. She also alleges the OSI investigation went beyond D-130. That is, the OSI investigators sought to find something to charge her with. She eventually was found to have committed several clerical violations of other regulations which resulted in disciplinary letters being placed in her file and a report to the Conflict of Interest Board which eventually cleared her. All of these matters were the result of an investigation into an alleged violation of Chancellor's regulation D-130 which, Plaintiff claims, should never have happened.

Another effect of the investigation was to empower the persons who made the complaint of so-called "communist organizing" to initiate one complaint after another against Plaintiff or other teachers who were also investigated for the same issue as Plaintiff. These complaints are then investigated by the DOE or subject to a Union grievance against her. The result of these actions have caused Plaintiff so much stress that she has developed health concerns which are forcing her to retire early.[3]

This case is not like the one where a person seeks a habeas or a benefit which is granted mooting the relief as in *F.O. v New York City Dep't of Education*. In this case Plaintiff sought to prevent the investigation but her current complaint and the proposed amended complaint seeks damages for the impact of the investigation on her. The effects of the violation of Plaintiff's Due

---

3   Plaintiff informed counsel after the filing of the proposed second amended complaint that she cannot return from the sabbatical she took in the fall of 2019. She has also informed the DOE of this. Plaintiff will likely be seeking permission to amend the complaint to allege constructive discharge as another element of Plaintiff's damages.

5

A.112

Process rights under Regulation D-130 are ongoing even if she was found not to have violated it. The DOE has not changed its policy on how it is interpreting D-130 and Plaintiff submits, this Court's erroneous finding that a clearly inconsistently applied policy is clear and unambiguous means that the DOE is free to use it again and can use D-130 to investigate conduct of those thought to be in a political organization/party not to the liking of the administration, even where the organization Plaintiff was erroneously alleged to be part of does not run candidates for office.

Defendants are incorrect that the allegations in the complaint which reiterate the points above are tied to there being an active, ongoing investigation. They are tied to why the investigation was started and the policy the DOE alleges supported that investigation as well as the effects of the investigation on her.

**B. Plaintiff Has A Viable Due Process Claim**

When this Court found in the September 24th Opinion that Plaintiff failed to plead facts demonstrating that OSI ignored conduct comparable to that which she engaged, she failed in her due process claim to show the regulation lacked explicit standards thus permitting discriminatory enforcement, (Opinion p. 29) Plaintiff determined to put into the amended complaint the very facts which not only showed arbitrary and discriminatory enforcement, but also that based on a document found after the briefs on the Motions to Dismiss were fully submitted, showed that the agency (DOE) had interpreted the term "political organization" in a manner opposite to that which the DOE urged on the Court in this case, leading to a comparable and discriminatory application of the rule. With this document (and other examples) it simply cannot be that the term "political organization" in Regulation D-130 is "unambiguous" or that it has "explicit standards".

In the proposed amended complaint Plaintiff has added examples of discriminatory

A.113

enforcement of Chancellor's Regulation D-130.   For example, at paragraph 93 [4]  Plaintiff refers the Court to the fact that the DOE has endorsed many political activities against President Trump, including voter registration drives, marches regarding climate change and many others.  Plaintiff cited a URL to an article on the DOE encouraging students to protest President Trump's ban on refugees.  While these actions might not have been explicitly taken by the Democratic Party, Plaintiff also cited an instance where members of a school community made students aware of opportunities to work on the DeBlasio Campaign.   (Proposed SAC paragraphs 123-124 ).

Paragraph 101 of the Proposed SAC on page 24, shows that the OSI investigators in this case were investigating whether a bake sale for a May Day march occurred at the school.  May Day is an International Workers Holiday which is not the province of any political party.  The idea that a bake sale for a May Day march could be a violation of Chancellor's regulation D-130 is a further example of how the regulation lacks explicit standards so as to be void for vagueness.

Most importantly, at the same time as the DOE argued to this Court that it must give deference to its own interpretation of the regulation, and argued for a broad reading of the term "political organization" in D-130 so as to include any organization with a political point of view (whether it has the word Party in its name or runs candidates), the DOE knew that it previously argued for an interpretation of D-130 that was the opposite of what was argued in this case.  That is, in an instance where a complaint had been filed about a violation of D-130 where Mayor De Blasio used a school building after hours for a rally for certain workers, to talk *inter alia* about his support for them, the DOE including Robin Greenfield of the counsel's office who oversees OSI, knew that the DOE's investigators adopted a narrow definition of "political organization".  The

---

4   There is a problem with the numbering of the paragraphs in the proposed complaint.  After paragraph 93 in the complaint on page 22, the numbering begins again at paragraph number 90.  After the Court rules on the motion to amend Plaintiff will ensure that this problem will be corrected.

A.114

opinion finding no violation of D-130 imported the definition of the term "political organization" from the Public Officers Law into D-130 (where it is not explicitly defined) to restrict the definition of "political organization" to ones which nominate and run candidates.  See SAC paragraphs 113 through 121.  The Court's claim that the name Progressive Labor Party suggests it is engaged in partisan politics, does not mean that it does.  D-130 is a regulation aimed at not having school systems appear to be supporting specific candidates in an election,  it is not a regulation to police activities of persons in organizations which have a political point of view, may have the term "party" in their name,  but which do not run candidates.

If the DOE wants to regulate the activities of such non-partisan affirmations, it can issue other regulations to address that matter consistent with First Amendment provisions. The DOE just cannot use D-130 to do so.

The Defendants rely on this Court's September 24th order for the finding that regulation D-130 is clear and unambiguous to show Plaintiff no longer can claim otherwise.  The fact that the term "political organization" in the Public Officers Law is what the DOE used for the definition of the same term in D-130 shows that the Court's ruling on this point is not correct.  The Court under Rule 54 (b) may change its ruling in light of this evidence.

From these examples it is clear that Plaintiff has alleged instances where investigative arms of the DOE treated different and comparable conduct differently than conduct in which Plaintiff allegedly engaged such that Plaintiff's Due Process claims should be allowed to proceed.

A.115

CONCLUSION

For the foregoing reasons, Plaintiff requests the Court allow her to proceed to file her

Second Amended Complaint.

New York, New York
Dated:  January 10, 2020

Respectfully submitted,

_____
Jeanne Mirer
MIRER, MAZZOCCHI & JULIEN PLLC
Attorney for Plaintiffs
1 Whitehall Street, 16th Floor
New York, New York 10004
Tel: (212) 231-2235
Fax: (646)786-3861

9

A.116

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

                         Plaintiff,

        - against -

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                         Defendants.

**ORDER**

17 Civ. 3136 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        It is hereby ORDERED that Plaintiff Jill Bloomberg shall submit by **Friday,**

**November 20, 2020** a redline comparison between the First Amended Complaint (Dkt. No. 39)

and the Proposed Second Amended Complaint (Dkt. No. 94-1).

Dated:  New York, New York
        November 17, 2020

                                        SO ORDERED.

                                        _____
                                        Paul G. Gardephe
                                        United States District Judge

A.117

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

                    Plaintiff,

           - against -                                      **ORDER**

THE NEW YORK CITY DEPARTMENT                         17 Civ. 3136 (PGG)
   OF EDUCATION and CARMEN FARINA,

                    Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

           Plaintiff Jill Bloomberg – a high school principal – brings this action against the

New York City Department of Education (the "DOE") and its chancellor (collectively,

"Defendants").  The Amended Complaint claims that a DOE investigation of Plaintiff's conduct

– purportedly premised on her violation of a DOE regulation governing DOE personnel's

activity on behalf of political organizations – was retaliatory and in violation of her First

Amendment rights.  (Am. Cmplt. (Dkt. No. 39) ¶¶ 1, 4-6)  The Amended Complaint further

pleads that the DOE regulation on which the investigation was based does not apply to her

alleged conduct and, in any event, is unconstitutionally vague.  (Id. ¶¶ 88-89, 118-120)

           The Amended Complaint pleads claims for a violation of Due Process, and for

retaliation in violation of the First Amendment, Title VI of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000d-1 et seq., and the New York City Human Rights Law (the "NYCHRL"), N.Y.C.

Admin. Code § 8-101 et seq.  (Id. ¶¶ 4-5; id. at 111-56)[1]

---

[1]  Citations to page numbers refer to the pagination generated by this District's Electronic Case
Files ("ECF") system.

Defendants moved to dismiss the Amended Complaint's First Amendment, Title VI, and Due Process claims.  (Mot. (Dkt. No. 77)  On September 24, 2019, this Court granted Defendants' motion (the "September 24, 2019 Opinion").  (Dkt. No. 89)

On November 6, 2019, Plaintiff moved for leave to file a Second Amended Complaint ("SAC").  (Dkt. No. 93)  For the reasons stated below, Plaintiff's motion will be denied.

## BACKGROUND

I.  **FACTS**

    A.  **May 12, 2016 Anonymous Complaint Concerning Plaintiff's Political Activities at Park Slope Collegiate**

Plaintiff is the principal of Park Slope Collegiate ("PSC"), a secondary school in Park Slope, Brooklyn.  (SAC (Dkt. No. 94-1) ¶¶ 1, 3, 20, 30)

On May 12, 2016, the Special Commissioner of Investigation for the New York City School District ("SCI") received a complaint concerning Plaintiff.  (Id. ¶¶ 71, 74-76; see also id. ¶¶ 84-86 (referencing a declaration provided to the Court by Charity Guerra); see also Guerra Decl. (Dkt. No. 13) ¶ 11 (explaining that "[o]n May 12, 2016," a complainant contacted SCI to report information about Plaintiff))  The anonymous complaint alleged that Plaintiff was a member "of a communist organization known as the Progressive Labor Party" and had "actively recruit[ed] students into the organization during school hours, and that [she had] invited students to participate in marches for Communism," in violation of Chancellor's Regulation D-130.  (Id. ¶ 74; see also Guerra Decl. (Dkt. No. 13) ¶ 11)

On May 13, 2016, SCI referred the anonymous complaint about Plaintiff to the Office of Special Investigations ("OSI"), an internal DOE investigatory unit overseen by DOE's Office of General Counsel.  (Id. ¶¶ 62, 64, 71, 74-75; see also Guerra Decl. (Dkt. No. 13) ¶¶ 5,

12)  OSI "has the primary function of investigating alleged violations of the Chancellor's

Regulations."  (Id. ¶ 64)  OSI concluded that there was insufficient information to pursue the

complaint, and – given that the identity of the complainant was unknown to OSI – on May 17,

2016, OSI "marked the complaint as closed pending additional information."  (Id. ¶ 75; see also

Guerra Decl. (Dkt. No. 13) ¶ 13)

On December 20, 2016, the anonymous complainant provided additional

information to SCI.  (Id. ¶¶ 76, 79, 84; see also Guerra Decl. (Dkt. No. 13) ¶ 14)  The

complainant reported, inter alia, that Plaintiff's husband was the president of the Len Ragozin

Foundation (the "Foundation"), an organization associated with the Progressive Labor Party; that

Plaintiff's husband included images of students and staff in a documentary he filmed for the

Foundation, without the students' and staff's authorization; and that this documentary had been

screened at PSC, with a $20 admission fee.[2]  (Id. ¶ 84)  The anonymous complainant further

reported that "[a] bake sale was held to raise funds for a May Day march," and that "[s]tudents

who voice opinions different from those of plaintiff are not allowed to express them."  (Id.)

---

[2]  On May 4, 2016, about a week before SCI received the May 12, 2016 anonymous complaint,
the Foundation applied for an "extended use" permit for a June 3, 2016, 6:00 p.m. "film
screening and panel discussion" at the PSC auditorium.  The application requested permission to
sell goods and solicit donations.  The application does not provide a description of the
Foundation.

The application form provides that "[s]chool buildings cannot be used for    . . . [p]olitical
events, activities or meetings[,] including those conducted on behalf of an elected official,
candidate, slate of candidates or political organizations. . . ."  (Extended Use Permit App. (Dkt.
No. 21-4))

The application was approved.  (Permit Confirmation (Dkt. No. 21-3))

3

A.120

**B.    Plaintiff's January 10, 2017 Complaint Regarding
the Sports Programs at the John Jay Campus**

PSC is located at the "John Jay Campus," which houses PSC and three other

schools:  the Secondary School for Journalism ("Journalism"); The John Jay School for Law

("Law"); and Millennium Brooklyn High School ("Millennium").  (Id. ¶ 3; Bloomberg Aff., Ex.

3 (Dkt. No. 10-3) at 2)  The John Jay Campus operates two sports programs:  one is for students

at PSC, Journalism, Law, and a neighboring school – Brooklyn High School of the Arts – and the

second is for students at Millennium and Millennium High School in Manhattan ("Millennium-

Manhattan").  (Id. ¶ 58; Bloomberg Aff., Ex. 3 (Dkt. No. 10-3) at 2)

PSC's student body is 85 percent Black or Latino.  (SAC (Dkt. No. 94-1) ¶ 58)

Millennium's student body is 51.5 percent Black or Latino.  (Id.)  Millennium-Manhattan, for

which Millennium is an off-short, and with which Millennium participates in sports program, is

25.2 percent Black or Latino.  (Id.; see id. ¶ 35)  The "Millennium sports program," however, has

a "high percentage of White students."  (Id. ¶ 58)

In a January 10, 2017 email, Plaintiff complained to Eric Goldstein – chief

executive officer of the DOE sports programs – and Michael Prayor – the District Superintendent

– about the sports programs at the John Jay Campus.  (Id. ¶¶ 27, 58; Bloomberg Aff., Ex. 3 (Dkt.

No. 10-3) at 2)  Plaintiff asserted that the two sports programs offered "vastly unequal

opportunities" to students (Bloomberg Aff., Ex. 3 (Dkt. No. 10-3) at 2); see also SAC (Dkt. No.

94-1) ¶ 58 ("[T]he John Jay Campus was operating two separate and unequal sports programs")),

and that the sports programs were segregated on the basis of race.[3]  (SAC (Dkt. No. 94-1) ¶ 58;

---

[3]  Plaintiff speculates that her January 10, 2017 email complaining about the alleged racially
segregated sports programs would have been "immediately referred to [DOE's] Office of Civil
Rights" (id. ¶ 62), and that "Robin Greenfield, the Executive Deputy Counsel for Employment
and General Practice, within the Office of the General Counsel" – whose office "oversees the

see also id. ¶ 59 ("Plaintiff's primary protest was the segregation of the programs based on race."))

### C.      OSI Re-Opens Its Investigation of Plaintiff

SCI referred the anonymous complainant's new information to OSI on January 25, 2017, about two weeks after Plaintiff had sent her January 10, 2017 email about sports programs at the John Jay Campus.  (Id. ¶ 79)

Equipped with this new information, OSI re-opened its investigation of the complaint concerning Plaintiff, and assigned the investigation to Confidential Investigator Michelle Archie.  (Id. ¶¶ 65-69, 81)

### D.      Further Developments Regarding the Sports Program at PSC

Plaintiff claims that she "received no meaningful response to her January 10, 2017" email (id. ¶ 60), and that accordingly, "on February 13, 2017, the PSC PTA organized a leafleting action," distributing flyers on the "sidewalk outside of the John Jay Campus to inform the community about the race discrimination and segregation that [P]laintiff had complained about on January 10, 2017 (the 'Title VI Complaint')."  (Id. ¶ 61)

On March 3, 2017, Donald Douglas – the executive director of the Public School Athletic League – who had been copied on the January 10, 2017 email – granted "John Jay an additional five teams."  (Bloomberg Supp. Aff. (Dkt. No. 21) ¶¶ 7,10; Bloomberg Aff., Ex. 3 (Dkt. No. 10-3) at 2)  Douglas "refused to combine the programs between the PSC and other John Jay programs with the programs at Millennium," however.  (Bloomberg Supp. Aff. (Dkt.

_____

Office of Special Investigations ('OSI')" – would have received information about Plaintiff's January 10, 2017 email by at least January 15, 2017.  (Id. ¶¶ 62-63, 79)

No. 21) ¶ 10)  After John Jay was granted five additional teams, Douglas asked Plaintiff "if that

made [her] happy."  (Id.)

    **E.**    **The OSI Investigation Becomes Overt**

On March 2, 2017, Michelle Archie – "an investigator with the OSI [–] a visited

[PSC] and informed [Plaintiff] that she was under investigation.  Plaintiff was told, however, that

the allegations against her and the subject of the investigation could not be disclosed to her."

(SAC (Dkt. No. 94-1) ¶¶ 26, 65)

Investigator Archie spoke with PSC's Assistant Principal Carla Laban:

66.    Archie informed Laban that the investigation of [P]laintiff related to "communist activities taking place at the school."  Archie then showed Laban a list of names, and asked Laban to identify who from the list she had ever seen "engaging in communist activities."  Laban informed Archie that she did not know what was meant by "engaging in communist activities" and therefore was unable to answer the question.

67.    . . . Archie's list of names contained the name of [P]laintiff and four current PSC teachers.  It also contained names of people who had no present connection to the school including six former PSC teachers, [P]laintiff's family members, a few employees from an after-school sports and arts program, and a few former students who had graduated long ago.

68.    . . . At that time[,] [P]laintiff believed, and still believes, that the OSI investigation against her was retaliation for her complaint about the segregated sports programs.

69.    . . . On March 16, 2017, at an after school PTA meeting with several members of staff present, Laban announced that the OSI was investigating [P]laintiff, and that the OSI investigator had asked her whether she had ever seen [P]laintiff and/or others engaging in communist activities at the school.

. . . .

96.    . . . [O]n May 16, 2017, two investigators from OSI and the District Superintendent Michael Prayor came to PSC, and pulled several students from their classes.  The students that were targeted by the OSI were the most outspoken students, the children of outspoken PTA members, and children of DOE employees.

A.123

97.    . . . Plaintiff was asked to accommodate the OSI in their interrogation of students, and she cooperated fully.

(Id. ¶¶ 66-69, 96-97)

F.    **Plaintiff's Complaints that the OSI Investigation is Retaliatory**

On March 22, 2017, Plaintiff's counsel "sent a letter to defendant[s] requesting [that] they cease and desist from . . . [their] retaliatory investigation," which was causing a "'chilling effect.'"  (Id. ¶ 70)

In a March 27, 2017 letter, DOE Deputy Counsel Greenfield "claimed that the OSI investigation was based on a complaint that had been lodged in May, 2016."  (Id. ¶ 71)

In a March 28, 2017 letter, Plaintiff repeated her claim that the OSI investigation was retaliatory and had been launched in response to Plaintiff's January 10, 2017 email and the February 13, 2017 leafleting action.  Plaintiff's counsel also asked that "the DOE . . . identify the specific regulation [and practices] that [P]laintiff had allegedly violated[.]" (Id. ¶¶ 26, 72-73)

In an April 6, 2017 letter, Greenfield responded that Plaintiff "and two teachers . . . stood accused of being members of a communist organization known as the Progressive Labor Party and that they had been accused of actively recruiting students into the organization during school hours, and that they invited students to participate in marches for Communism," all in "violation of Chancellor's Regulation D-130."[4]  (Id. ¶ 74; see also id. Guerra Decl. (Dkt.

---

[4]  As discussed in the September 24, 2019 Opinion, Regulation D-130 "'governs the use of school buildings by candidates, elected officials, and political organizations and the conduct of school employees and officers with respect to political campaigns and elections.'"  (Dkt. No. 89 at 10 (quoting Regulation D-130 (Abstract) (Dkt. No. 79-3)))  Regulation D-130 provides generally that school facilities, equipment, and supplies "'may not be used on behalf of any candidate, candidates, slate of candidates, or political organizations/committee.'"  (Id. (quoting Id. at § I(B)); see also id. ("School buildings are not public forums for purposes of community or political expression." (quoting Regulation D-130 (Introduction) (Dkt. No. 79-3) (footnote omitted))))

7

A.124

No. 13) ¶¶ 11-13)  Greenfield also disclosed "that more but unspecified evidence was presented to the DOE through the [SCI] in December[] 2016."  (Id. ¶ 76)  Greenfield also warned Plaintiff not to interfere with the investigation, noting that such conduct "was grounds for removal and dismissal."  (Id. ¶ 77)

G.    **August 25, 2017 OSI Investigative Report**

On August 25, 2017, OSI issued a report concerning the results of its investigation of Plaintiff.  (Id. ¶ 75)  Plaintiff contends that the OSI Investigative Report (the "OSI Report") supports her claim that the investigation of her was commenced in retaliation for her January 10, 2017 email and the February 13, 2017 leafletting at the school.  (Id. ¶¶ 3, 26-27, 58, 61, 65, 68, 72, 75-76, 91)

The proposed SAC includes the following allegations regarding the findings of the OSI Report:

75.    . . . [A]ccording to the OSI's August 25, 2017 Investigative Report . . . at the time Greenfield made the April 6, 2017 representations regarding the nature of the allegations against plaintiff, OSI investigators had already twice interviewed the confidential complainant who filed the original May 2016 complaint referred to in Greenfield's April 6, 2017 letter, and as of March 13, 2017, the OSI had already determined that the confidential complainant had no evidence to support the May 2016 accusation.

. . . .

85.    . . . [T]hat the DOE's stated rationale for commencing the D-130 investigation against [P]laintiff is a pretext for retaliation is demonstrated by the contradictory rationales provided by Ms. Guerra and the OSI.  According to the August 25, 2017 OSI Report, the OSI's stated rationale for investigating whether [P]laintiff had violated D-130 is because the OSI received documentation on January 25, 2017 indicating that a May Day bakesale had taken place at PSC.  The OSI Report omits any reference whatsoever to the Len Ragozin Foundation's alleged connection with the PLP as a basis for commencing the D-130 Investigation.

86.    Moreover, also in contradiction to the information provided to the Court in Ms. Guerra's declaration, the OSI Report explicitly contradicted the claim that students with different opinions than [P]laintiff's were not allowed to express

8

A.125

them since as of March 13, 2017 the OSI's interviews with the confidential complainant showed she had no evidence to support her claims.

. . . .

90.     . . . . The DOE could have easily discovered all of the allegations regarding the Len Ragozin Foundation and the screening of the movie "Profiled" without opening an OSI investigation into [P]laintiff's activities and disrupting the entire school.  The OSI Report's complete omission of these facts is also proof that the DOE knew they were false.

. . . .

101.    On August 25, 2017, the OSI issued the OSI Report, (Attached as Exhibit 1), which acknowledged that as of March 13, 2017, (a good six weeks before the DOE through its general counsel refused to put off the investigation thus precipitating the filing of the injunctive relief) the **OSI was aware that the confidential complainant had no evidence to support the assertion that [P]laintiff was a member of the PLP and was actively recruiting students to join the organization.  Instead, the OSI Report stated that the investigation into whether [P]laintiff had violated D-130 was commenced based on an allegation that a May Day bakesale had taken place at PSC.**

102.    The OSI Report detailed how the investigation focused on the political activities of [P]laintiff, PSC employees, students, and family members, with a particular focus on whether anyone had attended May Day and/or Black Lives Matters rallies.

103.    The OSI Report ultimately determined that the OSI did not substantiate the initial allegation that [P]laintiff had violated D-130.  Implicit in this finding was a chilling message to [P]laintiff that had the OSI determined that a May Day bakesale had taken place, it would have determined that [P]laintiff had violated D-130.  This message was chilling because [P]laintiff has no way of knowing what other types of activities the DOE considers to be proscribed by D-130.

104.    Moreover, although the OSI investigation focused almost exclusively on the activist and civic activities of [P]laintiff, other PSC employees, students and their familes [sic], the OSI nonetheless substantiated that plaintiff was guilty of conduct that essentially amounted to three alleged clerical mistakes – not conduct that would merit the commencement of an OSI investigation or discipline.

105.    The OSI Report further noted that based on the OSI's findings, an investigation by the [Conflict of Interest Board] against [P]laintiff had been commenced.

106.    On October 3, 2017, as a result of the OSI Report, [P]laintiff was disciplined with a written reprimand.

(Id. ¶¶ 75, 85-86, 90, 101-06 (emphasis in original))[5]

## II.    PROCEDURAL HISTORY

The Complaint was filed on April 28, 2017, and asserts claims for retaliation under the First Amendment, Title VI, and the NYCHRL.  (Cmplt. (Dkt. No. 1))  On April 29, 2017, Plaintiff moved for a temporary restraining order and preliminary injunction enjoining the DOE's investigation of her pending the outcome of this case.  (Mot. (Dkt. No. 3))

On May 1 and May 3, 2017, this Court conducted a hearing on Plaintiff's application for injunctive relief.  (See May 1, 2017 Hearing Tr. (Dkt. No. 33); May 3, 2017 Hearing Tr. (Dkt. No. 36))  On May 3, 2017, the Court denied the application, finding that Plaintiff had not shown a likelihood of success or irreparable injury with respect to her retaliation claims under the First Amendment, Title VI, and the NYCHRL.  (See May 3, 2017 Hearing Tr. (Dkt. No. 36) at 37; see also Order (Dkt. No. 31))

On May 23, 2017, Plaintiff filed the Amended Complaint.  (Am. Cmplt. (Dkt. No. 39))  The Amended Complaint includes the causes of action originally pled, but also asserts that OSI's investigation violates Plaintiff's Due Process rights, because Regulation D-130 does not address Plaintiff's alleged conduct, and because the Regulation is unconstitutionally vague.  (Id.)

---

[5]  Certain paragraph numbers are mistakenly repeated in the SAC.  The material quoted from paragraph 90 above is from the first paragraph 90.  (See Proposed SAC (Dkt. No. 94-1) at 22)

A.127

On September 6, 2018, Defendants moved to dismiss Plaintiff's First Amendment and Title VI retaliation claims, and her Due Process claim.  (Def. Mot. (Dkt. No. 77))  On September 24, 2019, this Court granted Defendants' motion.  (Dkt. No. 89)

### A.    The September 24, 2019 Opinion

#### 1.    First Amendment Retaliation Claim

This Court found that Plaintiff failed to state a claim for First Amendment retaliation because the January 10, 2017 "email was sent pursuant to her duties as the principal of PSC, rather than as a citizen."  (Id. at 22)

This Court recognized that "[a]nalyzing whether speech is protected by the First Amendment 'encompasses two separate sub-questions:  (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee.'"  (Id. at 15 (quoting Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (citation and internal quotation marks omitted)))  If the answer to either of those two sub-questions is no, the First Amendment retaliation claim fails.  (Id. (citing Matthews, 779 F.3d at 172))

"A plaintiff speaks pursuant to her official job duties when the speech at issue 'owe[s] its existence' to those job duties" (id. at 16 (quoting Garcetti v. Ceballos, 547 U.S. 410, 421-22, 423 (2006))), "or when the speech is 'part-and-parcel of [the employee's] concerns about [her] ability to properly execute [her] duties.'"  (Id. (quoting Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 593 F.3d 196, 203 (2d Cir. 2010) (citation and internal quotation marks omitted)))

Noting that Plaintiff had asserted that "'[i]t is part of a principal's . . . regular job duties to request sports teams of the [Public School Athletic League]'" (id. at (quoting

11

A.128

Bloomberg Supp. Aff. (Dkt. No. 21) ¶ 5)), this Court concluded that Plaintiff's January 10, 2017

email was sent in furtherance of her regular job duties and not as a citizen. (Id. at 17-18, 21)

Accordingly, Plaintiff's First Amendment retaliation claim was dismissed. (Id. at 21-22)

### 2.    Title VI Retaliation Claim

"To plead a claim for retaliation under Title VI, a plaintiff must 'plausibly allege:

(1) participation in a protected activity known to the defendants; (2) adverse action by the

defendants against the plaintiff; and (3) a causal connection between the plaintiff's protect[ed]

activity and defendants' adverse action.'" (Id. at 23 (quoting Diaz v. City Univ. of New York,

No. 15 Civ 1319 (PAC) (MHD), 2016 WL 958684, at *2 (S.D.N.Y. Mar. 8, 2016) (internal

quotation marks omitted)))

Title VI provides, however, that "'[n]othing contained in [it] shall be construed to

authorize action under [Title VI] . . . with respect to any employment practice of any employer

. . . except where a primary objective of the Federal financial assistance is to provide

employment.'" (Id. at 23-24 (quoting 42 U.S.C. § 2000d-3)) "'[T]his section essentially

"requires a logical nexus between the use of federal funds and the practice toward which [the]

action is directed."'" (Id. at 24 (quoting Johnson v. Cty. of Nassau, 411 F. Supp. 2d 171, 175

(E.D.N.Y. 2006) (quoting Ass'n Against Discrimination in Emp., Inc. v. City of Bridgeport, 647

F.2d 256, 276 (2d Cir. 1981)))) "In the Title VI employment discrimination context, courts have

construed Section 2000d-3 as imposing 'a threshold requirement . . . that the employer be the

recipient of federal funds aimed primarily at providing employment.'" (Id. (quoting Ass'n

Against Discrimination in Emp., 647 F.2d at 276 and citing Sulehria v. New York, No. 13-CV-

6990 AJN, 2014 WL 4716084, at *5 (S.D.N.Y. Sept. 19, 2014)); see also Sulehria, 2014 WL

4716084, at *5 ("To state a claim under Title VI, a plaintiff must plausibly allege . . . that the

defendant was an entity receiving federal funding . . . [and] that the federal funds have been made available primarily for providing employment.”))

In moving to dismiss Plaintiff's Title VI claim in the Amended Complaint, Defendants argued that Plaintiff had not identified the primary objective of the federal funding DOE receives and had not demonstrated that the alleged retaliation was related to the primary objective of the federal funding DOE had received.  (Def. Br. (Dkt. No. 78) at 22-23))

This Court concluded that Plaintiff is required to “plead a nexus between the use of federal funds and the alleged discriminatory practice about which Plaintiff allegedly complained, and for which complaint she allegedly suffered retaliation:  discrimination in the PSAL's sports programs.”  (Dkt. No. 89 at 25)  Noting that the Amended Complaint merely pled that “‘the DOE was and is a recipient of federal funding for purposes of Title VI,’” and that the “‘New York City DOE receives Federal Financial Assistance,’” this Court ruled that Plaintiff had not pled sufficient facts to demonstrate the requisite nexus.  (Id. (quoting Am. Cmplt. (Dkt. No. 37) ¶¶ 23, 125))  Accordingly, Plaintiff's Title VI retaliation claim was dismissed.  (Id.)

### 3.    Due Process Claim

In connection with Plaintiff's Due Process claim, “‘[t]he Amended Complaint asserts that Regulation D-130 [(1)] applies ‘exclusively to partisan electoral politics,’ and does not reach the conduct upon which the OSI investigation purportedly was predicated”; and (2) “‘is void for vagueness.’”  (Id. at 26 (quoting and citing Am. Cmplt. (Dkt. No. 39) ¶¶ 112-115, 119-20))

As to Plaintiff's first argument, this Court found “that Regulation D-130 unambiguously encompasses the reported conduct that instigated the OSI's investigation,” as the “OSI received information alleging that Plaintiff was a ‘member[] of a communist organization

A.130

known as the Progressive Labor Party,' and was 'actively recruiting students into the

organization during schools hours, . . . invit[ing] students to participate in the organization's

activities.'"  (Id. at 27-28 (quoting Bloomberg Aff., Ex. 8 (Dkt. No. 10-8); Am. Cmplt. (Dkt. No.

39) ¶72))

This Court rejected Plaintiff's effort to distinguish between ideological

organizations and those that are engaged in electoral partisan politics, noting that Regulation D-

130 "does not qualify or limit the scope of 'political organization/committee' . . . in the manner

Plaintiff proposes. . . . Plaintiff's distinction between 'ideological organizations which . . . do[]

not run candidates' and 'those engaged in electoral politics' is unclear and impractical," as

Plaintiff's distinction would lead to "an absurd result."  (Id. at 28-29)  An organization's status as

a "political organization/committee" would change with the election cycle, depending on

whether it was then engaged in electioneering.  (Id.)

As to Plaintiff's "void for vagueness" argument, this Court noted that "'[a]

punitive enactment is unconstitutionally vague when it (1) does not allow a person of ordinary

intelligence a reasonable opportunity to know what is prohibited, or (2) lacks explicit standards,

thus permitting arbitrary or discriminatory enforcement.'"  (Id. at 26 (quoting Kramer v. New

York City Bd. of Educ., 715 F. Supp. 2d 335, 356 (E.D.N.Y. 2010)))  As to the second prong,

"'[a] statute or rule is inadequate . . . when it fails to provide sufficiently explicit standards for

those who apply it, and impermissibly delegates basic policy matters . . . for resolution on an ad

hoc and subjective basis.'"  (Id. (quoting Kramer, 715 F. Supp. 2d at 356 (internal quotation

marks omitted)))

This Court concluded that Regulation D-130 "provides adequate notice of the

conduct it prohibits . . . [,] set[ting] forth a detailed list of prohibited and permissible conduct."

14

A.131

(Id. at 29)  Although the term "political organization" is not defined in Regulation D-130, "a reasonable person would surely understand that 'a communist organization known as the Progressive Labor Party' is a 'political organization.'"  (Id.)  And although Plaintiff suggested that Regulation D-130 was "enforced in an arbitrary and discriminatory manner, Plaintiff [did] not ple[a]d facts demonstrating that OSI ignored conduct comparable to that in which she allegedly engaged."  (Id.)

Accordingly, this Court granted Defendants' motion to dismiss Plaintiff's Due Process claim.

**B.     The Proposed Second Amended Complaint**

On November 6, 2019, Plaintiff moved for leave to file a second amended complaint.  (Mot. (Dkt. No. 93); see also Mirer Aff. (Dkt. No. 94); SAC (Dkt. No. 94-1))  The proposed SAC alleges (1) a Due Process claim; (2) Title VI retaliation; and (3) retaliation in violation of the NYCHRL.[6]  (See generally SAC (Dkt. No. 94-1))

**DISCUSSION**

**I.     LEGAL STANDARDS**

A party may amend a pleading with the court's leave, and the court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2); see also Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.'" (quoting Foman v. Davis, 371 U.S. 178, 182 (1962))).  "Under this liberal standard, a motion to amend should be denied only if

---

[6] The proposed SAC does not contain a claim for First Amendment retaliation.  (SAC (Dkt. No. 94-1))

15

A.132

the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly

prejudiced if leave is granted, or the proposed amendment is futile." Agerbrink v. Model Serv.

LLC, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016).  "'Where it appears that granting leave to

amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend.'"

Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002) (quoting Ruffolo v.

Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993) (per curiam)).

      "An amendment to a pleading is futile if the proposed claim could not withstand a

motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Id. (citations omitted); see also Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . .

[N]aked assertion[s] devoid of further factual enhancement, [are insufficient]" (citation and

quotation marks omitted)).

## II.  ANALYSIS

### A.  Title VI Retaliation Claim

      As discussed above, this Court dismissed the Amended Complaint's Title VI

retaliation claim because of Plaintiff's failure "to plead a 'logical nexus between the use of

federal funds and the practice to which [Plaintiff's] action is directed.'"  (Dkt. No. 89 at 25

(quoting Johnson, 411 F. Supp. 2d at 175))  This Court ruled that "Plaintiff must plead a nexus

between the use of federal funds and the alleged discriminatory practice about which Plaintiff

allegedly complained, and for which complaints she allegedly suffered retaliation:

discrimination in the PSAL's sports programs."  (Id.)

      The proposed SAC includes three new paragraphs regarding DOE's receipt of the

federal funds:

16

A.133

23.  . . . the DOE receives federal funds pursuant to Title I of the Elementary and Secondary Education Act which provides funds to schools which have a high percentage of families from impoverished backgrounds.

24.  Schools qualify for Title I if a certain percentage of the students qualify for free or reduced lunch programs.

25. Because over 60% of the students at PSC qualified for free or reduced lunch programs, PSC receives Title I funds for school wide programs.

(Proposed SAC (Dkt. No. 94-1) ¶¶ 23-25; see also id. ¶¶ 154-56)

Defendants contend that these new factual allegations do not cure the pleading defect, because they do not show a link between federal funding and the sports programs at issue here.  According to Defendants, Plaintiff has still not pled facts demonstrating a logical nexus between federal funds received by DOE and the sports programs allocated to PSC, in which Plaintiff alleges that discrimination took place.  (Def. Br. (Dkt. No. 99) at 12)

Plaintiff responds that the new allegations in the proposed SAC "show[] [that] the students at PSC were beneficiaries of federal funds given to the school system."  (Pltf. Reply Br. (Dkt. No. 104) at 4)  Plaintiff also contends that if she were required to "show a logical nexus between federal funds received by the DOE and the sports programs allocated to PSC," such a requirement would be "program specific" and thus "prohibited by the Civil Rights Restoration Act of 1987."  (Id. at 6 (citations and quotation marks omitted))

As discussed in the September 24, 2019 Opinion, this is not a case of Title VI employment discrimination in which "'a plaintiff must plausibly allege . . . that the defendant was an entity receiving federal funds . . . [and] that the federal funds have been made available primarily for providing employment.'"  (Sept. 24, 2019 Opinion (Dkt. No. 89) at 24 (quoting Sulehria, 2014 WL 4716084, at *5))  But Plaintiff must show that the students at issue were the "intended beneficiaries of the federal funding."  (Id. at 24-25)  In other words, Plaintiff must show a link between the federal funds allotted to DOE and "the students whose discrimination

17

A.134

was the subject of Plaintiff's complaint." Verdi v. City of New York, 306 F. Supp. 3d 532, 546 (S.D.N.Y. 2018).

Moreover, a Title VI plaintiff is required to plead program-specific federal funding. See, e.g., McCrudden v. E-Trade Fin. Corp., No. 13CV8837, 2014 WL 3952903, at *4 (S.D.N.Y. Aug. 12, 2014) ("A Title VI plaintiff must allege he is the intended beneficiary of a specific program or activity which receives federal financial assistance." (citing Kelly v. Rice, 375 F. Supp. 2d 203, 209 (S.D.N.Y. 2005))); see also Kelly, 375 F. Supp. 2d. at 208-09 (finding that "plaintiff had not alleged that Westchester County . . . receiv[ed] federal funds in connection with any program to provide handicapped parking facilities," and that plaintiff's failure to plead such facts was "absolutely fatal to [plaintiff's] Title VI claim").

Verdi – discussed at length in the September 24, 2019 Opinion – is instructive here. The Verdi court found that it was not sufficient for plaintiff to allege that, "'[d]uring all relevant times, the DOE was and is a recipient of federal funding for the purposes and under the guise of Title VI'"; that "'[t]he New York public school system clearly fits into this [federal assistance] category'"; and that "'[t]he New York City DOE receives Federal Financial Assistance.'" Verdi, 306 F. Supp. 3d at 546 (citations omitted). The court held that, instead, plaintiff was required to "provide detail regarding the DOE's federal funding," and to "allege facts from which the [c]ourt [could] infer that the discrimination that [the assistant principal] proposed was against individuals who were intended beneficiaries of that funding." Id.

Here, Plaintiff has pled facts demonstrating a link between federal funding and unspecified "school-wide programs" administered by the DOE. (See SAC (Dkt. No. 94-1) ¶¶ 23-25) But Verdi makes clear that this type of vague allegation that a school district receives federal funding is not sufficient. A Title VI plaintiff must plead facts showing a nexus between

the federal funding and the program at issue.  The proposed SAC does not plead facts showing a

nexus between the federal funding allotted to DOE and PSAL's sports programs.  Proof of the

"'require[d] . . . logical nexus between the use of federal funds and the practice toward which

[Plaintiff's complaints were] directed'" is still missing.  Johnson, 411 F. Supp. 2d at 175

(quoting Ass'n Against Discrimination in Emp., 647 F. 2d at 276)); see also Verdi, 306 F. Supp.

3d at 546.

        Because Plaintiff's Title VI retaliation claim remains defective, Plaintiff's motion

for leave to amend is denied as to this claim.  See Agerbrink, 155 F. Supp. 3d at 452.

    **B.    Due Process Claim**

        As discussed above, in the September 24, 2019 Opinion, this Court dismissed

Plaintiff's Due Process claim after determining that (1) "Regulation D-130 unambiguously

encompasses the reported conduct that instigated OSI's investigation"; and (2) Regulation D-130

is not void for vagueness, as it "sets forth a detailed list of prohibited and permissible conduct."

(Sept. 24, 2019 Opinion (Dkt. No. 89) at 27, 29)  The Court further noted that "[a]lthough the

Amended Complaint suggests that the Regulation is enforced in an arbitrary and discriminatory

manner, Plaintiff ha[d] not pled facts demonstrating that OSI ignored conduct comparable to that

in which she allegedly engaged."  (Id. at 29)

        As set forth above, the proposed SAC includes numerous allegations regarding

the OSI Report, in which OSI reports the results of its investigation of Plaintiff.  (SAC (Dkt. No.

94-1) ¶¶ 75, 85-86, 90, 101-06)  The proposed SAC also discusses two incidents involving

Mayor de Blasio's campaign, which Plaintiff claims demonstrates that Regulation D-130 is

enforced in an arbitrary and discriminatory manner.  (Id.  ¶¶ 113-22, 124-26, 143-44)

A.136

Defendants argue that Plaintiff's Due Process claim is moot because the DOE determined that the allegation that Plaintiff violated Regulation D-130 was unsubstantiated: "[P]laintiff has not been found to have violated D-130, she has not been disciplined for violating D-130, and, therefore, no case or controversy exists for plaintiff's Due Process claims." (Def. Br. (Dkt. No. 99) at 8)  Defendants further argue that Plaintiff has "failed to plead any facts demonstrating that OSI or DOE ignored conduct comparable to what she was alleged to have engaged in."  (Id. at 11)

Plaintiff counters that the "finding that the charges against [her] under D-130 were not substantiated . . . does not eradicate the underline(effects) of the Defendants' actions or omissions, to wit:  the impact of the investigation and its aftermath on [her]."  (Reply Br. (Dkt. No. 104) at 7-8 (emphasis in original))  "The effects of the violation of Plaintiff's Due Process rights under Regulation D-130 are ongoing even if she was found not to have violated it."  (Id. at 8-9)

"A case becomes moot – and therefore no longer a Case or Controversy for purposes of Article III of the Constitution – when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  Mangouras v. Squire Patton Boggs, 980 F.3d 88, 96 (2d Cir. 2020) (citation, quotation marks, and alteration marks omitted); see also Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet, 260 F.3d 114, 118-19 (2d Cir. 2001) (same (citing U.S. Const. art. III, § 2, cl. 1)).  In other words, "'[a] case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur.'"  F.O. v. New York City Dep't of Educ., 899 F. Supp. 2d 251, 254 (S.D.N.Y 2012) (quoting Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 647 (2d Cir. 1998)).

A.137

An exception to this doctrine "exists for cases that are 'capable of repetition, yet evading review' – that is, cases where '(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.'" Id. (quoting Van Wie v. Pataki, 267 F.3d 109, 114 (2d Cir. 2001)).

Here, the purpose of Plaintiff's lawsuit was to "prevent" what she alleged was a retaliatory OSI investigation.  (SAC (Dkt. No. 94-1) ¶¶ 82, 101 and p. 39; Pltf. Reply Br. (Dkt. No. 104) at 8)  Plaintiff sought "[i]njunctive relief temporarily, preliminarily, and permanently barring the retaliatory OSI investigation against [her]," (SAC (Dkt. No. 94-1) at 39) as well as "[i]njunctive relief preliminarily and permanently barring disciplinary action against [her] for opposing an illegal retaliatory OSI investigation."  (Id.)  The OSI investigation ended in August 2017, with a finding that the Regulation D-130 allegations alleged against Plaintiff were "unsubstantiated."  (SAC (Dkt. No. 94-1) ¶125; see also id. ¶ 103)  Because the OSI investigation that Plaintiff sought to enjoin has long since been completed, and because the allegations against Plaintiff were found by OSI to be "unsubstantiated," the controversy between the parties is no longer "live."  See, e.g., Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 84-85 (2d Cir. 2005) (finding that plaintiff's challenge to removal of child from a public school and placement of the child in a private education facility "no longer present[ed] a live dispute[]," as the child had not been removed from public school, and thus the case was moot); id. at 86 (explaining that to "avoid a mootness dismissal, a 'reasonable expectation' of repetition must be more than a 'mere physical or theoretical possibility'" (citation omitted)).  There is no dispute here that the OSI investigation was long since completed.  (SAC (Dkt. No. 94-1) ¶¶ 101, 103)

While the proposed SAC pleads that – as a result of the OSI investigation – Plaintiff "was disciplined with a written reprimand," and "an investigation by the [Conflict of Interest Board] against [her was] commenced" (SAC (Dkt. No. 94-1) ¶¶ 3, 105-06, 132), the SAC provides no details concerning either the reprimand or the conflict of interest inquiry.  Nor is there any suggestion in the proposed SAC that the reprimand or the conflict of interest inquiry are premised on Plaintiff's alleged violation of Regulation D-130.

To the extent, that Plaintiff asserts that an OSI investigation of her could happen again – i.e., that there is a reasonable expectation of recurrence – the proposed SAC does not plead sufficient facts to make this concern plausible.

In support of her reasonable expectation of recurrence argument, Plaintiff argues that Regulation D-130 is enforced in an arbitrary and discriminatory manner (see, e.g., id. ¶ 146), citing the following two incidents:  a 2014 event for the Communications Workers of America at P.S. 66, at which Mayor de Blasio spoke, and a 2017 posting by a principal at a DOE school soliciting student support for the de Blasio campaign. (Id. ¶¶ 115-24, 143-44)  SCI investigated the 2014 event and concluded that there was no violation of Regulation D-130, "because the Mayor's remarks were not 'overtly political.'"  (Id.)  As to the principal's posting, the proposed SAC alleges that "the DOE insisted that no rules were broken."  (Id. ¶ 124)

These incidents do not support Plaintiff's claim of arbitrary and discriminatory enforcement, because the OSI investigation of Plaintiff, the SCI investigation of Mayor de Blasio's remarks, and the DOE's handling of the principal's posting, all concluded with a finding that Regulation D-130 had not been violated.  (See id. ¶¶ 103, 118, 124, 143-44)

Leave to amend will be denied as to Plaintiff's Due Process claim, both because her claim is moot and because the claim alleged in the proposed SAC remains insufficiently pled.

A.139

Accordingly, the proposed amendment would be futile.  See F.O., 899 F. Supp. 2d at 255 ("Mere speculation that the parties will be involved in a dispute over the same issues does not rise to the level of a reasonable expectation or demonstrated possibility of recurrence."  (citation and quotation marks omitted)); Kramer, 715 F. Supp. 2d at 356; Agerbrink, 155 F. Supp. 3d at 452.

### C.   NYCHRL Retaliation Claim

The proposed SAC asserts a claim for retaliation under the NYCHRL.  (See SAC (Dkt. No. 94-1) ¶¶ 166-168)  Under 28 U.S.C. § 1367(a), "in any civil action of which the [federal] district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that . . . form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

However, a district court "may decline to exercise supplemental jurisdiction over a claim [if] . . .  the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); see also Sefovic v. Mem'l Sloan Kettering Cancer Ctr., No. 15 Civ. 5792 (PAC), 2017 WL 3668845, at *8 (S.D.N.Y. Aug. 23, 2017) ("'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'" (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988))); see also, e.g., Booker v. Soho Studio Corp., No. 17-CV-5426 (PKC) (SMG), 2020 WL 363912, at *8 (E.D.N.Y. Jan. 22, 2020) ("[I]n light of the Court's dismissal of all of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims, which are dismissed without prejudice to renew in state court.").

23

A.140

Because this Court concludes that amendment of Plaintiff's federal claims would be futile, it will not exercise supplemental jurisdiction over Plaintiff's NYCHRL retaliation claim.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's motion for leave to file a Second Amended Complaint (Dkt. No. 93) is denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 93) and to close this case.

Dated:  New York, New York
      September 23, 2021

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JILL BLOOMBERG,

                  Plaintiff,

     v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                  Defendants.
-----------------------------------------------------------------x

17-cv-03136 (PGG)

**<u>NOTICE OF MOTION</u>**

**Mr. Joseph Anci:**

           **PLEASE TAKE NOTICE**, that upon the Affirmation of Jeanne E. Mirer, dated October 8, 2021, and the Memorandum of Law in support of Plaintiff's Motion for Reconsideration, plaintiff will move this Court, before the Honorable Judge Paul G. Gadarphe at the Room 705 of the Thurgood Marshall Courthouse located at 40 Foley Square  New York, New York, at a time and date set by the Court to reconsider and reverse the Court's decision denying Plaintiff's motion to file an amended complaint as to her claims under Title VI of the Civil Rights Act of 1964.

Dated:  October 8, 2021
New York, New York

                  Respectfully submitted,


                  _____/s/_____
                  Jeanne Mirer
                   MIRER, MAZZOCCHI & JULIEN PLLC
                  Attorney for Plaintiff
                  1 Whitehall  Street, 16th Floor
                  New York, New York 10004
                  (212) 231-2235

A.142

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JILL BLOOMBERG,

                Plaintiff,

      v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                Defendants.
----------------------------------------------------------------x

17-cv-03136 (PGG)

**AFFIRMATION OF JEANNE MIRER IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION**

JEANNE MIRER, under penalty of perjury states as follows:

1. My firm, Mirer, Mazzocchi & Julien PLLC represents plaintiff, Jill Bloomberg in this action.

2. I submit this Affirmation in support of plaintiff's motion for reconsideration of this Courts order of September 24, 2021 denying Plaintiff the right to file an amended complaint.

3. The case alleges that plaintiff, now the former Principal at Park Slope Collegiate (PSC), suffered adverse actions after she protested racially discriminatory allocation of sports teams to the schools in the John Jay campus, (other than Millenium) where PSC is located.

4. On September 24, 2019 this Court dismissed Plaintiff's claims alleging violations of her First Amendment and Fourteenth Amendment due process right.

5. The Court dismissed plaintiff's Title VI claim based on a pleading deficiency with respect to pleading that the receipt of Federal funds were related to the sports programs which she stated were discriminatorily allocated on the basis of the students' race.

6. Plaintiff filed a motion to amend to cure any pleading deficiency in the Title VI claim.

7. As to the Title VI claim, plaintiff has added paragraphs 23-25.

A.143

8.  As part of the argument in support of the amendments to her Title VI claim she noted that the Civil Rights Restoration Act removed any requirement that a plaintiff plead federal funds went to specific programs complained about in order to support a Title VI claim.

9.  This court nonetheless, denied Plaintiff's motion to amend the Title VI claim by erroneously applying the employment discrimination specific requirements in 42 U.S.C. 2000d-3 to a claim of retaliation for protesting racial discrimination in programs or activities by recipient of Federal Funds such as the New York City Department of Education.

10. Plaintiff nonetheless had added paragraphs to the proposed amended Complaint to state that the NYC DOE receives federal funds pursuant to Title I of the Elementary and Secondary Education Act which provides funds to schools which have a high percentage of families from impoverished backgrounds.  The allegations go on to state that a school will qualify for Title I funds if they have a certain percentage of students who qualify for free or reduced lunch programs.  PSC is a Title I school because over 60% of the students who attend qualify for free or reduced lunch programs.  Because of this, PSC receives Title I funds for school-wide programs.

11. The Court on September 24, 2021 denied Plaintiff's motion to amend as to her Title VI claim stating she had failed to plead facts showing a nexus between the federal funding and the program at issue.

12. Plaintiff files this motion for reconsideration because the Court in this holding overlooked the definition of "program" or "activity" in the Civil Rights Restoration Act of 1987 which defined such programs as all programs or activities of the school district.

13. In this way the court committed clear error by requiring to plead any nexus between the federal funding given to the New York City Department of Education and the sports programs Plaintiff claimed were racially discriminatory.

2

A.144

14. Based on the forgoing, plaintiff requests this Court grant her motion for reconsideration.

New York, New York

Dated:  October 8, 2021

_____
Jeanne Mirer

3

A.145

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JILL BLOOMBERG,

                    Plaintiff,

       v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                   Defendants.
-------------------------------------------------------------x

17-cv-03136 (PGG)

**MEMO OF LAW IN
SUPPORT OF PLAINTIFF'S
MOTION FOR
RECONSIDERATION**

## INTRODCUTION

     Plaintiff, Jill Bloomberg, moves this Court pursuant to Local Rule 6.3 for an order

reconsidering the decision of this Court of September 24, 2021, denying Plaintiff's Motion to

Amend her Complaint.  [Dkt # 108] Specifically, Plaintiff alleges that this Court committed clear

error in denying Plaintiff's right to amend her complaint with respect her Title VI claim.    The

basis for this motion is that this Court committed clear error in determining that a Title VI Plaintiff

is required to plead program specific federal funding in order state a claim.   For the reasons stated

below, Plaintiff requests this Court reconsider and reverse the Court's decision and reinstate

Plaintiff's Title VI claim.

## STANDARD FOR RECONSIDERATION

A motion for reconsideration pursuant to Local Rule 6.3, which is analogized to FRCP 59(e), is

1

A.146

appropriate where the movant can "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v.CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). *See also Range Road Music, Inc. v. Music Sales Corp.*, 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000) (granting the motion "is appropriate only where the movant demonstrates that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion" (internal citations and quotations omitted)).). "The major grounds justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. National Mediation Bd.,*956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4478, at 790). See also *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004). "Clear error" is present where a reviewing court would be "left with the definite and firm conviction that a mistake has been committed.' *United States v. Cavera*, 550 F.3d 180, 205 (2d Cir. 2008); see also Black's Law Dictionary 622 (9th ed. 2009) (noting that "clear error" is error that is" unquestionably erroneous"). Similarly, a district court commits a "manifest injustice" where its error was"direct, obvious, and observable." *In re UBS AG ERISA Litig.*, 2012 U.S. Dist. LEXIS 51806, *11, 2012 WL 1034445 (S.D.N.Y. Mar. 23, 2012) (citing Black's Law Dictionary 1048).

   Plaintiff alleges that the Court committed clear error in its decision denying Plaintiff's motion to amend her complaint with respect to the Title VI claim.    Title VI of the Civil Rights Act of 1964 codified at 42 U.S.C. §2000d is entitled "Prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color or national origin".  It says in pertinent part: "No person in the United States

A.147

shall, on the ground of race, color, or national origin, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance."

### BACKGROUND TO PLAINTIFF'S TITLE VI CLAIM

This Court has familiarity with the facts of this case. Briefly, Plaintiff in January 2017,

Plaintiff protested to members of the Department of Education hierarchy the racial discrimination

against the students Park Slope Collegiate (PSC)where she was Principal.  The protest was to the

unequal allocation of sports teams to PSC with a very high Black and Latino student body, in

comparison to another School which shared the John Jay Campus with PSC, "Millenium", which

had an almost predominately White student body.  Plaintiff also protested segregation of the teams

in the same building which prevented the PSC teams from including any Millenium students and

vice versa.  Plaintiff also alleges at paragraphs 62-and 63 that this complaint would have gone to

Robin Greenfield, the Executive Deputy Counsel for Employment and General Practice within the

Office of the General Counsel whose office oversees the office of special investigations.   She

alleges that shortly thereafter the OSI started an investigation into the Plaintiff on a complaint that

had arisen the almost a year prior, but for which there was allegedly new information.

Plaintiff has alleged the adverse actions of subjecting her and many faculty staff and

students to an investigation which turned out to not have any supporting evidence to sustain the

charges, led to emotional distress and a letter of reprimand for matters unrelated to the reasons for

the investigation.  She suffered significant emotional distress regarding this investigation as set

forth in the complaint, as well as ongoing harassment by the DOE continuing to support the faculty

member who brought forward the unsupported complaints.

A.148

Plaintiff in her complaint has alleged only retaliation against her for efforts to protest racial discrimination against the students in her school with respect to unequal allocation of sports teams and resources.

## ARGUMENT

I.     **This Court's September 24, 2019 Decision Correctly Stated the Standard for Title VI Retaliation Claims, But Committed Clear Error by Requiring Plaintiff To Plead Facts Tying Federal Assistance to the School District's Sports Programs As if Plaintiff's Case was an Employment Discrimination Case.**

In this Court's decision of September 24, 2021 this Court in describing it September 19, 2019 opinion on this subject, stated:

> "To plead a claim for retaliation under Title VI, a plaintiff must 'plausibly allege: (1) participation in a protected activity known to the defendants; (2) adverse action by the defendants against the plaintiff; and (3) a causal connection between the plaintiff's protect[ed] activity and defendants' adverse action.'" (Id. at 23 (quoting *Diaz v. City Univ. of New York,* No. 15 Civ 1319 (PAC) (Op p. 12)

Plaintiff agrees this is the correct pleading standard for a Title VI retaliation claim.  It is undisputed among the parties that Plaintiff has plausibly plead all off the necessary elements for a retaliation claim.   The Court, however addressed Plaintiff's claim as if it was a claim of employment discrimination, which it is not.  Plaintiff did not allege she was subject to a discriminatory employment practice.   She alleged she suffered adverse actions because she protested racial/national origin discrimination against the students at PSC with respect to a program and activity of the Department of Education in the City of New York.  Employment discrimination cases under Title VI are subject to 42 U.S.C. 2000d-3.  This section of Title VI states:

> Nothing contained in this subchapter shall be construed to authorize action under this title by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization **except where a primary objective of the Federal financial assistance is to provide employment. (emphasis added)**

4

The Court erroneously applied the Title VI requirements for employment discrimination claims to Plaintiff's case by citing to *Johnson v County of Nassau*, 411 F. Supp 2d 171 (E.D.N.Y. 2006) and other employment discrimination cases.

*Johnson* was an employment discrimination case under 2000d-3 in which Plaintiff was required to show that the primary objective of the federal assistance was to provide employment to the County    It is in the context of employment discrimination cases under 42 U.S.C 2000d-3 that the Court first used the term "logical nexus" between the federal assistance and the practice toward which the agency action is directed.  The court in *Johnson* was citing to § 2000d-3 when it said:

This section [2000d-3] essentially "requires a logical nexus between the use of federal funds and the practice toward which agency action is directed." *Association Against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981). Although the statute speaks only of agency action, the Second Circuit has held that the logical nexus requirement [**6] applies to private actions as well. *Id.* "Thus, for a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment." Id, 175.

All of the cases cited in the September 24, 2019 to support the "logical nexus" requirement were employment discrimination cases which arise only out of 2000d-3 and with requirements of that statute.

II.    **The Court While Citing to the Decision In *Verdi v City of New York*, But Committed Clear Error By Continuing to Apply A "Nexus Test" As If Plaintiff's Case Was An Employment Discrimination Case.**

In *Verdi v City of New York*,  306 F. Supp. 3d 532, 546 (S.D.N.Y. 2018), a case similar to the present, the Plaintiff, an Assistant Principal at a New York City public school, claimed he was retaliated against for his opposition to discriminatory practices at his school.  As here, the Defendant DOE claimed that the case arose under 2000d-3 and was employment discrimination. The Court rejected this stating in pertinent part:

5

A.150

Although the Second Circuit has yet to consider this question, a [**15] few district courts have. *Hickey v. Myers*, for example, involved a college dean who had been removed from his position for opposing an allegedly racially-discriminatory admissions policy. No. 09-CV-01307, 2010 U.S. Dist. LEXIS 18281, 2010 WL 786459, at *1-2 (N.D.N.Y. Mar. 2, 2010). The *Hickey* court rejected the defendant's argument that the plaintiff must prove that a primary objective of the school's federal funding was to provide employment: "Plaintiff does not allege employment discrimination but instead alleges that he was retaliated against because he spoke out against racial discrimination in the school's admission policy. This argument does not implicate § 2000d-3." 2010 U.S. Dist. LEXIS 18281, [WL] at *3 n.1 (N.D.N.Y. Mar. 2, 2010). This Court agrees with *Hickey* because its approach effectuates the well-established precedent of providing "an implied private right of action to enforce [Title VI's] core prohibition of discrimination in federally-financed programs." *Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir. 2003) (citing *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 610-611, 103 S. Ct. 3221, 77 L. Ed. 2d 866 (1983)).

 At the heart of a Title VI retaliation claim could be the very individuals whom the statutory scheme was intended to protect, so it is important to distinguish between garden variety retaliation-for-complaining-about-employment-discrimination claims, on the one hand, and retaliation claims in which the complainant's employment is affected based on complaints regarding nonemployment [**16] discrimination against others, on the other. Section 2000d-3 "ma[d]e it clear that discrimination in employment which does not affect [the] intended beneficiaries of federal assistance is not within the reach of title VI," *Carmi v. Metro. St. Louis Sewer Dist.*, 620 F.2d 672, 674 & n.4 (8th Cir. 1980) (citing *United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 882-83 (5th Cir. 1966)), *abrogated on other grounds by CONRAIL v. Darrone*, 465 U.S. 624, 104 S. Ct. 1248, 79 L. Ed. 2d 568 (1984). **In contrast, recognizing a retaliation claim based on harms to a claimant's employment where the complained-of discrimination *was* against the intended beneficiaries of the relevant federal funding would vindicate rather than undermine the intent and spirit of § 2000d-3. Accordingly, this Court finds that the "primary objective of providing employment" requirement does not apply when analyzing an employment-based retaliation claim where the victims of the discrimination about which the claimant [*546] complained (and for which complaining the claimant suffered retaliation) are the intended beneficiaries of the federal funding. (emphasis added).**

While the Court in *Verdi*, did say that conclusory allegations regarding receipt of federal assistance were not sufficient to state whether the discrimination the plaintiff opposed was against the intended beneficiaries of the funding, there was no mention in the *Verdi* decision of the impact of Civil Rights Restoration Act of 1987 on the specificity necessary in pleading the receipt of federal assistance by the New York City Department of Education.

### III.     The Civil Rights Restoration Act of 1987

In 1987, Congress passed the Civil Rights Restoration Act in part because the Supreme Court had made various rulings regarding the reach of Title VI and other laws where federal financial assistance had created rights against discrimination.  The Congressional findings included:

> The Congress finds that --
>   (1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and title VI of the Civil Rights Act of 1964; and
>   (2) legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered.

CIVIL RIGHTS RESTORATION ACT OF 1987, 1988 Enacted S. 557, 100 Enacted S. 557, 102 Stat. 28, 32-29, 100 P.L. 259, 1988 Enacted S. 557, 100 Enacted S. 557

As to Title VI, the act states:

For the purposes of this title, the term **'program or activity' and the term 'program' mean all of the operations of --**
  "(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
  "(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
  "(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or
  **"(B) a local educational agency (as defined in section 198(a)(10) of the Elementary and Secondary Education Act of 1965), system of vocational education, or other school system;**
  "(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship --
  "(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or
  "(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or
  "(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or
  "(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance.".

A.152

CIVIL RIGHTS RESTORATION ACT OF 1987, 1988 Enacted S. 557, 100 Enacted S. 557, 102 Stat. 28, 30, 100 P.L. 259, 1988 Enacted S. 557, 100 Enacted S. 557

**IV.    Based On the Clear Language of The Civil Rights Restoration Act of 1987 It Was Clear Error For this Court to Require Plaintiff's Pleading Show the Sports Programs Plaintiff Protested Were Discriminatory Received Federal Funding**

The clear language of the Civil Rights Restoration Act, which defines for the purpose of Title VI 'program or activity' to mean **all of the operations of school system,** specifically prohibits the Court from requiring a plaintiff to show any kind of connection between the federal assistance a school system receives and a particular program or activity alleged to be discriminatory.  Federal funding to the School District prohibits discrimination in all operations of the school system, from sports to books.   This Court overlooked the clear language of the Civil Rights Restoration act and in so doing committed clear error by denying Plaintiff's motion to amend her claim under Title VI by finding: "A Title VI Plaintiff must plead facts showing a nexus between the federal funding and the program at issue."   Indeed, it is precisely this sort of narrow reading of "program" or "activity" which lead to the passage of the Civil Rights Restoration Act in the first instance. [1]

For these reasons, Plaintiff believes this Court must reconsider, and reverse its decision to deny Plaintiff's motion to amend her complaint on Plaintiff's Title VI.

---

[1] The Court referred to *McCrudden v E-Trade Fin. Corp.* (S.D.N.Y. Aug. 12, 2014) and *Kelly v Rice* 375 F. Supp 2d 203 (S.D.N.Y. 2005 for the proposition that a Title VI plaintiff is required to plead program specific federal funding. Neither case so holds.  The Plaintiff in McCrudden tried to open futures trading accounts with private trading companies.  He sued after such accounts were closed to him.   The Court dismissed that claim because he could point to any basis for a Title VI claim including being an intended beneficiary of a specific program or activity which receives federal financial assistance. .  In Kelly v Rice, cited in McCrudden, the plaintiff a Black woman who had a handicapped parking permit was given a parking ticket by an officer who she alleged did not give such a ticket to a white person who had a handicap parking permit in a shopping center in Westchester.  She sued the individual police officer and Westchester County but again was dismissed again based on not being a beneficiary of a specific program or activity which receives federal assistance.  The holding *Kelly v Rice* (and by McCrudden by extension) was criticized in 2018 in *Alexander v Hunt*, U.S. Dist. LEXIS 134572, (D. Vt. 2018) based on the fact that the Civil Rights Restoration Act of 1987 ("CRRA") had the effect of abrogating the logical nexus requirement by expanding the definition of a covered "program or activity" to include "all of the operations of a recipient of federal funds.

8

A.153

Respectfully Submitted,


_____/s/_____
Jeanne Mirer
 MIRER, MAZZOCCHI & JULIEN PLLC
Attorney for Plaintiff
1 Whitehall Street, 16th Floor
New York, New York 10004
(212) 231-2235

A.154

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

                Plaintiff,

    - against -

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                Defendants.

**<u>ORDER</u>**

17 Civ. 3136 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        It is hereby ORDERED that the following schedule will apply to Plaintiff's

motion for reconsideration (Dkt. No. 109):

    1.  Defendants' opposition is due on **October 29, 2021**; and

    2.  Plaintiff's reply, if any, is due on **November 5, 2021**.

Dated: New York, New York
       October 15, 2021

                SO ORDERED.

                Paul G. Gardephe
                United States District Judge

A.155

Docket No. 17-CV-3136 (PGG)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

Plaintiffs,

-against-

THE NEW YORK CITY DEPARTMENT EDUCATION
and CARMEN FARINA,

Defendants.

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION

***GEORGIA M. PESTANA***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, Rm. 2-123*
*New York, N.Y.  10007*

*Of Counsel:  Joseph Anci*
*Tel:  (212) 356-1106*

A.156

A.157

## PRELIMINARY STATEMENT

Defendants respectfully submit this memorandum of law in opposition to Plaintiff's motion for reconsideration of Court's September 24, 2021 Order denying Plaintiff's Motion to Amend her Complaint (the "Order").  As set forth in greater detail below, Plaintiff's motion is a recitation of meritless legal arguments, all of which were previously presented to the Court and were dismissed and discounted in the Order.  Plaintiff's motion only serves to memorialize Plaintiff's disagreement with the Court's decision to deny her motion to amend the complaint and nothing more. Such a disagreement, while foreseeable, is insufficient to satisfy the extremely high burden necessary to grant a motion for reconsideration.  Plaintiff fails to present any cogent arguments that would require the Court to reverse its prior ruling and, therefore, her motion must be denied.

Specifically, Plaintiff's instant motion, under Local Civil Rule 6.3 ("Rule 6.3"), seeks reconsideration of the Court's denial with respect to the dismissal of her Title VI claim. The dismissal of plaintiff's Title VI claims against the Defendants should be upheld because Plaintiff has failed to meet the strict standard for reconsideration, which requires plaintiff to cite any facts or applicable controlling law that the Court overlooked in its Order. Instead, the plaintiff merely reiterates the assertions raised in the prior motion, namely that a Title IV plaintiff is not required to plead program specific federal funding in order to state a claim. Furthermore, Plaintiff impermissibly puts forth new arguments not originally made to the Court. Accordingly, Plaintiff's cannot establish that the Court's Order was issued in clear error, or that a manifest injustice resulted from the Order, and the motion for reconsideration should be denied.

**PROCEDURAL HISTORY**

Plaintiff's First Amended Complaint pleaded claims for a violation of Due Process, and for retaliation in violation of the First Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-1 et seq., and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. On September 24, 2019, the Court granted Defendants' motion to dismiss all of the amended complaint's claims. On November 6, 2019, Plaintiff moved for leave to file a Second Amended Complaint. In the Order on September 24, 2021, plaintiff's motion was denied.

**STANDARD OF REVIEW**

The Second Circuit has held that "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked–matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). The "requirements of Local Rule 6.3 are narrowly construed and strictly applied." Spa 77 G.L.P. v. Motiva Enters. LLC, 772 F. Supp. 2d 418, 436 (E.D.N.Y. 2011); Shrader, 70 F.3d at 257 ("The standard for granting [a 6.3 motion] is strict."). This strictness aims "to avoid duplicative rulings on previously considered issues and to prevent Rule 6.3 from being used to advance different theories not previously argued, or as a substitute for appealing a final judgment." Spa 77 G.L.P., 772 F. Supp. 2d at 436.

"The major grounds justifying reconsideration are an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." NEM Re Receivables, LLC v. Fortress Re, Inc., 187 F. Supp. 3d 390, 395 (S.D.N.Y. 2016) (quoting Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)).

A.159

Here, plaintiff is seeking reconsideration under the clear error/manifest injustice prong.  See Plaintiff's October 8, 2021 Memorandum of Law ("Pl. Mem.") p. 4-8.  Courts have emphasized that a "motion for reconsideration is 'an extraordinary remedy' to be employed sparingly in the interests of finality and conservation of scarce judicial resources."  See Walker v. City of New York, No. 12-840, 2012 WL 6563044, 2012 U.S. Dist. LEXIS 178239, at *5-6 (E.D.N.Y. Dec. 17, 2012) (quoting In re Initial Public Offering Sec. Litig., 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005)).  Generally, reconsideration will not be granted where the moving party: (1) seeks to introduce additional facts not in the record on the original motion; (2) advances new arguments or issues that could have been raised on the original motion; or (3) seeks solely to re-litigate issues already decided.  See Manney v. Reichert, No. 13-4413, 2014 WL 4805046, 2014 U.S. Dist. LEXIS 137715, at *29-30 (E.D.N.Y. Sep. 26, 2014); see also Shrader, 70 F.3d at 257 (reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided").  Here, Plaintiff attempts to re-litigate issues already decided by expanding on arguments made in their previous motion to amend.  Consequently, Plaintiff fails to show any meritorious ground to warrant reconsideration of the Court's Order dismissing her Tile VI claim, and her motion for reconsideration should be denied.

**ARGUMENT**

**POINT I**

**PLAINTIFF FAILS TO DEMONSTRATE THAT THE DISMISSAL OF HER TITLE VI RETALIATION CLAIM RESULTED IN A CLEAR ERROR OR MANIFEST INJUSTICE**

Plaintiff's attempt to demonstrate that the Order was issued in clear error and resulted in a manifest injustice, thus necessitating reconsideration, rests on the argument that the decision in Verdi v City of New York, 306 F. Supp. 3d 532, 546 (S.D.N.Y. 2018), was incorrect,

A.160

and therefore, the Court erred in relying on Verdi. Plaintiff concedes that the facts and circumstances in Verdi are similar to those in the subject case. See Pl. Mem. at p. 5.  In Verdi, an assistant principal, who allegedly opposed race discrimination in placement of children into public school's kindergarten, was allegedly retaliated against with respect to his employment. Verdi 306 F. Supp. 3d 532. The procedural histories are also similar. In both cases, the Plaintiffs' amended complaints failed to allege facts from which the Court could infer that the discrimination that they opposed was against individuals who were intended beneficiaries of federal funding. Plaintiff puts forth the same argument from their first amended complaint—that the Civil Rights Restoration Act of 1987 prohibits a Court from requiring a plaintiff to show a connection between federal funding and the alleged discriminatory school program. See Id. at p. 8.

Seeking to relitigate issues already decided, Plaintiff presents the same argument in their memo for reconsideration as they brought in their motion to amend. Plaintiff argues that Verdi was wrongly held because they did not mention the Civil Rights Restoration Act of 1987. See Pl. Mem. at p. 5. This exact argument was presented in Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Motion To File Her Amended Complaint. See Motion To File Her Amended Complaint at 3 fn. 1.

However, contrary to Plaintiff's assertions, the Court did not overlook the Civil Rights Restoration Act of 1987 *the "Restoration Act") and did, in fact, address this issue in the Order. In the Order, the Court reviewed Plaintiff's arguments regarding the Restoration Act and found that regardless of the Act's changes to Title VI pleading, Plaintiff was still required to show a "Logical Nexus" between the federal funds and the practice towards which plaintiff's complaint was directed. See Order at 19. Plaintiff's motion to reconsider presents the same

Restoration Act argument already addressed, and discounted, in the Order. This is patently improper because reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided" <u>Shrader</u>, 70 F.3d at 257.

Plaintiff also argues that the Court incorrectly treated this case like an employment discrimination case. <u>See</u> Pl. Mem. at p. 4. However, the Order clearly states, "this is not a case of Title VI employment discrimination in which 'a plaintiff must plausibly allege . . . that the defendant was an entity receiving federal funds . . . [and] that the federal funds have been made available primarily for providing employment.' The Court explicitly addressed that this was not an employment discrimination case and acknowledged that Plaintiff did not have to plausibly allege a connection between the federal funds and employment. Contrary to Plaintiff's arguments that were raised in her motion to amend, and are being repeated again here, the Court went held that, "Plaintiff must show that the students at issue were the 'intended beneficiaries of the federal funding.'" <u>See Id.</u> at 17. Plaintiff still has not, and did not, plausibly allege that the students within the challenged school sports program were the intended beneficiaries of federal funding. Plaintiff did not fail to show a connection between the federal funds and employment but rather a connection between the funds and the students at issue. The Court did not address this case is if it were an employment discrimination case and therefore, no clear error can be shown in that regard.

For these reasons, the Order was properly decided; Plaintiff has not demonstrated that the Court committed clear error in its analysis of Plaintiff's deficient Title VI claim; and no manifest injustice has resulted from the Order. Plaintiff's mere disagreement with the Order denying her motion to amend is not enough to satisfy the high burden required to establish the

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully requests that the Court issue an order denying plaintiff's motion for reconsideration in all respects with such other and further relief as this Court may deem just and proper.

Dated:     New York, New York
            November 12, 2021

            **GEORGIA M. PESTANA**
            Corporation Counsel of the
             City of New York
            Attorney of for Defendants
             100 Church Street, Room 2-123
            New York, New York 10007
            (212) 356-1106
            janci@law.nyc.gov

By:           **/s**_____
              Joseph Anci
              Senior Counsel

A.163

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JILL BLOOMBERG,                                                           17-cv-03136 (PGG)

              Plaintiff,                              **REPLY MEMO OF LAW
                               IN SUPPORT OF
   v.                                                                    PLAINTIFF'S MOTION
                               FOR RECONSIDERATION**

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

              Defendants.
------------------------------------------------------------------x

## INTRODUCTION

      Plaintiff filed a motion for reconsideration requesting this Court to allow Plaintiff to amend her complaint to go forward on her Title VI cause of action.  The gravamen of the argument is that this Court committed clear error resulting in manifest injustice by requiring Plaintiff to show a logical nexus between the Federal assistance the New York City Department of Education receives and the sports programs which Plaintiff protested were allocated in a racially discriminatory manner.  Her claim is she was retaliated against for making that protest.    Plaintiff's motion for reconsideration takes issue with the Court's decision to still require "program specific" pleading to support her Title VI claim.  Plaintiff alleges the Court committed clear error which must be corrected in order to prevent manifest injustice.

## I.     THE COURT DID OVERLOOK THE IMPACT OF THE CIVIL RIGHTS RESTORATION ACT ON THIS CASE

      Defendants, in opposition to Plaintiff's motion, claim that Plaintiff has not met the standard for reconsideration.  More specifically Defendants claim Plaintiff has merely reargued the issue of the Civil Rights Restoration Act.    This is not so.  Plaintiff made the arguments and quoted

A.164

extensively from the Civil Rights Restoration Act of 1987 precisely because this Court, while acknowledging the act, overlooked its clear provisions of the Act, by requiring Plaintiff's proposed amended complaint to allege facts which showed a connection between federal assistance and the sports programs Plaintiff complained had been racially discriminatorily allocated.

Plaintiff in reality argued that by its ruling, this Court is attempting to reintroduce a requirement that a Title VI Plaintiff must provide evidence that Federal funds were "program specific" when the purpose of the Civil Rights Restoration Act was to overrule the cases that had interpreted the law in that way. The Restoration Act makes clear that Title VI, (and other laws) covered all programs and activities in entities like the New York City Department of Education to which federal assistance was provided.    It is clear error for this Court to have clearly overlooked the language of this law, and seek to reimpose pleading and or proof requirement of program specific federal assistance.   It is disingenuous for the Defendants to support the Court's reasoning as the NYCDOE knows full well that as a prerequisite of receiving Federal Assistance the NYCDOE may not violate Title VI in any program or activity which it has given that it receives federal assistance.   Title VI, states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The Civil Rights Restoration Act defines "program or activity" and all such programs or activities. The Court overlooking the plain language of the legislation is outcome determinative.

As the Supreme Court in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020):

This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute

2

A.165

the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations. (Citation omitted)

Plaintiff submits that this Court's effort to reintroduce program specific pleading for purposes of this case, overlooks the plain language of the law, and therefore is not only clear error, but also, Plaintiff alleges, is reversible error.

## II.     DEFENDANTS MISCONSTRUE PLAINTIFF'S POSITON REGARDING VERDI

Defendants claim that Plaintiff's motion rests on the argument that the decision in *Verdi v City of New York*, 306 F. Supp. 3d 532, 546 (S.D.N.Y. 2018)*, was incorrect. (Def Br. p. 3). This is not so. While Plaintiff, as this Court, accepted that the standard in Title VI retaliation cases was correctly stated in Verdi supra, and did not include the requirements of 42 U.S.C. 2000d-3, what Plaintiff claimed was:

> "While the Court in *Verdi*, did say that conclusory allegations regarding receipt of federal assistance were not sufficient to state whether the discrimination the plaintiff opposed was against the intended beneficiaries of the funding, there was no mention in the *Verdi* decision of the impact of Civil Rights Restoration Act of 1987 on the specificity necessary in pleading the receipt of federal assistance by the New York City Department of Education." (Plaintiff's Brief on Reconsideration p. 6).

That is, Plaintiff alleged that in light of the Civil Rights Restoration Act, the facts which have to be alleged for a claim to arise under Title VI is that the NYCDOE is the recipient of Federal Funds and that Plaintiff alleged discrimination in a program or activity of the New York City Board of Education. Then for retaliation based on protest of this discrimination she has to show the elements of retaliation.

3

A.166

The papers in Verdi as well as the decision show no reference whatsoever to the Civil Rights Restoration Act in either the papers in opposition to the motion to dismiss, or when the matter of Title VI was replead in Plaintiffs Second Amended Complaint.  In Verdi, the Plaintiff alleged he was retaliated against for voicing opposition to what he viewed as racially discriminatory placement into P.S. 24.   His complaint in essence stated that minority students were discriminatorily excluded from PS 24 and also that a loss of a lease for the school's annex promoted overcrowding.  Being excluded from a school base was alleged to be a program or activity of the NYCDOE.   The Court on the motion to dismiss alleged that NYCDOE received federal assistance but the Court sought more specifics regarding the nature of the funding whether the funding was linked to students whose discrimination was the subject of the complaint.  In Verdi's Second Amended Complaint Plaintiff listed the types of federal funds that NYCDOE receives, but then stated "It is contended that the beneficiaries of the federal funding to the DOE and P.S. 24 is the *entire* student body."   [See *Verdi v City of New York* 17-cv-1755 dkt #43 paragraph 41].

Similarly in Plaintiff's proposed amended complaint she alleged in paragraph 22 that the NYCDOE was the recipient of significant federal funding and in paragraphs 23-25 stated:

23.  More specifically the DOE receives federal funds pursuant to Title I of the Elementary and Secondary Education Act which provides funds to schools which have a high percentage of families from impoverished backgrounds.

24. Schools qualify for Title I if a certain percentage of the students qualify for free or reduced lunch programs.

25. Because over 60% of the students at PSC qualified for free or reduced lunch programs, PSC receives Title I funds for school wide programs.

This pleading should be specific enough to show that the students at PSC were beneficiaries of federal assistance received by the NYCDOE, and demanding that Plaintiff plead that Federal Assistance goes directly to the sports programs run through the Public School Athletic League of

4

A.167

the NYCDOE, as the recipient of federal fund specifically is prohibited under the Civil Rights

Restoration Act.

Conclusion:

For the foregoing reasons Plaintiff requests this Court reconsider its decision to deny

Plaintiff's request to amend her complaint on her Title VI claim.

New York, New York
November 19, 2021

Respectfully Submitted,


_____/s/ _____
Jeanne Mirer
 MIRER, MAZZOCCHI & JULIEN PLLC
Attorney for Plaintiff
1 Whitehall Street, 16th Floor
New York, New York 10004
(212) 231-2235
jmirer@mmsjlaw.com

A.168

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

                Plaintiff,

    - against -

THE NEW YORK CITY DEPARTMENT
OF EDUCATION and CARMEN FARINA,

              Defendants.

**ORDER**

17 Civ. 3136 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In a September 23, 2021 order (the "Order"), this Court denied Plaintiff Bloomberg's motion to amend the Complaint. (Dkt. No. 108) Plaintiff has moved for reconsideration of the Order as it pertains to her Title VI retaliation claim. (Mot. for Reconsideration (Dkt. No. 109))

        Plaintiff argues that "this Court committed clear error in determining that a Title VI plaintiff is required to plead program specific federal funding in order [to] state a claim [for retaliation]." (Pltf. Reconsideration Br. (Dkt. No. 111) at 1)[1] According to Plaintiff, this Court, "addressed Plaintiff's claim as if it was a claim for employment discrimination," when in fact Plaintiff is claiming that she suffered retaliation at work after complaining that her students' rights under Title VI had been violated. (Id. at 4-5) Plaintiff goes on to argue that, in rejecting her motion to amend, this Court overlooked the Civil Rights Restoration Act of 1987 (the "CRRA"). (Id. at 8)

        The CRRA amended Title VI's definition of "program or activity" as follows:

---

[1] The page numbers of documents referenced in this order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

A.169

> For the purposes of [Title VI of the Civil Rights Act of 1964], the term "program or activity" and the term "program" mean all of the operations of – (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government; (2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or (B) a local educational agency (as defined in section 198(a)(10) of the Elementary and Secondary Education Act of 1965), system of vocational education, or other school system. . . .

Civil Rights Restoration Act of 1987 Pub. L. No. 100-259, § 6, 102 Stat. 28 (Mar. 22, 1988).

The parties have not adequately briefed the issue of how the CRRA affects the pleading standard for a Title VI retaliation claim where plaintiff alleges that she suffered retaliation at work after complaining that others' rights under Title VI had been violated. Accordingly, the parties will submit supplemental briefing addressing how and to what extent Title VI's definition of "program or activity" – as amended by the CRRA (see 42 U.S.C. § 2000d-4a) – affects the pleading standard articulated in Verdi v. City of New York, 306 F. Supp. 3d 532 (S.D.N.Y. 2018) and in this Court's September 23, 2021 Order. In particular, the parties will address how the CRRA affects the requirement that a plaintiff allege a factual nexus between the use of federal funds and the discriminatory practices complained of.

Given that the factual background of this case is set forth in detail in this Court's September 23, 2021 Order and September 24, 2019 Opinion, the parties need not address the factual background in their supplemental briefing. (See Sept. 23, 2021 Order (Dkt. No. 108) at 2-10; Sept. 24, 2019 Opinion (Dkt. No. 89) at 2-12) Instead, the supplemental briefing should focus on the legal question described above, citing relevant case law.

On a motion for reconsideration, the movant bears the heavy burden of showing that the Court overlooked "'controlling decisions'" which might reasonably have led to a different result. See Eisemann v. Greene, 204 F.3d 393, 395 n.2 (2d Cir. 2000) (quoting Shamis

2

<u>v. Ambassador Factors Corp.</u>, 187 F.R.D. 148, 151 (S.D.N.Y. 1999)).  Accordingly, Plaintiff

must cite case law satisfying this standard.

        The parties' briefing should address, <u>inter alia</u>, the applicability of the following

cases in determining the appropriate pleading standard for a Title VI retaliation claim in the

context of this case:  <u>Hickey v. Myers</u>, 2010 WL 786459 (N.D.N.Y. Mar. 2, 2010) (Title VI

retaliation standard); <u>Lopez v. Webster Cent. Sch. Dist.</u>, 682 F. Supp. 2d 274 (W.D.N.Y. 2010)

(sufficiency of allegations related to defendants' receipt of federal funds); <u>New York Urb.</u>

<u>League, Inc. v. Metro. Transp. Auth.</u>, 905 F. Supp. 1266 (S.D.N.Y.), <u>vacated on other grounds</u>,

71 F.3d 1031 (2d Cir. 1995) (applicability of Title VI to a state agency); <u>Peters v. Jenney</u>, 327

F.3d 307 (4th Cir. 2003) (private right of action for retaliation under Title VI); <u>Horner v.</u>

<u>Kentucky High Sch. Athletic Ass'n</u>, 43 F.3d 265 (6th Cir. 1994) (Civil Rights Restoration Act

and the definition of "program or activity" under Title IX).

        The supplemental briefing will be filed according to the following schedule:

(1)      Plaintiff's supplemental brief is due by January 4, 2023; and

(2)      Defendants' supplemental brief is due by January 11, 2023.

Dated: New York, New York
      December 20, 2022

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

3

A.171

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JILL BLOOMBERG,

                    Plaintiff,

                                                          17-cv-03136 (PGG)

        v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and CARMEN FARINA,

                    Defendants.
-----------------------------------------------------------------x

**PLAINTIFF'S SUPPLEMENTAL BRIEF**

**IN SUPPORT OF HER MOTION FOR RECONSIDERATION**

JULIEN MIRER & SINGLA
Jeanne Mirer
1 Whitehall St., 16th floor
New York, NY 10004
212-231-2235
jmirer@workingpeopleslaw.com
*Attorneys for Plaintiff*

A.172

## INTRODUCTION

This Court's December 20, 2022, Order stated that the parties have not adequately briefed how the Civil Rights Restoration Act (CRRA) affects the pleading standard for a Title VI retaliation claim where the Plaintiff claims she suffered retaliation after complaining that others' rights under Title VI had been violated. The Court therefore asked the parties to submit supplemental briefing addressing how and to what extent Title VI's definition of a program or activity, as amended by the CRRA (42 U.S.C. 2000d-4a), affects the pleading standard articulated in *Verdi v. City of New York*, 306 F. Supp 3d 532 (S.D.N.Y. 2018) and this Court's Order of September 23, 2021. In particular, the Court requested the parties address how the CRRA affects the requirement that a plaintiff allege a factual nexus between the use of federal funds and the discriminatory practice complained of. The Court asked the parties to address the pleading standards for a retaliation case under Title VI in the context of this case. These cases include, but are not limited to *Hickey v. Myers*, (2010 U.S. Dist. LEXIS 18281 (N.D.N.Y. March 2, 2010); (Title VI retaliation standard); *Lopez v. Webster Cent. Sch. Dist.,* 682 F. Supp. 2d 274 (W.D.N.Y. 2010) (sufficiency of allegations related to defendants' receipt of federal funds); *New York Urb. League, Inc. v. Metro. Transp. Auth.,* 905 F. Supp. 1266 (S.D.N.Y.), *vacated on other grounds* 71 F.3d 1031 (2d Cir. 1995) (applicability of Title VI to a state agency); *Peters v. Jenney,* 327 F.3d 307 (4th Cir. 2003) (private right of action for retaliation under Title VI); and *Homer v. Kentucky High Sch. Athletic Ass'n,* 43 F.3d 265 (6th Cir. 1994) (Civil Rights Restoration Act and the definition of "program or activity" under Title IX).

## I.      STANDARD FOR RECONSIDERATION

In Plaintiff's motion for reconsideration on this Court's denial of her motion to amend the complaint, she stated the proper standard for reconsideration under Local Rule 6.3. This Court in

1

A.173

reference to the standard referred to *Eismann v Greene,* 204 F.3d 393, 395 n.2 (2d Cir. 2000), which stated in relevant part: "There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." To be entitled to reargument, a party "must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion." *Shamis v. Ambassador Factors Corp.,* 187 F.R.D. 148, 151 (S.D.N.Y. 1999). Plaintiff's motion for reconsideration alleged in part that the Court overlooked the impact of the CRRA on the very question of the nexus between the use of federal funds and the discriminatory act complained of in the sports programs at the schools.  That is, the CRRA  made clear that  the reach of Title VI and related statutes applied to all programs and activities of recipient of federal financial assistance, not to specific programs which received direct assistance.   In other words the CRRA eliminated the need for a plaintiff to articulate a factual nexus between the use of federal funds and the discriminatory acts Plaintiff complained of.

## II.   THE COURT IN *VERDI* WAS NEVER PRESENTED WITH ARGUMENT REGARDING THE CIVIL RIGHTS RECONSTRUCTION ACT. HOWEVER, THE COURT IN VERDI CORRECTLY FOUND THE STANDARD FOR RETALIATION TO BE THAT SET FORTH IN *HICKEY V. MYERS*.

In *Hickey v. Myers, supra,* the Plaintiff, a college dean, complained he was retaliated against in violation of Title VI for opposing a racially discriminatory admissions policy at the College. He claimed that the policy as well as the cutting of remedial programs violated the rights of students of color. He claimed he was terminated as a result of his complaints on behalf of the students. The Court recognized his claim for retaliation under Title VI. In so doing, the Court determined his claim was not one for employment discrimination but for retaliation. As such, his case did not implicate the requirement in Title VI for employment discrimination cases, where he

2

A.174

would have had to show that the federal financial assistance given to the College (which was not in dispute). was not for the purpose of providing employment.

The court in *Verdi, supra,* discussed the *Hickey* case at length, and this discussion is set forth in Plaintiff's brief in support of reconsideration [Dkt 111] page 5, where the Plaintiff similarly claimed retaliation against him for advocating for the rights of racial minority students to access the school.

Needless to say, in neither *Hickey* nor *Verdi* did any of the counsel argue that their pleading as to receipt of federal financial assistance was sufficient for Title VI purposes given the CRRA's determination that federal funds did not have to be program specific in order to be covered under Title VI. In *Verdi*, the Plaintiff amended the complaint to make more specific references to the receipt of federal funds, as Plaintiff did here in her amended complaint. In reality, such amendment should not have been necessary in light of the CRRA, but in *Verdi* no one brought the CRRA to Judge Caproni's attention. In this case, Plaintiff brought the CRRA to the Court's attention in her motion to amend the complaint. In this case, just as in *Hickey* and in *Verdi*, the Plaintiff claimed the New York Department of Education was discriminating against students of color when it provided more sports team opportunities to the white students in Millenium Brooklyn than the they did to the predominantly Black and Hispanic students whose schools shared the same building as Millenium. Plaintiff, as the principal of one of those predominantly minority schools, Park Slope Collegiate, had complained of this discrimination as well as the segregation in the sports program.

III.   ***LOPEZ*** **AND** ***HORNER*** **SUPPORT PLAINTIFF'S CLAIMS THAT HER PLEADINGS, BOTH ORIGINAL AND AMENDED, ADEQUATELY PLEAD FEDERAL FINANCIAL ASSISTANCE TO SUPPORT HER TITLE VI RETALIATION CLAIM**

3

A.175

Although the case of *Lopez v. Webster Central School District, supra,* was not a retaliation claim, it did address the pleading standard for pleading federal financial assistance to support a Title VI claim. The Plaintiffs allegations in *Lopez* were of racial harassment at the school and disparate treatment with respect to tutoring services. While the case was dismissed on summary judgment as to proofs, the Court did address an allegation that the Plaintiffs failed to plead that the school received federal financial assistance. Defendants argued that Plaintiffs' Title VI claims should fail (a) because the complaint did not allege that the school board received federal financial assistance as required by the statute, and (b) because the Plaintiffs presented no evidence that the Board of Education received federal financial assistance. In response to these two arguments the Court said:

> With regard to the first two points, the failure to allege or prove that the Board of Education receives federal funds, the amended complaint does allege that the Webster Central School District did receive and continues to receive federal funds. (Am. Compl. P 6.) Defendants do not dispute that the Board of Education is part of the District and the Civil Rights Restoration Act of 1987 overturned the program-specific interpretation of *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 634-36, 104 S. Ct. 1248, 79 L. Ed. 2d 568 (1984). As the district court in *Grimes v. Superior Home Health Care of Middle Tennessee, Inc.*, 929 F. Supp. 1088 (M.D. Tenn. 1996) observed:
>
> "The new definition specifies that entire entities receiving federal funds--whether governmental entities, school systems, or universities--must comply with Title VI, rather than just the particular program or activity that actually receives the funds." *Id.; see also* 42 U.S.C. § 2000d-4a (Supp. 1996). *Grimes*, 929 F. Supp. at 1091 (quoting *Stanley v. Darlington County School Dist.*, 879 F. Supp. 1341, 15 (D.S.C. 1995), *rev'd in part on other grounds*, 84 F.3d 707 (4th Cir. 1996)). The omission of an allegation directed against the Board of Education is inconsequential. 42 U.S.C. § 2000d-4a (2002); 20 U.S.C. § 7801(26)(A) (2002). Plaintiffs have included an excerpt from the deposition of John D. Carlevatti who testified that the Webster School District received federal funds, including in 2004. (Carlevatti Dep. at 45-46.) Thus, the Court is not persuaded by Defendants' first two arguments against Plaintiffs' Title VI claim.

*Lopez* at 280-281.

In *Horner v. Kentucky High School Athletic Association, supra,* the Plaintiffs in a Title IX and equal protection case in which Plaintiffs, who were twelve female athletes, contend that

4

A.176

defendants, the Kentucky State Board of Education for Elementary and Secondary Education and

the Kentucky High School Athletic Association (KHSAA), discriminated against them on the basis

of sex by sanctioning fewer sports for girls than for boys and by refusing to sanction girls'

interscholastic fast-pitch softball. The District Court dismissed both the Title IX case and equal

protection claims on summary judgement. The Sixth Circuit reversed as to Title IX. One of the

issues was whether Title IX applied to these programs.

The Defendants had asked the District Court to dismiss Plaintiffs' Title IX claim based on

Defendants' claim neither the Board of Education nor the KHSAA were recipients of federal

financial assistance. The District Court did not reach that question. On appeal, the Defendants

asked the Court to dismiss the Title IX claim on that basis. The Court of Appeals refused to do so

stating:

> Title IX prohibits sex discrimination under any education program or activity receiving
> federal funds. 20 U.S.C. § 1681(a). Pursuant to regulation, "recipient" is defined as:
> any State or political subdivision thereof, or any instrumentality of a State or political
> subdivision thereof, any public or private agency, institution, or organization, or other
> entity, or any person, to whom Federal financial assistance is extended directly or through
> another recipient and which operates an education program or activity which receives or
> benefits from such assistance, including any subunit, successor, assignee, or transferee
> thereof. 34 C.F.R. § 106.2(h).
>
> Prior to its amendment in 1987 by the Civil Rights Restoration Act, Title IX was construed
> as being program-specific, and not providing institution-wide coverage. *Grove City
> College v. Bell*, 465 U.S. 555, 79 L. Ed. 2d 516, 104 S. Ct. 1211 (1984).
>
> In response to that construction, Congress amended Title IX by adding § 1687, entitled
> "Interpretation of 'program or activity.'"
> For the purposes of this chapter, the term "program or activity" and "program" mean all of
> the operations of--
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or
> of a local government; or
> (B) the entity of such State or local government that distributes such assistance and each
> such department or agency (and each other State or local government entity) to which the
> assistance is extended, in the case of assistance to a State or local government;
> **(2)(A)** . . . .
> **(B)** a local educational agency, system of vocational education, or other school system;

5

A.177

. . . .

> *any part of which* is extended Federal financial assistance, except that such term does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization. 20 U.S.C. § 1687 (footnote omitted; citation omitted; emphasis added).

> The legislative history describes the effect of the amendments, stating that the definitions of "program or activity" and "program" "make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance." S. Rep. No. 64, 100th Cong., 2d Sess. 4, *reprinted in* 1988 U.S.C.C.A.N. 3, 6. The amendment has been construed consistently with this intent. *Williams v. School Dist. of Bethlehem*, 998 F.2d 168, 171 n.3, *cert. denied*, 126 L. Ed. 2d 656, 114 S. Ct. 689 (1994); *Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir. 1993).

It was uncontested that the State of Kentucky Department of Education received over $ 396 million in federal funds. Pursuant to state statute the Board of Education *controls and manages*, on behalf of the Department, the state's schools and all programs conducted in the schools. The Court of Appeals made clear that the Board has the statutory authority to implement the provisions of federal statutes in appropriating funds to the state and based on this declined to determine that the Board of Education was entitled to summary judgment on the ground that it is not a recipient of federal funds. While the Court found it was a closer question for the KHSAA, which was funded by dues and other proceeds of sports programs, the Court found they were directed by the Board to run programs for the Board, and that the dues they received came from schools, which received federal money, made them a recipient of federal funds. *Horner* at 271-272.

These two decisions make clear that Plaintiff's claim that Plaintiff did not have to plead a factual nexus between the use of federal funds and the discriminatory acts Plaintiff complained of in order to claim protection from retaliation under Title VI. As long as she was complaining about a program, school sports, in a school system which received federal financial assistance, she has adequately plead an actionable claim.

6

A.178

I.      THE DECISIONS IN *PETERS V. JENNEY* AND *NEW YORK URBAN LEAGUE* SUPPORT PLAINTIFF'S RIGHT TO PROCEED UNDER TITLE VI

In *Hickey v. Myers, supra,* the Court relied on *Peters v. Jenney supra,* for the proposition that "it is well settled that a Plaintiff has a private right of action for retaliation for opposing practices that one reasonably believes constitutes intentional discrimination." There has been no challenge to Plaintiff having a private right of action for retaliation and to do so at this point would be going against considerable precedent. It is clear Plaintiff believed she was protesting what she reasonably believed to be intentional discrimination and segregation and should be allowed to proceed on her Title VI case. Thus, *Peters v. Jenney, supra,* supports Plaintiff's right to proceed on her Title VI claim.

The Plaintiffs in *New York Urb. League, Inc. v. Metro. Transp. Auth., supra,* sought an injunction against the MTA implementing a fare hike on the subways, which it was argued had a disparate impact on Black, Hispanic and Asian populations of the City of New York, in violation of Title VI. The MTA and the State challenged whether they could be held liable under Title VI. The Court held:

> Under Title VI the State of New York can be held liable along with the MTA, even if it is not included in the definition of a program, if it is responsible for the Title VI violation by creating the recipient, the MTA, and participating in the Title VI violations. *See Association of Mexican-American Educators v. State of California,* 836 F. Supp. 1534, 1543 (N.D.Cal. 1993). *Cf. United States v. City of Yonkers,* 880 F. Supp. 212, 232 (S.D.N.Y. 1995) (the plain language of 42 U.S.C. § 2000d-7(a)(1) is reinforced by the fact that Congress amended Title VI to make clear that the statute authorizes suit against an entire system for the discriminatory practices of a discrete program within that system receiving federal funds).

> Under these circumstances it appears that Title VI and 49 C.F.R. § 21.5(b)(2) apply to the actions of the MTA and the state asserted in the Plaintiffs' Complaint.
> *New York Urban League* at 1273.

Although Plaintiff's case is not against the State but the New York City Board of Education, which receives federal financial assistance that is used *inter alia* at her school, the holding of the case

reiterates the duty of any entity and all programs therein which receive federal financial assistance to comply with the anti-discrimination provisions of Title VI.

### IV. CASES IN OTHER JURISDICTIONS SUPPORT PLAINTIFF'S CLAIM THAT THE CRRA ELIMINATES ANY REQUIREMENT FOR A PLAINTIFF TO PLEAD THERE IS A FACTUAL NEXUS BETWEEN THE FEDERAL FINANCIAL ASSISTANCE AND THE ALLEGED DISCRIMINATION.

Plaintiff refers this Court to *Ass'n of Mexican-American Educators v. California,* 836 F. Supp. 1534, 1540-43 (N.D. Cal. 1993) and *PAS Communs., Inc. v. U.S. Sprint, Inc.*, 112 F. Supp. 2d 1106, 1110-11 (D. Kan. 2000) as other cases where the Court has recognized the expansive definition of program or activity after the passage of the CRRA.

In *Mexican American Educators*, *supra,* the Court stated:

> In 1984, the Supreme Court, in a case involving Title IX, construed "program or activity" to mean only those entities that actually received federal funds. *Grove City College v. Bell,* 465 U.S. 555, 570-74, 79 L. Ed. 2d 516, 104 S. Ct. 1211 (1984). Three years later, Congress overturned *Grove City* by passing the Civil Rights Restoration Act of 1987 ("Restoration Act"), Pub. S. No. 100-259, 102 Stat. 28. The Restoration Act amended Title VI by adding an expansive definition of the term "program or activity." 42 U.S.C. § 2000d-4a.

In *PAS Communics Inc. supra*, the Court made a similar point with respect to the CRRA's passage in 1988.

> "The Restoration Act modified Title VI so that it encompasses programs or activities of a recipient of federal financial assistance on an institution-wide basis. *See* 42 U.S.C. § 2000d-4a. With respect to corporations, Title VI defines "program or activity" to include "all the operations of . . . an entire corporation . . . if assistance is extended to such corporation as a whole." *See id.* § 2000d-4a(3)(A)(i). In light of this amendment, plaintiffs' failure to allege discrimination in connection with the specific program receiving federal funds is not fatal to their Title VI claim. *See Quinn v. National Railroad Passenger Corp.*, 1997 U.S. Dist. LEXIS 20532, *15, No. 97- C-3529, 1997 WL 790738, at *5 (N.D. Ill. Dec. 18, 1997) (In light of Restoration Act's amendment to Title VI, "the fact that the [plaintiffs'] complaint is bereft of specific allegations as to the nature and extent of [federal] funding does not render their Title VI claim legally insufficient.")

8

*     *     *

> In their complaint, plaintiffs allege that defendant receives "federal financial assistance subject to institution-wide coverage" under Title VI. Accepting this allegation as true (as the court is compelled to do at this stage of the proceedings), the court concludes that plaintiffs have stated a claim under Title VI. *See id.* (where complaint simply alleged that defendant was "a recipient of federal financial assistance," allegations were sufficient to state a claim under Title VI;

The Court in *PAS supra* also referred many cases where Courts have properly viewed Plaintiff's pleading that an entity receiving federal financial assistance should be considered true on a motion to dismiss, allowing cases to proceed to discovery.

## CONCLUSION

Plaintiff Jill Bloomberg filed her case in April of 2017.   Based on relevant case law, she has adequately plead a Title VI retaliation case to move forward to discovery in this case.  Plaintiff submits that, as a matter of law, this Court should grant her motion for reconsideration having overlooked the impact of the CRRA on her Title VI case.

Dated: January 04, 2023

New York, NY

       Respectfully Submitted,


       _____/s/_____
       Jeanne Mirer
        JULIEN, MIRER & SINGLA PLLC
       Attorney for Plaintiff
       1 Whitehall Street, 16th Floor
       New York, New York 10004
       (212) 231-2235

9

A.181

Docket No. 17-CV-3136 (PGG)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

Plaintiffs,

-against-

THE NEW YORK CITY DEPARTMENT EDUCATION
and CARMEN FARINA,

Defendants.

## SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION

***HON. SYLVIA O. HINDS-RADIX***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, Rm. 2-100*
*New York, N.Y.  10007*

*Of Counsel:  Andrea O'Connor*
*Tel:  (212) 356-4015*

A.182

<u>STATEMENT</u>

Defendants respectfully submit this supplemental memorandum of law in response to the Court's December 20, 2022 Order directing the parties to "address how the [Civil Rights Restoration Act of 1987] affects the requirements that plaintiff allege a factual nexus between the use of federal funds and the discriminatory practices complained of." *See* Order, dated December 20, 2022 at Dkt. No. 117 (hereinafter "December 20 Order"). For the reasons set forth below, defendants respectfully submit that the Court did not overlook the Civil Rights Restoration Act of 1987 ("CRRA") in issuing its September 24, 2019 Order granting their motion to dismiss or its September 23, 2021 Order denying plaintiff's motion for leave to file a Second Amended Complaint. Therefore, plaintiff's instant motion for reconsideration must be denied.

<u>ARGUMENT</u>

Title VI, along with the Age Discrimination Act, Title IX, and Section 504 of the Rehabilitation Act of 1973, were amended in 1987 in response to the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555, 570-75 (1984). In response to the Supreme Court's narrow interpretation of the phrase "education program or activity," Congress passed and the President signed the Civil Rights Restoration Act of 1987 ("CRRA") which amended the affected statutes by inserting a common definition of "program or activity" for all four of the statutes. *See Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 73, (1992) (describing the history of the CRRA). In sum, the CRRA specified that entities receiving federal funds must comply with civil rights legislation in all of their operations, not just in the specific program or activity that receives federal funding.

A.183

A.184

A.185

[1] Thus, in *Hickey*, the plaintiff alleged in paragraph 14 of his Amended Complaint that applicants (i.e. the victims of the discrimination about which he complained) were the intended beneficiaries of the federal funding received by his employer.

Here, the proposed Second Amended Complaint ("SAC") alleges that the DOE is the recipient of "federal funds pursuant to Title 1 of the Elementary and Secondary Education Act which provides funds to schools which have a high percentage of families from impoverished backgrounds." *See* Dkt. No 107-1, Proposed SAC at ¶ 23. The SAC further alleges that that "[b]ecause over 60% of the students at PSC qualified for free or reduced lunch programs, PSC receives Title I funds for school wide programs." *Id.* at ¶ 25. Plaintiff alleges that she was retaliated against for complaining about "the [Public School Athletic League][2] policy of allowing segregated and unequal allocation of sports teams and resources." *Id.* at ¶ 27. The proposed SAC is devoid of any allegation that participants in PSAL athletic teams (i.e. the victims of the discrimination about which plaintiff complained) were the intended beneficiaries of the Title I[3] funds received by DOE. *See generally id.*

---

[1] For the Court's convenience, a copy of the publicly available Amended Complaint in *Hickey v. Myers, et al.*, Docket No. 09 CV 1307 (TJM)(DEP), is annexed hereto as Appendix A.

[2] The Public School Athletic League "coordinates interscholastic competition for all New York City Public High Schools." *See* Public School Athletic League, "About Us," at www.psal.org/PDF/Miscellaneous/2016_AboutUs.pdf (last accessed Jan. 10, 2023).

[3] Title I, Part A (Title I) of the Elementary and Secondary Education Act, as amended by the Every Student Succeeds Act, provides financial assistance to local educational agencies and schools with high numbers or high percentages of children from low-income families to help ensure that all children meet challenging state academic standards. *See* U.S. Department of Education, Improving Basic Programs Operated by Local Educational Agencies (Title I, Part A), "Program Description," at https://www2.ed.gov/programs/titleiparta/index.html (last accessed Jan. 10, 2023).

A.187

[4] The Court in *Lopez* held that since it was uncontested that defendant Webster Central School District was the recipient of federal funds, "[t]he omission of an allegation directed against the Board of Education [wa]s inconsequential" in connection with the plaintiffs' intentional discrimination claim. *Lopez*, 682 F. Supp. 2d at 280-281. Thus, the decision in *Lopez* did not address or concern the appropriate pleading standard for a Title VI retaliation claim.

The Court's decision in *New York Urb. League, Inc. v. Metro. Transp. Auth.*, 905 F. Supp. 1266 (S.D.N.Y. 1995), also does not address or concern the appropriate pleading standard for a Title VI retaliation claim. Rather, the Court in *New York Urb. League, Inc.* reiterated that an entire system can be held liable under Title VI for the proven intentional discriminatory practices of a program within that system.

Similarly, in *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 268 (6th Cir. 1994), the plaintiffs, female athletes, filed an action pursuant to the Equal Protection Clause and Title IX of the Education Amendments of 1972 against a state board of education and a state high school athletic association alleging that they were intentionally discriminated against because of their sex. *Horner* did not involve Title VI claims or retaliation claims brought under Title IX. Rather, *Horner* reiterated the impact of the CRRA upon Title IX, with the CRRA making clear that the definitions of "program or activity" establish that discrimination is prohibited throughout an entire entity that receives federal funding. *See Horner*, 43 F.3d at 271 *citing* Rep. No. 64, 100th Cong., 2d Sess. 4, reprinted in 1988 U.S.C.C.A.N. 3, 6. Here,

---

[4] For the Court's convenience, a copy of the publicly available Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment in *Lopez v. Webster Cent. Sch. Dist.*, Docket No. 05 CV 6473 (CJS)(JWF), is annexed hereto as Appendix B.

---

For the reasons set forth above, and for those set forth in Defendants' Opposition to Plaintiff's Motion for Reconsiderations, defendants respectfully request that the Court issue an order denying plaintiff's motion for reconsideration in all respects with such other and further relief as this Court may deem just and proper.

Dated:      New York, New York
            January 11, 2023

                          **HON. SYLVIA O. HINDS-RADIX**
                          Corporation Counsel of the
                            City of New York
                          Attorney of for Defendants
                            100 Church Street, Room 2-100
                          New York, New York 10007
                          (212) 356-4015
                          aconnor@law.nyc.gov

            By:   _____
                          Andrea O'Connor
                          Assistant Corporation Counsel

A.190

# APPENDIX A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

THOMAS J. HICKEY,

Plaintiff,

– against –

ANNE C. MYERS, DONALD P. ZINGALE, and
THE STATE UNIVERSITY OF NEW YORK
COLLEGE OF AGRICULTURE AND
TECHNOLOGY AT COBLESKILL,

Defendants.

**Amended Complaint**

Civil Action No. 09-cv-01307-TJM-DEP

Plaintiff, Thomas J. Hickey, by his attorneys, Cooper Erving & Savage LLP and Thomas J. Marcelle, Esq., for his complaint herein, alleges as follows:

## INTRODUCTION AND JURISDICTIONAL STATEMENT

1.      This is a civil rights action for damages brought pursuant to 42 U.S.C. §§ 1981, 1983, and § 2000d to redress violations of plaintiff's rights to be free from retaliation for having spoken out against fraudulent and racially discriminatory practices in education.

2.      Defendants, acting under color of state law, have retaliated against plaintiff for asserting that The State University of New York College of Agriculture and Technology at Cobleskill is engaged in fraudulent policies that discriminate against African–American students and in the course of such retaliation unlawfully interfered with plaintiff Hickey's peaceful exercise of his constitutionally protected speech in violation of the First and Fourteenth Amendments to the United States Constitution.

3.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

1

A.192

4.     Venue is properly laid in the Northern District of New York, under the provisions of 28 U.S.C. § 1391, in that all, or a substantial part, of the events or omissions giving rise to the claims alleged herein occurred within the Northern District of New York and defendants reside, or are located, in this District.

5.     Plaintiff demands a jury trial of this action.

## PARTIES

6.     Plaintiff Thomas J. Hickey is the former Dean of Liberal Arts and Sciences at the college. He is a tenured professor at the college.  Dr. Hickey resides in the County of Otsego, State of New York.

7.     Defendant Anne C. Myers is the Provost and Vice President for Academic Affairs at the college.  She resides in the County of Schoharie, State of New York.

8.     Defendant Donald P. Zingale is President of the college.   He resides in the County of Schoharie, State of New York.

9.     Defendant The State University of New York College of Agriculture and Technology at Cobleskill is a public educational institution that is part of the State University of New York.

10.     Defendants Myers and Zingale were acting under color of the law of the State of New York but are sued under 42 U.S.C. §§ 1981 and 1983 in their personal capacity for committing acts in violation of the Constitution of the United States.

11.     Defendants Myers and Zingale are sued in their official capacity under 42 U.S.C. §§ 2000d and 2000d-7.

12.     Defendant The State University of New York College of Agriculture and Technology at Cobleskill is sued in its capacity as part of the government of New York State pursuant to 42 U.S.C. § 2000d-7.  § 2000d-7 abrogates the sovereign immunity of the States in actions brought

2

under § 2000d. The college is liable for the actions of defendants Myers and Zingale committed in their official capacity under 42 U.S.C. §§ 2000d and 2000d-7.

13.  Defendant The State University of New York College of Agriculture and Technology at Cobleskill is a program or activity receiving Federal financial assistance and/or operates programs receiving Federal financial assistance.

14.  Among the areas in which defendant The State University of New York College of Agriculture and Technology at Cobleskill received Federal funds are the following: admissions, recruitment, financial aid, academic programs, student health, counseling and guidance services, discipline, academic assistance, technical education, recreation, physical education, athletics, housing, and employment.

15.  The students referred to in this action participated in various programs operated by the college which received Federal financial assistance.

**FACTUAL ALLEGATIONS**

16.  Since at least 1999, defendant college has had a policy of admitting students whose academic background, as revealed to its admissions office, is such that, given the current programs in effect at the college, they have no reasonable likelihood of graduating. These students are known to lack appropriate academic foundation to succeed at the college level without remediation. The college has taken their tuition for the express and admitted purpose of making budget knowing that these students are not reasonably likely to graduate.

17.  This policy targeted African-American students in particular. African-American students were recruited, particularly from the New York City metropolitan area, that the college knew did not meet the admissions standards of the college.

3

A.194

18.    Defendant Myers wrote a memorandum in 1999 describing this policy and, upon information and belief, participated in the development of the policy.

19.    Defendant Myers knew that the policy was harmful to the students affected but did nothing to change it.

20.    Defendant Myers knew that the college was not adhering to its published admissions standards in order to make budget.

21.    Defendant Myers resisted the development of sufficient remedial programs, and indeed curtailed existing programs, that could have given these students a reasonable chance to succeed at the college level.  In the course of opposing these remedial programs, and on other occasions, she concurred in the view that these students were not cognitively and genetically prepared to function in college.  The students simply did not have the "brain power" to succeed at the college level.  She analogized the situation to her own inability to play for the Los Angeles Lakers basketball team.

22.    The policy of admitting students to the college, in defendant Myers' words, without being "honest with them up front, explaining what they would have to do in order to succeed here at Cobleskill" has continued unabated to the present time.

23.    In July, 2006, plaintiff Hickey began work in his position as Dean of Liberal Arts and Sciences.

24.    Defendant Myers was not on the Committee that recommended the hiring of Dr. Hickey as Dean.

25.    At the time Dr. Hickey became Dean, he was not otherwise employed by the college and was unaware of the college's improper use of the admissions process to make budget.

4

A.195

26.     Upon his arrival, defendant Myers refused Dr. Hickey's initial request for relevant data relating to the student body at the college.

27.     In October, 2006, only a few months after Dr. Hickey's arrival, defendant Myers announced that there would be a change in the process known as Academic Review.  Students are not permitted to pass from the Freshman to the Sophomore year unless they achieve a 2.0 grade point average.  Students who, during the course of their Freshman year, had a sufficiently low GPA that they were deemed at risk of not attaining a 2.0 GPA prior to their Sophomore year are subject to Academic Review and, if found incapable of reaching the requisite GPA level, are dismissed from the college.  Mathematically, the lower a student's current GPA, the more unlikely it would be that he or she would ever be able earn sufficient grades to attain a 2.0 GPA.  In other words, a student would have to stay in school for years to have any hope of ever raising his or her GPA to 2.0.

28.     Defendant Myers lowered the threshold GPA used to determine which students were classified as at risk such that they would be subject to Academic Review.  Using a lower threshold GPA meant that students could stay in the school longer even though they had no realistic possibility of obtaining a college diploma.  She defended the change by saying the college the revenue from their tuitions to make budget.

29.     During the period 2007-2009, Myers continued to lower the standards for Academic Review.  At one point, she suspended Academic Review entirely.

30.     As a result of his involvement in Academic Review, and a variety of other events that occurred, Dr. Hickey became aware that the college had a longstanding policy of admitting students who were unprepared for college and that this policy was carried out in a particularly egregious manner with respect to African-Americans.

A.196

31.     For example, in September, 2007, a student complained to Dr. Hickey about a faculty member.  The student had a B+ in English Composition; however, when the student put his complaint in writing, it became clear that the student was functionally illiterate.  Defendant Myers refused Dr. Hickey's request to remedy the situation.  Dr. Hickey then asked the Humanities faculty to require an extemporaneous writing assignment in all classes to assure that functionally illiterate students do not escape detection and could be identified as in need of remediation.

32.     In January, 2008, during the process of Academic Review, faculty members informed Dr. Hickey for the first time that students with very low predictors of college achievement (high school grades and/or standardized test scores) had been admitted to the school.  Another similar institution, SUNY Delhi, located approximately 30 miles from SUNY Cobleskill, will not accept any of those same students.

33.     Statistical data demonstrated that these students had no reasonable chance of succeeding at the college level without substantial remediation; they were not receiving significant remedial education; and they were in fact not succeeding.

34.     For the first time, Dr. Hickey learned that these students were being admitted to the college as a conscious policy to enable the college to make its budget and that the policy had been in effect for years.

35.     Dr. Hickey learned that the policy was victimizing African-American students in particular, many of whom were being recruited from the New York City metropolitan area to attend the college.

36.     Upon learning of this problem, Dr. Hickey discussed the matter with defendant Myers who replied "I do not care about these people."

6

A.197

37.     In April, 2008, Defendant Zingale accepted an offer to become President of the college. Dr. Hickey informed him that African-American students were being admitted under false pretenses and then being dismissed from the college.

38.     The changes to the process of academic review, and the college's policies with respect to the admission of incoming freshman, had become the major issue in dispute between the faculty and defendant Myers and the most significant bone of contention between Dr. Hickey and defendant Myers.  In the wake of Dr. Hickey's repeated opposition to the Provost on this issue, in the Spring of 2008, defendant Myers informed faculty members of her intention to seek Dr. Hickey's removal as Dean but that she needed more time to develop evaluations that would support her position.  Defendant Myers directly tied Dr. Hickey's opposition to her policies concerning the admission and retention of students to her desire to remove him as Dean, claiming that he was "not doing his job" in repeatedly bringing up these matters.

39.     In October, 2008, Dr. Hickey repeated in a written memo to defendant Zingale his objections with respect to the college's policy of admitting African-American students under false pretenses.

40.     On December 2, 2008, Defendant Myers sent an email to the faculty stating that "in light of the budget, we will use a 1.0 [Grade Point Average] cut off for first semester freshmen for Academic Review."  Thomas Cronin, Professor of Physics, responded by stating, in part: "The list of academically and morally corrupt practices that ensue from our inability to adhere to our own standards is rather long. One of our worst offenses is that we admit, and re-admit students absolutely unqualified and absolutely incapable of achieving a college degree.  Many go into debt or cause their families to go into debt into [sic] order to attempt a college degree.  This is an

7

A.198

absolutely corrupt practice and it may be criminal. If we have done this to even one student, then we are guilty of a very low form of corruption."

41.  In March, 2009, a faculty member who investigated the situation determined that African-American and white students were being treated as two separate populations having two overlapping but distinctly separate sets of admissions requirements.

42.  Dr. Hickey investigated the policies of the admissions office in this regard and confirmed that in fact the appropriate standards were not being adhered to.

43.  Upon information and belief, students' academic records were falsified in order to facilitate the admission of certain African-American students to the college.

44.  Dr. Hickey repeatedly requested that the policy be discontinued, or, in the alternative, that the college design remedial programs so that these African-American students could succeed. Other faculty members who were aware of the policy had requested the development of remedial programs for years.

45.  Faculty members advised Dr. Hickey that these various practices of academic gerrymandering, combined with racist incidents on campus, created a racially hostile environment at the college which was adversely affecting the college's ability to retain African-American students.

46.  The college was using tuition from African-American students to subsidize agricultural programs, which run at an annual deficit, even though these programs serve white students almost exclusively.

47.  Dr. Hickey frequently spoke out against the college's policy of fraudulently inducing students, and especially African-American students, to enroll at the college.

8

A.199

48.     Nothing in Dr. Hickey's job description as campus ethics officer, or in his duties as Dean, required him to speak out against the college's budgetary policies or against racial discrimination.

49.     Defendant Zingale, after becoming aware of the college's policy with respect to the admission of African-American students, actively supported defendant Myers in the perpetuation of such policy.

50.     Defendants Myers and Zingale retaliated against Dr. Hickey for speaking out against corrupt budgetary practices and racial discrimination at the college.

51.     Defendants Myers and Zingale pursued the removal of Dr. Hickey from his position as Dean and denied him promotional opportunities within the SUNY system.

52.     In March, 2009, defendant Myers made false statements about Dr. Hickey that resulted in his not receiving the position of Provost at SUNY Delhi even though he was the only person recommended for the position by the University's duly constituted 16-member search committee. Upon information and belief, defendant Zingale was aware of and concurred with defendant Myers' efforts.

53.     Dr. Hickey and other members of the faculty continued their efforts to redress the treatment of African-American students at the college and to secure appropriate remedial education for those students.

54.     In response, on April 7, 2009, defendant Myers ordered a review of Dr. Hickey's functioning in his position as Dean. While other Deans were also reviewed, the review had been suggested by defendant Myers for some time as a vehicle for attacking Dr. Hickey specifically. The review was conducted contrary to the policies of the SUNY Faculty Senate that all administrators be reviewed, the methodology of review admittedly lacked validity, and the

9

A.200

response rate was so low that it would not be possible to draw meaningful conclusions from the review. No change in the methodology was permitted by order of defendant Myers.

55.     Dr. Hickey's persistent opposition to defendant Myers' policies with respect to the admission and retention of students at the college caused the review to be developed and used as a pretext for removing him as Dean.

56.     Defendant Myers has a record of retaliating against faculty members who express disagreement with her policies.

57.     Defendant Zingale was aware of the nature of the dispute between Dr. Hickey and defendant Myers and of the deficiencies in the review process.

58.     On July 17, 2009, Dr. Hickey was removed from his position as Dean by virtue of the concurrence of defendants Myers and Zingale.

59.     Dr. Hickey's complaints of discrimination were a substantial factor in the decision to remove him as Dean and to deny him promotional opportunities within the SUNY system.

## COUNT I

### VIOLATION OF 42 U.S.C. § 2000d: RETALIATION
### FOR OPPOSING RACIAL DISCRIMINATION IN EDUCATION

60.     Repeats and realleges each of the foregoing allegations as if fully set forth herein.

61.     Defendants received Federal financial assistance within the meaning of 42 U.S.C. § 2000d.

62.     The students subjected to the policies referred to in this complaint were intended beneficiaries of that Federal financial assistance.

63.     Plaintiff believed in good faith that defendants intentionally discriminated against those students on the basis of race in connection with a program or activity receiving Federal financial assistance in violation of 42 U.S.C. § 2000d.

10

A.201

64.     Individuals who seek to protect the rights of others guaranteed under 42 U.S.C. § 2000d are entitled to do so free from retaliation by those accused of violating said statutes.

65.     Dr. Hickey engaged in activity in furtherance of the rights guaranteed under 42 U.S.C. § 2000d.  He opposed defendants' fraudulent practices with respect to the admission of African-American students to the college.

66.     Defendants Myers, Zingale, and the college, acting by and through defendants Myers and Zingale, intentionally retaliated against Dr. Hickey as aforesaid because of his efforts to protect the rights of the students guaranteed under 42 U.S.C. § 2000d.

67.     Defendants Myers, Zingale, and the college, acting by and through defendants Myers and Zingale, are jointly and severally liable to Dr. Hickey for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

68.     Dr. Hickey is entitled to reimbursement from all defendants for the reasonable attorneys' fees, costs, disbursements, and expert witness fees incurred in the prosecution of this action.

69.     Defendants' actions against Dr. Hickey were undertaken with reckless disregard of plaintiff's constitutional rights and/or with malice towards plaintiff.

70.     Due to the wanton, reckless, malicious, and/or intentional nature of defendants' actions, plaintiff demands and is entitled to punitive damages against all defendants, jointly and severally.

## COUNT II

### VIOLATION OF 42 U.S.C. § 1981: RETALIATION
### FOR OPPOSING RACIAL DISCRIMINATION IN CONTRACTS

71.     Repeats and realleges each of the foregoing allegations as if fully set forth herein.

72.     The college contracted with the students referred to in this complaint to provide them with an education.

11

A.202

73.     Plaintiff believed in good faith that defendants Myers and Zingale fraudulently induced the students to enter into such contracts.

74.     Plaintiff believed in good faith that defendants Myers and Zingale intentionally prevented the students from enjoying all the benefits, privileges, terms, and conditions of that contractual relationship.

75.     Plaintiff believed in good faith that defendants Myers and Zingale intentionally discriminated on the basis of race in the making, performance, modification, and termination of contracts in violation of 42 U.S.C. § 1981.

76.     Dr. Hickey engaged in activity in furtherance of the rights guaranteed under 42 U.S.C. § 1981. He opposed defendants' fraudulent practices with respect to the admission of African-American students to the college.

77.     Individuals who seek to protect the rights of others guaranteed under 42 U.S.C. §1981 are entitled to do so free from retaliation by those accused of violating said statutes.

78.     Defendants Myers and Zingale intentionally retaliated against Dr. Hickey as aforesaid because of his efforts to protect the rights of the students guaranteed under 42 U.S.C. §1981.

79.     Defendants Myers and Zingale are jointly and severally liable to Dr. Hickey for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

80.     Dr. Hickey is entitled to reimbursement from defendants Myers and Zingale for the reasonable attorneys' fees, costs, disbursements, and expert witness fees incurred in the prosecution of this action.

81.     The individual defendants' actions against Dr. Hickey were undertaken with reckless disregard of plaintiff's constitutional rights and/or with malice towards plaintiff.

12

A.203

82.    Due to the wanton, reckless, malicious, and/or intentional nature of the individual defendants' actions, plaintiff demands and is entitled to punitive damages against the individual defendants, jointly and severally.

**COUNT III**

**VIOLATION OF 42 U.S.C. § 1983: EQUAL PROTECTION**

83.    Repeats and realleges each of the foregoing allegations as if fully set forth herein.

84.    Dr. Hickey concluded that the students referred to in this complaint were treated differently than similarly situated non-minority students in violation of their constitutional right to equal protection of the laws, that defendants acted in bad faith toward those students in violation of their constitutional right to equal protection of the laws, and that defendants violated the students' rights under the applicable federal statutes and regulations.

85.    Dr. Hickey spoke out against defendants' practices that violated the constitutional rights of the students.  He opposed defendants' fraudulent practices with respect to the admission of African-American students to the college.

86.    Plaintiff believed in good faith that defendants Myers and Zingale intentionally discriminated on the basis of race in violation of the students' right to equal protection under the laws.

87.    Dr. Hickey engaged in activity in furtherance of students rights' guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.   He opposed defendants' fraudulent practices with respect to the admission of African-American students to the college.

13

A.204

88.     Individuals who seek to protect the rights of others guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution are entitled to do so free from retaliation by those accused of acting unconstitutionally.

89.     Defendants Myers and Zingale intentionally retaliated against Dr. Hickey as aforesaid because of his efforts to protect the rights of the students guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

90.     Defendants Myers and Zingale violated plaintiff's constitutional rights while acting under color of the law of the State of New York.

91.     Pursuant to 42 U.S.C. § 1983, defendants Myers and Zingale are jointly and severally liable to Dr. Hickey for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

92.     Pursuant to 42 U.S.C. § 1983, Dr. Hickey is entitled to reimbursement from defendants Myers and Zingale for the reasonable attorneys' fees, costs, disbursements, and expert witness fees incurred in the prosecution of this action.

93.     The individual defendants' actions against Dr. Hickey were undertaken with reckless disregard of plaintiff's constitutional rights and/or with malice towards plaintiff.

94.     Due to the wanton, reckless, malicious, and/or intentional nature of the individual defendants' actions, plaintiff demands and is entitled to punitive damages against the individual defendants, jointly and severally, pursuant to 42 U.S.C. § 1983.

### COUNT IV

### VIOLATION OF 42 U.S.C. § 1983: FIRST AMENDMENT

95.     Repeats and realleges each of the foregoing allegations as if fully set forth herein.

A.205

96.     Remedying racial discrimination in education and remedying defendants' corrupt budgetary practices was not a part of Dr. Hickey's job duties so that, when he spoke out, he had the same right to free speech as any citizen of the United States. Indeed, one of the reasons defendant Myers expressed for her decision to pursue the removal of Dr. Hickey as Dean was her belief that he had exceeded his job duties in objecting to race discrimination and defendants' corrupt budgetary practices.

97.     By objecting to race discrimination and defendants' corrupt budgetary practices, Dr. Hickey engaged in speech which was a matter of public concern and thus protected under the First Amendment to the Constitution of the United States.

98.     Dr. Hickey spoke out in a non-disruptive manner.

99.     The conduct of defendants Myers and Zingale described above in retaliating against plaintiff violated plaintiff's right to freedom of speech under the First and Fourteenth Amendments to the Constitution of the United States.

100.    Defendants Myers and Zingale violated plaintiff's right to freedom of speech while acting under color of the law of the State of New York.

101.    Pursuant to 42 U.S.C. § 1983, the plaintiff is entitled to damages against defendants Myers and Zingale as aforesaid.

WHEREFORE, plaintiff respectfully requests that this Court enter judgment in favor of Dr. Hickey against defendants as follows:

A.      On Count I, against all defendants for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

B.      On Count I, against all defendants for punitive damages.

15

A.206

C.      On Count I, against all defendants for the costs, disbursements, expert witness fees, and reasonable attorneys' fees incurred in the prosecution of this action.

D.      On Counts II, III, and IV, against the individual defendants for damages, including back pay, front pay, emotional harm, compensatory, and other damages.

E.      On Counts II, III, and IV, against the individual defendants for punitive damages.

F.      On Counts II, III, and IV, against the individual defendants for the costs, disbursements, expert witness fees, and reasonable attorneys' fees incurred in the prosecution of this action.

G.      For such other and further relief as this Court may deem just and proper.

DATED:      Albany, New York
            December 8, 2009

                                    COOPER ERVING & SAVAGE LLP
                                    Attorneys for Plaintiff
                                    39 North Pearl Street
                                    Albany, New York 12207
                                    (518) 449-3900


                              By:   s:/ Phillip G. Steck
                                    Phillip G. Steck
                                    Bar Roll #102664

                                    THOMAS J. MARCELLE, ESQ.
                                    Bar Roll # 102117
                                    Of counsel to Plaintiff
                                    2 E-Comm Sq., 3rd Floor
                                    Albany, NY 12207
                                    (518) 427-1720

A.207

# APPENDIX B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

**NORBERTO LOPEZ and EILEEN M. LOPEZ,**
Individually and as Parents and Natural Guardians of
**NICK,** an Infant over the age of 14 years,
and **NICK,**

Plaintiffs,

vs.                                    Civ No.: 05-06473CJS-JWF

**WEBSTER CENTRAL SCHOOL DISTRICT,**
**WEBSTER BOARD OF EDUCATION,**
**JOHN WALKER,** Individually and in his capacity as
Principal of Webster-Thomas High School and
**MARY KIDD,** Individually and in her capacity as
Assistant Principal of Webster-Thomas High School,

Defendants

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

**Webster Szanyi LLP**
Attorneys for Defendants
Michael P. McClaren
Jeremy A. Colby
1400 Liberty Building
Buffalo, New York 14202

i

A.209

## **TABLE OF CONTENTS**

Preliminary Statement ............................................................................... 1

Statement of Facts. .................................................................................... 2

Summary Judgment Standard ..................................................................... 3

Argument ................................................................................................... 3

Point I        Plaintiffs' Title VI Claims Must Be Dismissed ............................... 3

        A. The District Did Not Deny N.L. Homework Or Educational
           Services ................................................................................ 5

        B. Defendants Did Not Intentionally Discriminate Against
           Plaintiffs ............................................................................. 6

        C. Defendants Were Not Deliberately Indifferent To A Hostile
           Environment.......................................................................... 7

Point II       Plaintiffs' Negligence Claims Must Be Dismissed Against All
        Defendants Because The Amended Complaint Failed To Comply With
        General Municipal Law § 50-i(1)(b) ......................................... 18

Point III      Plaintiffs' Negligence Claims Must Be Dismissed As A Matter Of Law .... 19

Point IV       Plaintiffs Negligence Claims Against Mary Kidd Are Barred
        Because Plaintiffs' Notice Of Claim Failed To Name Her ......................... 21

Point V        Plaintiffs Failed To Properly Serve A Notice Of Claim On The
        Board Of Education As Required By Education Law Section 3813.......... 23

Conclusion ................................................................................................ 25

A.210

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Pages**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ...................................................................... 3

*Barmore v. Aidala,*
    2006 WL 1978449 (N.D.N.Y. 2006) ................................ 14, 15, 17, 19, 21

*Barnett ex rel. M.B. v. Johnson City Sch. Dist.,*
    2006 WL 3423872 (N.D.N.Y. 2006) ........................... 5, 7, 8, 9, 10, 14, 17

*Bedden-Hurley v. New York City Bd. of Educ.,*
    385 F. Supp. 2d 274 (S.D.N.Y. 2005) ...................................................... 24

*Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist.,*
    238 F. Supp. 2d 469 (N.D.N.Y. 2002) ...................................................... 13

*Cudjoe v. Ind. Sch. Dist. No. 12;*
    297 F.3d 1058 (10th Cir. 2002) ................................................................. 5

*Curto v. Edmundson,*
    392 F.3d 502 n.3 (2d Cir. 2004) ................................................................ 3

*Davidson v. Bronx Mun. Hosp.,*
    64 N.Y.2d 59 (1984) ................................................................................ 18

*Davis v. Monroe Co. Bd. of Educ.,*
    526 U.S. 629 (1999) ........................................................ 7, 8, 9, 10, 12, 13

*Dauber v. Bd. of Educ. of City of New York,*
    2001 WL 1246581 (S.D.N.Y. 2001) ......................................................... 24

*DeLeon v. Putnam Valley Bd. of Educ.,*
    2006 WL 236744 (S.D.N.Y. 2006) ........................................................... 17

*Fornaro v. Kerry,*
    139 A.D.2d 561 (2d Dep't 1988) ................................................................ 8

*Gant ex rel. Gant v. Wallingford Bd. of Educ,*
    195 F.3d 134 (2d Cir. 1999) .............................................. 4, 7, 9, 10, 13, 14

*Grillo v. New York City Transit Authority;*
    291 F.3d 231 (2d Cir. 2002) ................................................................... 6, 7

A.211

*Harker v. Rochester City Sch. Dist.,*
 241 A.D.2d 937 (4th Dep't 1997)..................................................8

*Harris v. Forklift Sys., Inc.,*
 510 U.S. 17 (1993).....................................................................8

*Hawkins v. Wegmans Food Markets, Inc.,*
 2006 WL 4070304 (W.D.N.Y. 2006)........................................3, 7

*Hayut v. State Univ. of N.Y.,*
 352 F.3d 733 (2d Cir. 2003) ...................................................7, 8

*Ingrao v. County of Albany,*
 2007 WL 1232225 (N.D.N.Y. 2007) ..........................................22

*Melito v. Canastota Central Sch. Sys.,*
 192 A.D.2d 754 (3d Dep't 1993)................................................18

*Moore v. Melesky,*
 14 A.D.3d 757 (3d Dep't 2005)..................................................22

*Mroz v. City of Tonawanda,*
 999 F. Supp. 436 (W.D.N.Y. 1998) ............................................18

*Parochial Bus Sys., Inc. v. Board of Educ. of the City of New York,*
 60 N.Y.2d 539 (1983)................................................................24

*Pravda v. County of Saratoga,*
 224 A.D.2d 764 (3d Dep't 1996)................................................18

*Radvany v. Jones,*
 184 A.D.2d 349 (1st Dep't 1992)................................................24

*Saggio v. Sprady,*
 475 F. Supp. 2d 203 (E.D.N.Y. 2007) ....................................7, 13

*Sanzo v. Solvay Union Free Sch. Dist.,*
 299 A.D.2d 878 (4th Dep't 2002)...............................................19

*Scantlebury v. New York City Health & Hospitals Corp.,*
 4 N.Y.3d 606 (2005)............................................................23, 24

*Shotz v. City of Plantation,*
 344 F.3d 1161 (11th Cir. 2003) ...................................................3

iv

A.212

*Smith v. Half Hollow Hills Cent. Sch. Dist.*,
    349 F. Supp. 2d 521 (E.D.N.Y. 2004) ....................................................... 19

*Soriano v. Bd. of Educ. of the City of New York*,
    2004 WL 2397610 (E.D.N.Y. 2004)............................................. 13, 16, 17

*Tannenbaum v. City of New York*,
    30 A.D.3d 357 (1st Dep't 2006)................................................................ 22

*Taylor v. Dunkirk City Sch. Dist.*,
    12 A.D.3d 1114 (4th Dep't 2004).............................................................. 19

*Tolbert v. Queens Coll.*,
    242 F.3d 58 (2d Cir. 2001) ........................................................................ 5

*Van Leuvan v. Rondout Cent. Sch. Dist.*,
    20 A.D.3d 645 (3d Dep't 2005)................................................................. 19

*White v. Averill Park Cent. Sch. Dist.*
    195 Misc.2d 409 (N.Y. Sup. Ct. 2003)................................................21, 22

*Yap v. Oceanside Union Free Sch. Dist.*,
    303 F. Supp. 2d 284 (E.D.N.Y. 2004) ................................................15, 16

## Statutes and Rules

42 U.S.C. §2000(d)...................................................................................... 1, 3

CPLR 312 .................................................................................................. 2, 23

Education Law § 3813 ............................................................................... 2, 22

Education Law § 3813(2)........................................................................... 22, 24

Rule 56 of the Federal Rules of Civil Procedure ............................................. 1

General Municipal Law §50-e................................................................... 2, 22

General Municipal Law § 50-e(3)(a) ................................................... 2, 23, 24

General Municipal Law § 50e(3)(c)............................................................... 23

General Municipal Law §50-i ....................................................................... 18

General Municipal Law § 50-i(1)(b) ...........................................................2,18

A.213

## PRELIMINARY STATEMENT

Plaintiffs assert a claim for alleged violation of 42 U.S.C. § 2000(d) (Title VI) against the Webster Central School District ("the District") and the Webster Board of Education ("the Board") and a negligence claim against the District, the Board, Principal John Walker (in his individual and official capacities), and Vice-Principal Mary Kidd (in her individual and official capacities). This Memorandum of Law is submitted in support of Defendants' Motion for Summary Judgment made pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCvP").

Plaintiffs claim that their son, Nick, was racially harassed by a neighbor/classmate ("Rocco Mastrella") and his younger sister ("Alexandria Mastrella") in school and the neighborhood.[1] Plaintiffs also claim that Defendants did not respond appropriately to end the harassment when Mr. Lopez called and spoke with Mary Kidd, Assistant Vice-Principal at Webster Thomas High School ("WTHS").

Plaintiffs seek to hold Defendants liable in negligence and for intentional racial discrimination under Title VI based on name-calling and other alleged harassment by Rocco and his younger sister, Alexandria, directed towards Nick. The Lopez and Mastrella families live a few doors apart and their children have had an "on again/off again" relationship characterized by sophomoric name-calling. Although the name-calling appears to have been mutual, Plaintiffs claim that Nick was harassed. Assuming *arguendo* that Nick was harassed, it is undisputed that Plaintiffs first notified the District about this situation on or about September 27, 2004. The District was notified of an

---

[1] Inasmuch as the students have since graduated and are no longer minors, their names will be used herein.

incident of name-calling on a bus. Assistant Principal Mary Kidd investigated and asked the bus driver to monitor the situation. On October 6, 2004, however, Nick punched Rocco based on alleged verbal provocation. Both students were suspended.

Summary judgment is appropriate with respect to Plaintiffs' Title VI claim (Point I) because Plaintiffs do not create a genuine issue of material fact as to whether Defendants intentionally discriminated against Plaintiffs on the basis of race or that Defendants were deliberately indifferent to a racially hostile environment. Summary judgment is appropriate with respect to Plaintiffs' negligence claim because: (Point II) Plaintiffs' Amended Complaint failed to comply with General Municipal Law § 50-i(1)(b), which is a fatal jurisdictional defect; (Point III) the negligence claim fails as a matter of law because Defendants' lacked notice; (Point IV) Plaintiffs' negligence claim against Mary Kidd must be dismissed because she was not named in the notice of claim as required by General Municipal Law § 50-e and Education Law § 3813; and (Point V) Plaintiffs' negligence claim against the Board of Education must be dismissed because it was not served as required by General Municipal Law § 50-e(3)(a) and CPLR 312.

## STATEMENT OF FACTS

The facts material to this Motion are set forth in the Statement of Undisputed Facts and will not be repeated herein except for the purposes of discussion.

2

A.215

Case 6:05-cv-06753-CJS-JWF Document 152-9 Filed 02/11/08 Page 8 of 30

## SUMMARY JUDGMENT STANDARD

As this Court has noted, a party is entitled to summary judgment where "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"[2]

## ARGUMENT

### POINT I

### Plaintiffs' Title VI Claims Must Be Dismissed

Section 601 of Title VI of the Civil Rights Act of 1964 ("Title VI"), provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.  This provision "prohibits only intentional discrimination."[3]  The Second Circuit Court of Appeals has noted that "[b]ecause the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VI of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII."[4]

---

[2] Hawkins v. Wegmans Food Markets, Inc., 2006 WL 4070304, at *4 (W.D.N.Y. 2006) (quoting Fed. R. Civ. P. 56(c) and setting forth the summary judgment standard).

[3] Alexander v. Sandoval, 532 U.S. 275, 281 (2001).

[4] Curto v. Edmundson, 392 F.3d 502, 504 n.3 (2d Cir. 2004) (citation and internal quotations omitted).  See also Shotz v. City of Plantation, 344 F.3d 1161, 1170 n.12 (11th Cir. 2003) ("We construe Titles VI and IX in pari materia . . . because Title IX 'was modeled after Title VI ..., which is parallel to Title IX except that it prohibits race

3

A.216

The Amended Complaint does not allege that the Board received "Federal financial assistance" as is required by the statute. Although the District will concede that it has received such aid (which does not obviate the necessity of so alleging in the Amended Complaint), there is no evidence that the Board of Education received federal funds. Furthermore, there are no allegations in the Amended Complaint or evidence in the record that the Board intentionally discriminated against Plaintiffs.[5] Consequently, Plaintiffs' Title VI claim against the Board must be dismissed. Finally, all arguments made by the District are also made by the Board unless otherwise noted.

Plaintiffs appear to allege two types of intentional discrimination by the District: (1) denial of "homework" while Nick was absent from school (Compl. ¶¶ 35, 40); and (2) deliberate indifference to alleged harassment by classmates/neighbors (Compl. ¶¶ 44, 49). Although the homework allegations were related to Plaintiffs' Equal Protection claims (which have been dismissed), these allegations are addressed here to the extent that they are asserted with respect to Plaintiffs' Title VI claims.

---

discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs.'") (citation omitted).

[5] Carlevatti Aff., ¶ 3; Harder Aff. ¶¶ 2-4; Gant ex rel. Gant v. Wallingford Bd. of Educ, 195 F.3d 134, 145-46 (2d Cir. 1999) (affirming summary judgment for board of education where superintendent reviewed subordinate's report of investigation of name-calling allegations and adopting the conclusion that "criticism of the handling of these incidents was unwarranted").

4

A.217

A. __The District Did Not Deny Nick Homework Or Educational Services__

In order to "establish a Title VI claim, a plaintiff must show: (1) that the defendant discriminated against him on the basis of race; (2) that the discrimination was intentional; [and] (3) that the discrimination was a substantial or motivating factor for the defendant's actions."[6] To the extent that Plaintiffs claim that Nick was denied homework or educational services because the District intentionally discriminated against him on the basis of race, such claim must be dismissed because Plaintiffs have proffered no evidence that: (1) Nick was denied homework or any educational service or (2) that any such denial was based on intentional racial discrimination by the District. For example, in Barnett, Judge McAvoy granted summary judgment and dismissed a Title VI claim where plaintiffs offered nothing other than "unsupported speculation" by the student's mother that her son was denied participation in a "gifted" program that did not exist – and that plaintiff thus failed to "present evidence of an essential element of an actionable Title VI disparate treatment claim."[7] Barnett cited the Tenth Circuit's decision in Cudjoe v. Ind. Sch. Dist. No. 12, which held that " [b]ecause [plaintiff] has failed to show how [her son] was treated differently than students who are not African-Americans, we find that she has not presented a colorable claim under Title VI."[8]

Likewise, Plaintiffs have failed to proffer any evidence that Nick was treated different from non-Hispanic students – or that he was denied any educational

---

[6] Barnett ex rel. M.B. v. Johnson City Sch. Dist., 2006 WL 3423872, at *2 (N.D.N.Y. 2007) (citing Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001)).

[7] Barnett, 2006 WL 3423872, at *3.

[8] 297 F.3d 1058, 1070 (10th Cir. 2002).

5

A.218

services to which he was entitled. For example, when Nick missed several days of school when he was suspended for punching Rocco, he was provided homework.[9] Likewise, when Nick missed several weeks of school due to medical absence, he was provided tutoring services at the tutoring center at Schroeder High School.[10] Finally, when Nick returned to school, he was provided additional tutoring and other academic and counseling support services in order to get him successfully reintegrated into his classes.[11] Plaintiffs have proffered **no admissible evidence** that non-Hispanic students were provided any services that Nick was allegedly denied. Accordingly, Plaintiffs' Title VI disparate treatment claim must be dismissed because there is no genuine issue of material fact that Nick was provided homework, tutoring, and other educational services and Plaintiffs have proffered no evidence of a non-Hispanic comparator (as they must to establish a Title VI claim).

B.  **Defendants Did Not Intentionally Discriminate Against Plaintiffs**

Plaintiffs have proffered **no evidence** of intentional discrimination beyond their conjecture that Defendants "must have" been motivated by racial discrimination because Plaintiffs can think of no other reason for Defendants' alleged actions.[12] Such allegations, however, are insufficient to survive a motion for summary judgment. In Grillo v. New York City Transit Authority, the Second Circuit Court of Appeals affirmed

---

[9] Colby Decl., ¶ 79.

[10] Colby Decl., ¶ 81.

[11] Colby Decl., ¶ 83.

[12] Colby Decl., ¶¶ 87-99.

6

A.219

dismissal of a Title VII claim because plaintiff "has done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race. This is not sufficient."[13]  This Court has also noted that "a plaintiff may not defeat a motion for summary judgment merely by relying upon purely conclusory allegations of discrimination, absent any concrete particulars."[14]  Likewise, Plaintiffs have offered no evidence of intentional discrimination by Defendants other than the assertion that it "must" have been discrimination because they can divine no other reason for Defendants' alleged omissions.

C.  **Defendants Were Not Deliberately Indifferent To A Hostile Environment**

To establish a "hostile educational environment, Plaintiffs must prove:  (1) that the child was subjected to a racially hostile educational environment; and (2) that the School District was deliberately indifferent to it [citing Gant]."[15]  To establish the first prong, "Plaintiffs must prove that the environment was permeated with racial hostility of such severity or pervasiveness so as to significantly alter the conditions of [Nick's] educational environment[] and thereby deny [Nick] equal access to the School District's

---

[13] 291 F.3d 231, 234-35 (2d Cir. 2002) (citation and internal quotations omitted); *see also* Saggio v. Sprady, 475 F. Supp. 2d 203, 211 (E.D.N.Y. 2007) (noting that "[w]hat plaintiff has done here is simply assume that because she and her assailants are of different races, the District's actions must have been stacked against her because of her race" and citing Grillo for the proposition that the "Second Circuit has repeatedly rejected these kinds of naked inferences").

[14] Hawkins, 2006 WL 4070304, at *4 (citation omitted).

[15] Barnett, 2006 WL 3423872, at *4 (citing, *inter alia,* Davis v. Monroe Co. Bd. of Educ., 526 U.S. 629, 650 (1999), Hayut v. State Univ. of N.Y., 352 F.3d 733, 744-745 (2d Cir. 2003), and Gant, 195 F.3d at 140).

resources and opportunities."[16]  To be "'pervasive' means that the challenged incidents are 'more than episodic; they must be sufficiently continuous and concerted.'"[17]  This "standard requires an environment that is both objectively and subjectively hostile."[18]  Finally, "[m]aking a 'hostility' determination in the educational context, as in the employment context, entails examining the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with' the victim's academic performance.'"[19]

Plaintiffs cannot show that a "pervasive" hostile educational environment existed.  The evidence indicates that most of the alleged harassment reported to the District occurred in the neighborhood, with episodic name-calling on the bus and in the school.[20]  No Title VI liability attaches with respect to the alleged harassment off school property because "harassment must take place in a context subject to the school district's control."[21]  Sporadic name-calling, however, is not "sufficiently continuous and

---

[16] Barnett, 2006 WL 3423872, at *4 (citing Davis and Hayut).

[17] Id. (quoting Hayut, 352 F.3d at 745 (citation omitted)).

[18] Id. (quoting Hayut, 352 F.3d at 744-46).

[19] Id. (quoting Hayut, 352 F.3d at 745 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993))).

[20] Colby Decl., ¶¶ 30, 33, 43, 61.

[21] Davis, 526 U.S. at 644-45 ("A recipient [of federal funds] cannot be directly liable for its indifference where it lacks the authority to take remedial action.").  School districts are not responsible for student conduct at bus stops.  Harker v. Rochester City Sch. Dist., 241 A.D.2d 937, 938 (4th Dep't 1997); Fornaro v. Kerry, 139 A.D.2d 561, 562 (2d Dep't 1988).

concerted" and was no more than "an offensive utterance."[22]  Plaintiffs only reported sporadic name-calling, most of which occurred off of school property, which did not create a pervasive hostile educational environment because "[i]t is not enough to show . . . that a student has been 'teased' or 'called offensive names.'"[23]  Indeed, the Supreme Court in <u>Davis</u> limited "private damages actions to cases having a **systemic** effect on educational programs or activities," which is "gender-based mistreatment played out on a 'widespread level' among students."[24]

Regardless of the first prong, Plaintiffs cannot satisfy the second prong – that Defendants deliberately ignored the alleged harassment.  To establish the second prong of a disparate treatment claim under Title VI, Plaintiffs must show that the District was "aware of the hostile environment, but chose to do **nothing** about it."[25]  The Supreme Court has rejected a "should have known" test for deliberate indifference.[26] The Court of Appeals held in <u>Gant</u> that "deliberate indifference can be found when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'"[27]  Moreover, in <u>Davis</u>, the Supreme Court cautioned that "courts should refrain from second-guessing the disciplinary decisions made by school

---

[22] <u>Barnett</u>, 2006 WL 3423872, at *4.

[23] <u>Davis</u>, 526 U.S. at 652 (citations omitted).

[24] <u>Davis</u>, 526 U.S. at 653.

[25] <u>Barnett</u>, 2006 WL 3423872, at *4 (emphasis added).

[26] <u>Gant</u>, 195 F.3d at 141 n.6 (quoting <u>Davis</u>, 119 S. Ct. at 1671).

[27] <u>Gant</u>, 195 F.3d at 141 (quoting <u>Davis</u>, 119 S. Ct. at 1674).

administrators."[28]  In other words, under the deferential "deliberate indifference" standard enunciated in Davis, "[s]chool administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed '**deliberately indifferent**' to acts of student-on-student harassment **only where** the recipient's **response** to the harassment or lack thereof is **clearly unreasonable** in light of the known circumstances."[29]  The Supreme Court further noted that school districts need not "'remedy' peer harassment . . . [and that the district] must merely respond to known peer harassment in a manner that is not clearly unreasonable [, which] is not a mere 'reasonableness' standard."[30]  Indeed, the "standard is not one of mere reasonableness that 'transforms every school disciplinary decision into a jury question.'"[31]  The "ultimate inquiry . . . is one of discriminatory purpose . . . [and] a plaintiff must show that the defendant's indifference was such that the **defendant intended the discrimination to occur**."[32]  Consequently, the "ultimate failure of [school official's measures to end the harassment by other students] does not mean that Plaintiffs have created a jury question with regard to deliberate indifference."[33]

Plaintiffs have failed to show that the District's response to their report of

---

[28] Davis, 526 U.S. at 648 (citation omitted).

[29] Davis, 526 U.S. at 648 (emphasis added).

[30] Davis, 526 U.S. at 648-49 (emphasis added).

[31] Barnett, 2006 WL 3423872, at *5 (citation omitted).

[32] Gant, 195 F.3d at 141 (emphasis added).

[33] Barnett, 2006 WL 3423872, at *5 (alteration in the original and citation omitted).

10

A.223

harassment by Rocco was clearly unreasonable. Plaintiffs testified that they first reported the harassment to the District on or about September 27, 2004 when Mr. Lopez called Vice-Principal Mary Kidd. It is also undisputed that: (1) Kidd spoke with Alyssa Lito to investigate the report by Mr. Lopez and Alyssa told Kidd about harassment in the neighborhood at the bus stop by Alexandria – but that she did not see any harassment on school property; (2) Kidd contacted the bus driver and directed him to "monitor" the situation; (3) Kidd subsequently called Nick and Alyssa to her office to investigate the harassment allegations, but no in-school harassment was reported; (4) Kidd called Mr. Lopez and discussed with him her conversation with Nick; (5) Kidd intended to speak with Rocco about the allegations as soon as she received clear indication from Nick that Rocco had engaged in improper behavior on school property, but that she did not hear from Nick or his parents again until after Nick assaulted Rocco.[34]

It is also undisputed that on October 6, 2006, Nick assaulted Rocco for commenting on a dispute between Nick's brother, B.L., and one of Nick's classmates, Pete Hart -- and that Rocco did not throw any return punches.[35] Nick was suspended for five days for fighting and Rocco was suspended for three days for verbal harassment.[36] The District conducted a peer mediation between Nick and Rocco.[37] The District also offered to change Nick's schedule or transfer him to the other high

---

[34] Colby Decl, ¶¶ 37-44.

[35] Colby Decl, ¶¶ 51-58.

[36] Colby Decl, ¶ 60.

[37] Colby Decl, ¶ 72.

A.224

school in Webster (i.e., Schroeder), but Nick and his parents rejected these proposed accommodations.[38]  The District assigned Shelly Cahoon, Director of Pupil Services, to investigate Plaintiffs' discrimination allegations.[39]  Cahoon interviewed Plaintiffs, students, staff, and administrators, but concluded that Mary Kidd and the District acted appropriately in responding the Plaintiffs' report of harassment.[40]  It is also undisputed that the District has an anti-discrimination policy that was followed and that the District followed up on the Plaintiffs' report of harassment – but that Nick did not report any further harassment by Rocco.[41]  Nick reported one subsequent incident involving Alexandria, who was disciplined by having bus privileges suspended when the District substantiated that she had spread a rumor on the bus that Nick "egged" her house and stole a radio.[42]

Even construing the facts in Plaintiffs' favor, they have failed to show that the District's response was "clearly unreasonable."  The District responded immediately by investigating the complaint and directing the bus driver to monitor the students. When a subsequent complaint was made by Nick, the District investigated it and disciplined a student after confirming that name-calling occurred on the bus.  The District investigated each report and meted out discipline where disciplinary infractions were substantiated.  This cannot constitute "deliberate indifference" under Davis or

---

[38] Colby Decl, ¶ 73.

[39] Colby Decl, ¶ 69.

[40] Colby Decl, ¶¶ 65, 69.

[41] Colby Decl, ¶ 74.

[42] Colby Decl, ¶ 69.

Gant, which held that a principal's response to a report of racial name-calling involving a first-grader – directing the teacher to "'keep an eye open' on the situation" -- "cannot give rise to a reasonable finding of deliberate indifference."[43]

The District is neither legally capable nor obligated to remedy harassment that occurs off school property.[44] Moreover, the remedial measures that Plaintiffs requested – transferring Rocco to a different school or transporting him and his sister on a different bus or following Rocco around the school – are neither required nor prudent.[45] As Judge Gleeson has noted, "[w]hile plaintiffs may have preferred a different response from the school administrators, the standard is not whether the administrators responded in a particular manner, but whether their response was clearly unreasonable in light of all the known circumstances."[46] Indeed, "[w]here a plaintiff asserts that school officials failed to appropriately discipline students perpetrating the harassment, the Court must give **substantial deference** to school administrators'

---

[43] Gant, 195 F.3d at 144.

[44] Davis, 526 U.S. at 645.

[45] Davis, 526 U.S. at 648 (noting that it was erroneous to suggest "that victims of peer harassment now have a Title IX right to make particular remedial demands"); Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist., 238 F. Supp. 2d 469, 476 (N.D.N.Y. 2002) ("The District is compelled to secure the rights of every student, including the ones accused [of harassment]. The record shows that when the District's investigation disclosed that [plaintiff's] allegations were proved, disciplinary action against the offender was quickly taken."); cf. Saggio, 475 F. Supp. 2d at 211 (noting that school districts are not constitutionally required to provide security escorts to students faced with harassment and refusing to second-guess administrators where it was undisputed that administrators "were actively involved and making informed judgments"). Saggio involved a section 1983 claim, but noted that a Title VI claim (if asserted) would also fail for lack of evidence of discriminatory intent. Id. at 212 n.6.

[46] Soriano v. Bd. of Educ. of the City of New York, 2004 WL 2397610, at *4 (E.D.N.Y. 2004).

13

A.226

determinations."[47]   Although the Lopez family may be dissatisfied with the District's response, they cannot demonstrate that the District's response was clearly unreasonable.[48]  Finally, the District need not show that it was successful in stopping the harassment, it must only refrain from acting in a clearly unreasonable manner when informed of reported harassment.[49]

Case law supports the Defendants' summary judgment motion.   For example, in Barmore, Judge McAvoy granted a motion for summary judgment and dismissed a high school student's Title VI hostile environment claim.[50]  The plaintiff, Barmore, was an African-American high school student who experienced several incidents of racial epithets (and once being spat upon) over the course of his four years in high school, including several by one particular Caucasian student, J.P.[51]   For example, in Barmore's senior year, J.P. used racial epithets toward plaintiff on several occasions.[52]  One incident involved an epithet yelled from a moving vehicle on route to a homecoming dance.[53]  Although Barmore complained about the incident, the District's

---

[47] Barnett, 2006 WL 3423872, at *5 (citation omitted).

[48] See, e.g., Gant, 195 F.3d at 145 (holding that it was not "clearly unreasonable" for principal to take no further action when hearing that parent at bus stop made racial remark where principal was informed that kindergarten teacher held a "class meeting" to discuss the inappropriate nature of name-calling or where principal was informed of students using racial names where the students were verbally reprimanded by teacher).

[49] See Barmore v. Aidala, 2006 WL 1978449, at *8 (N.D.N.Y. 2006).

[50] Id.

[51] Id. at *3-6.

[52] Id. at *4-6.

[53] Id. at *4-5.

investigation was "inconclusive" and no punishment was meted out.[54] J.P. subsequently used an epithet towards Barmore in the hallway.[55] Rather than report the incident to school administrators, Barmore planned to confront J.P. a few days later.[56] Two days later, Barmore approached J.P. from behind in the cafeteria and slapped him in the head and the two boys began fighting; both boys were suspended.[57] Barmore filed suit under Title VI, claiming that the District had discriminated against him by punishing him more severely than similarly situated Caucasian students and that he justifiably assaulted J.P. based on the belief that the District did not enforce the same anti-discrimination policy against J.P. with respect to the homecoming incident.[58] The Court, however, found that

> each time [Barmore] brought his complaints of racial harassment to the attention of school administrators, an **investigation was conducted** and, **when presented by facts establishing racial harassment, punishment was meted out**. While **[Barmore] may not have liked the results** that were reached, especially with regard to the 2003 Homecoming Dance incident, and while Defendants' actions may not have stopped the harassment, that is not the determinative issue. 'The ultimate failure of [school official's measures to end the harassment by other students] does [not] mean that Plaintiffs have created a jury question with regard to deliberate indifference.'[59]

---

[54] *Id.* at *4-5.

[55] *Id.* at *5-6.

[56] *Id.* at *5-6.

[57] *Id.* at *5-6.

[58] *Id.* at *6-7.

[59] *Id.* at *8 (emphasis added) (quoting Yap v. Oceanside Union Free Sch. Dist., 303 F. Supp. 2d 284, 294 (E.D.N.Y. 2004)).

15

A.228

The Court found that a reasonable jury could not conclude that the District's responses were "so clearly unreasonable that a fact finder could draw the inference that Defendants wanted the discrimination to continue."[60]

Similarly, in Yap, the school district's summary judgment motion was granted because the district responded to allegations of ethnic harassment of a verbal and physical nature with interventions ranging from informal talks to suspension from the use of bus privileges.[61] Yap held that the failure of the district's punitive and preventative measures does not support a finding of "deliberate indifference," which requires a finding that the "measures taken must be so inadequate that a degree of discriminatory intent may be inferred – allowing the trier of fact to conclude that Defendants intended for the discrimination to occur."[62]

In this case, the Defendants immediately investigated a report of alleged harassment made by Mr. Lopez concerning Nick and took remedial action by directing the bus driver to monitor the situation and seeking to confirm the report by interviewing Nick and Alyssa. Kidd also told Nick to report any further harassment to her. Mr. Lopez first reported the harassment on or about September 27, 2004.[63] Kidd investigated the matter over the next few days. On October 6, 3004, however, Nick claims to have been called a "spic" by Rocco in the hallway. Regardless of what Rocco said, Nick did not

---

[60] Id. at *8.

[61] Yap, 303 F. Supp. 2d at 294.

[62] Id. at 295.

[63] Defendants, therefore, cannot be held liable for any harassment that occurred before September 27, 2004. Soriano, 2004 WL 2397610, at *3 (holding that defendants could not be liable for harassment that pre-dated the date on which defendants received actual notice of the harassment).

A.229

report such harassment to the District and took matters into his own hands by following Rocco into a classroom and punching him in the head several times. The District suspended both boys for their actions. Nick heard a remark and waited a period of time before physically escalating the situation. Defendants could not have anticipated Nick's response and will not be held to a standard of clairvoyance.[64] Accordingly, Plaintiffs' hostile environment claim should be dismissed because it is undisputed that the Defendants responded once they received actual notice of the alleged harassment – and that the response was not clearly unreasonable (albeit not the response preferred by the Lopez Family, which is not the standard).[65] The District followed up by conducting a peer mediation. The District received no further reports about harassment by Rocco, and, when Nick reported harassment by Alexandria, the District investigated and disciplined Alexandria by taking away her bus privileges for several weeks as punishment for telling students on the bus that Nick had "egged" her house and stolen a radio. No racial comments were alleged with respect to this incident.

---

[64] See Barmore, 2006 WL 1978449, at *9.

[65] Soriano, 2004 WL 2397610, at *4-5 (granting summary judgment and dismissing Title VI hostile environment claim where fourth grade girl was sexually assaulted twice and the school administrators responded by taking statements and disciplining students after verifying that they had acted improperly); DeLeon v. Putnam Valley Bd. of Educ., 2006 WL 236744, at *11-12 (S.D.N.Y. 2006) (granting summary judgment and dismissing student's Title VI claim where, inter alia, teacher reprimanded student making racial comments, there was no evidence that school administrators "turned a blind eye" to racial comments, and there was no evidence that plaintiff was disciplined "without legitimate cause"); Barnett, 2006 WL 3423872, at *9 (granting summary judgment and dismissing Title VI hostile environment claim where student was called the "N word" and offending student received detention).

17

A.230

## POINT II

**Plaintiffs' Negligence Claims Must Be Dismissed Against All Defendants
Because The Amended Complaint Failed To Comply
<u>With General Municipal Law § 50-i(1)(b)</u>**

This Court must dismiss Plaintiffs' negligence claims. Plaintiffs served a notice of claim on the Superintendent's Office on November 4, 2004.[66] The Amended Complaint (Docket No. 15), however, failed to comply with General Municipal Law § 50-i(1)(b), which requires that:

> It **shall appear** by and **as an allegation in the complaint** or moving papers that at least thirty days have elapsed since the service of such notice [of claim] and that adjustment or payment thereof has been neglected or refused . . . .

(emphasis added). Judge Curtin has noted that "[i]t is settled that the failure to comply with N.Y. Gen. Mun. Law § 50-i regarding timely service of the notice of claim and the related pleading requirement of § 50-i(1)(b) is a **jurisdictional rather than a procedural defect**."[67] The New York Court of Appeals has held that compliance with § 50-i(1)(b) is mandatory and that an action must be dismissed where a pleading fails to allege, *inter alia*, that "the notice was served at least 30 days prior to commencement of the action."[68] Accordingly, Plaintiffs' failure to comply with § 50-i(1)(b) is a jurisdictional defect that requires dismissal of their negligence claims as against all defendants.

---

[66] Colby Decl., Ex. Y.

[67] <u>Mroz v. City of Tonawanda</u>, 999 F. Supp. 436, 453 (W.D.N.Y. 1998) (emphasis added) (dismissing claims for failure to comply with section 50-i(1)(b)).

[68] <u>Davidson v. Bronx Mun. Hosp.</u>, 64 N.Y.2d 59, 61-62 (1984) (modifying Appellate Division's Order to dismiss action with prejudice); <u>Melito v. Canastota Central Sch. Sys.</u>, 192 A.D.2d 754, 754-55 (3d Dep't 1993) (following <u>Davidson</u>); <u>Pravda v. County of Saratoga</u>, 224 A.D.2d 764, 767 (3d Dep't 1996) (same).

18

A.231

**Point III**

**Plaintiffs' Negligence Claims Must Be Dismissed As A Matter Of Law**

In New York, "schools are under a duty to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision."[69]   To establish a claim for negligent supervision "where the underlying injury is caused by the intentional act of a fellow student, the plaintiff [must] demonstrate, by the school's prior knowledge or notice of the dangerous conduct which caused the injury, that the acts of the fellow student [ ] could have reasonably been anticipated."[70]   Consequently, "New York courts have not hesitated to grant summary judgment to school districts ... where the district makes a prima facie showing of a lack of notice and/or proximate cause and plaintiff fails to come forward with factual evidence to the contrary."[71]

For example, in Barmore, the plaintiff had been subjected to name-calling that eventually prompted plaintiff to physically assault the harasser, J.P.[72]   The assault occurred after plaintiff had reported previous incidents involving J.P. that resulted in no disciplinary action because the complaint could not be substantiated.   The Court

---

[69] Barmore, 2006 WL 1978449, at *12 (citation and internal quotations omitted).

[70] Barmore, 2006 WL 1978449, at *12 (citation and internal quotations omitted).

[71] Id. at * 13 (quoting Smith v. Half Hollow Hills Cent. Sch. Dist., 349 F. Supp. 2d 521, 525 (E.D.N.Y. 2004)); see Van Leuvan v. Rondout Cent. Sch. Dist., 20 A.D.3d 645, 646 (3d Dep't 2005) (affirming grant of summary judgment to school district); Taylor v. Dunkirk City Sch. Dist., 12 A.D.3d 1114, 1115 (4th Dep't 2004) (reversing denial of summary judgment to school district); Sanzo v. Solvay Union Free Sch. Dist., 299 A.D.2d 878, 879 (4th Dep't 2002) (same).

[72] Barmore, 2006 WL 1978449, at *3-6.

19

A.232

granted summary judgment to the school district because "there existed no information known to school officials from which a reasonable trier of fact could conclude that the dispute between Plaintiff and J.P. had reached such a fever pitch that *Plaintiff* would decide to ambush J.P. on school grounds."[73]  Likewise here.

Plaintiffs' negligence claim must be dismissed.  First, the District did not have notice of the alleged harassment by Rocco until September 27, 2004 (and thus cannot be held liable for anything that occurred before this date).  Second, Nick reported no further harassment by Rocco after the altercation of October 6, 2004 (and thus cannot be held liable for anything that occurred after this date).  Third, with respect to the period from September 27, 2004 through October 6, 2004, the Defendants had no notice that Nick would elevate the level of conflict to a physical altercation despite the fact that Kidd told Nick to report any problems to her and expressly warned Nick not to take matters into his own hands and that doing so would result in disciplinary consequences for Nick.[74]  Despite these statements by Kidd, Nick did not report any problems with Rocco and, instead, elected to assault Rocco.[75]  The reported harassment involved name-calling and was not physical.[76]  Consequently, as in Barmore, Defendants took action in response to reports of harassment by investigating the reports and meting out punishment where infractions were substantiated.[77]  There is

---

[73] *Id.* at *13.

[74] Colby Decl. at ¶ 40; *id*, Ex. F at 23.

[75] Colby Decl. at ¶¶ 45, 51.

[76] Colby Decl. at ¶ 47, Ex. F at 29-30.

[77] Colby Decl. at ¶¶ 27-46, 50, 59-74.

A.233

no duty to end harassment "because, obviously, school personnel cannot reasonably be expected to guard against all of the sudden, spontaneous acts that take place among students daily."[78]

Finally, to the extent that Plaintiffs suggest that the Defendants should have prevented Nick's assault of Rocco, such should be rejected, as in Barmore, because "Plaintiff's action in quickly and stealthily escalating the dispute between himself and [his harasser] from one of words to one of blows defeats any proximate cause arising from the District's alleged lack of supervision here."[79]

**Point IV**

**Plaintiffs Negligence Claims Against Mary Kidd Are
Barred Because Plaintiffs' Notice Of Claim Failed To Name Her**

Plaintiffs notice of claim served on the District Superintendent's Office on November 4, 2004 named the District, John Walker, and former Superintendent, Thomas Strining as respondents – but did not name Mary Kidd.[80]  The Amended Complaint, however, also named Mary Kidd as a defendant.  Under Section 50-e of the General Municipal Law and section 3813 of the Education Law, a claimant **must name each party** against whom the claim is asserted.  In White v. Averill Park Cent. Sch. Dist., the court rejected the argument that a plaintiff "may file a notice of claim naming a municipal entity and then commence an action against a roster of individual municipal

---

[78] Barmore, 2006 WL 1978449, at *13.

[79] Id.

[80] Colby Decl., Ex. Y; Carlevatti Aff., ¶ 4.

employees."[81]  Indeed, section 50-e "<u>does not authorize actions against individuals who have not been individually named in a notice of claim.</u>"[82]  This holding has been followed by federal courts and state appellate courts.[83]  Accordingly, this Court should dismiss Plaintiff's claims against Mary Kidd because she was not named in Plaintiffs' notice of claim.[84]

---

[81] 195 Misc.2d 409, 410-11 (N.Y. Sup. Ct. 2003) ("Education Law § 3813 and General Municipal Law § 50-e lend no support to plaintiffs' conclusion that they only needed to name the municipality in their notice of claim before commencing a cause of action naming individual municipal employees in their official and individual capacities. Education Law § 3813 sets forth that plaintiffs may not prosecute an action against any employees, . . . or members of the supervisory or administrative staff unless plaintiffs complied with General Municipal Law § 50-e.  General Municipal Law § 50-e makes no provision for directing the notice of claim at one entity and then prosecuting an action against another.").

[82] *Id.* at 411 (emphasis added).

[83] Moore v. Melesky, 14 A.D.3d 757, 759 (3d Dep't 2005) (affirming dismissal of claims against individual defendants not named in plaintiff's notice of claim, which only named the two municipal entities); Tannenbaum v. City of New York, 30 A.D.3d 357, 358 (1st Dep't 2006) (following White and holding that "General Municipal Law § 50-e makes unauthorized an action against individuals unauthorized an action against individuals who have not been named in a notice of claim"); Ingrao v. County of Albany, 2007 WL 1232225, at *3 (N.D.N.Y. 2007) (following Moore and dismissing claims against individual who was not named in notice of claim).

[84] White, 195 Misc. 2d at 411-12 ("Where the notice of claim fails to complain about the action or inaction of a particular employee and/or fails to set forth a theory for imposing individual liability on that employee, the municipality has no basis for investigating whether or not the claimant has a valid claim against that employee.  Thus, permitting plaintiffs to prosecute causes of action against individuals who were not named in their notice of claim is contrary both to the letter and the purpose of the statute.").

## Point V

### Plaintiffs Failed To Properly Serve A Notice Of Claim On The Board Of Education As Required By Education Law Section 3813

Plaintiffs' negligence claims against the Board of Education must be dismissed. Section 3813(2) of the Education Law provides that a notice of claim for such claims "shall have been made and served in compliance with section fifty-e of the general municipal law." Section 50-e(3)(a) of the General Municipal Law provides in relevant part that:

> notice **shall be served on the public corporation** against which the claim is made by delivering a copy thereof personally, or by registered or certified mail, to the **person designated by law** as one to whom a summons in an action in the supreme court issued against such corporation may be delivered, or to an attorney regularly engaged in representing such public corporation.

(Emphasis added). CPLR 312 requires service upon a board, such as the Board of Education, to be made upon "any one of the members" of such board.

In this action, Plaintiffs served the notice of claim on the Superintendent's Office – not the Board of Education – as evidenced by the time-stamp.[85] The Superintendent, however, is neither the "public corporation" nor the "person designated by law" under CPLR 312 to receive a notice of claim on behalf of the Board of Education. The Court of Appeals strictly construes the requirement that the correct entity be <u>served</u> with the notice of claim. In <u>Scantlebury v. New York City Health & Hospitals Corp.</u>, the Court of Appeals held that General Municipal Law "section 50-e(3)(c), which saves claims from dismissal on account of defects in the manner of service, <u>does not excuse</u> a plaintiff's failure to serve a timely notice of claim on the

---

[85] Colby Decl., Ex. Y; Carlevatti Aff., ¶ 4.

23

A.236

correct public entity."[86]  In <u>Scantlebury</u>, service of a notice of claim failed to comply with section 50-e(3)(a) where it was served on the City Comptroller rather than the New York City Health and Hospitals Corporation.  Moreover, "satisfaction of the notice of claim requirements of section 3813(2) 'is a **condition precedent** to bringing an action against . . . a board of education.'"[87]  Accordingly, Plaintiffs' negligence claim against the Board of Education must be dismissed because they failed to comply with General Municipal Law section 50-e(3)(a) (incorporated by reference in Education Law section 3813(2)), which required them to serve a notice of claim on a member of the Board of Education, <u>not</u> the District Superintendent.

---

[86] 4 N.Y.3d 606, 608 (2005); *see also* <u>Dauber v. Bd. of Educ. of City of New York</u>, 2001 WL 1246581, at *9 (S.D.N.Y. 2001) (dismissing state law claims because plaintiff filed a notice of claim with the Comptroller's Office rather than the Board of Education).

[87] <u>Bedden-Hurley v. New York City Bd. of Educ.</u>, 385 F. Supp. 2d 274, 277 (S.D.N.Y. 2005) (citing <u>Parochial Bus Sys., Inc. v. Board of Educ. of the City of New York</u>, 60 N.Y.2d 539, 547 (1983)) (emphasis added); <u>Radvany v. Jones</u>, 184 A.D.2d 349, 349-50 (1st Dep't 1992) (same).

A.237

**CONCLUSION**

For the reasons set forth herein and in the accompanying papers, Defendants respectfully ask this Court to issue an order: granting Defendants' motion for summary judgment, dismissing Plaintiffs' claims in their entirety (or declining to exercise supplemental jurisdiction over Plaintiffs' negligence claim if appropriate), and to provide any additional relief that this Court deems appropriate.

Dated: February 15, 2008

**WEBSTER SZANYI LLP**
Attorneys for Defendants

By: _/s/ Jeremy A. Colby_
Michael P. McClaren
Jeremy A. Colby
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
jcolby@websterszanyi.com

TO: **NIRA T. KERMISCH, ESQ.**
Attorney for Plaintiffs
36 West Main Street
Suite 405
Rochester, New York 14614

A.238

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG,

                    Plaintiff,

          - against -

THE NEW YORK CITY DEPARTMENT
OF EDUCATION and CARMEN FARINA,

                    Defendants.

**ORDER**

17 Civ. 3136 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

 Plaintiff Jill Bloomberg – a high school principal at Park Slope Collegiate –

brings this action against the New York City Department of Education (the "DOE") and its

chancellor (collectively, "Defendants").  The Amended Complaint claims that a DOE

investigation of Plaintiff's conduct – purportedly premised on her violation of a DOE regulation

governing DOE employees' activity on behalf of political organizations – was retaliatory and in

violation of her rights.  (Am. Cmplt. (Dkt. No. 39) ¶¶ 1, 4-6)  The Amended Complaint further

pleads that the DOE regulation on which the investigation was premised does not apply to her

alleged conduct and, in any event, is unconstitutionally vague.  (Id. ¶¶ 88-89, 118-120)[1]

 The Amended Complaint pleads claims for a violation of Due Process, and for

retaliation in violation of the First Amendment, Title VI of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000d-1 et seq., and the New York City Human Rights Law (the "NYCHRL"), N.Y.C.

Admin. Code § 8-101 et seq.  (Id. ¶¶ 4-5, 111-51)

---

[1]  The factual background of this case is discussed in greater detail in this Court's September 24,
2019 decision granting Defendants' motion to dismiss the Amended Complaint (Dkt. No. 89),
and in this Court's September 23, 2021 order denying Plaintiff's motion for leave to file a second
amended complaint (Dkt. No. 108).

A.239

Defendants moved to dismiss the Amended Complaint's First Amendment, Title VI, and Due Process claims. (Mot. (Dkt. No. 77); Am. Cmplt. (Dkt. No. 39) ¶¶ 111-51)  On September 24, 2019, this Court granted Defendants' motion in its entirety (the "September 24, 2019 Opinion"). (Dkt. No. 89)

On November 6, 2019, Plaintiff moved for leave to file a Second Amended Complaint ("SAC"). (Dkt. No. 93)  The proposed SAC alleges a Due Process claim and retaliation claims under Title VI and the NYCHRL.  (See generally Proposed SAC (Dkt. No. 94-1))  On September 23, 2021, this Court denied Plaintiff's motion to amend her Due Process and Title VI retaliation claims and declined to exercise supplemental jurisdiction over her NYCHRL claim (the "September 23, 2021 Order"). (Dkt. No. 108)

Plaintiff has now moved pursuant to Local Rule 6.3 for reconsideration of the September 23, 2021 Order.  Plaintiff seeks reconsideration only as to that portion of the September 23, 2021 Order that addresses her Title VI retaliation claim. (Reconsideration Mot. (Dkt. No. 111) at 1)[2]  In that claim, Plaintiff alleges that she suffered retaliation at work after she complained that DOE was offering "racially separated . . . [and] unequal opportunities in [its] sports programs [for students at the schools sharing the John Jay Campus in Brooklyn]."[3] (Proposed SAC (Dkt. No. 94-1) ¶ 58; see also id. ¶¶ 64-81 ("Within six weeks of plaintiff's Title VI Complaint, [Defendants] . . . informed plaintiff that she was under investigation . . . .

---

[2]  Citations to page numbers refer to the pagination generated by this District's Electronic Case Files ("ECF") system.

[3]  Park Slope Collegiate is "one of four schools housed on the John Jay Campus in Brooklyn." (Proposed SAC (Dkt. No. 94-1) ¶ 3)  The Public School Athletic League allocates "sports teams and resources" to New York City public schools, including the schools housed on the John Jay Campus. (See id. ¶ 27)  Plaintiff alleges that she complained to DOE that the Public School Athletic League has a "policy of allowing segregated and unequal allocation of sports teams and resources" with respect to the schools located at the John Jay Campus. (Id.)

2

A.240

[P]laintiff believed, and still believes, that the [] investigation against her was retaliation for her complaint about the segregated sports programs.")

For the reasons stated below, Plaintiff's motion for reconsideration will be granted, but leave to amend the Title VI retaliation claim will be denied.

## **BACKGROUND**

### I.     **THIS COURT'S DISMISSAL OF PLAINTIFF'S TITLE VI RETALIATION CLAIM AND PLAINTIFF'S MOTION TO AMEND**

In the September 24, 2019 decision dismissing, inter alia, Plaintiff's Title VI retaliation claim, this Court noted that 42 U.S.C. § 2000d-3 requires plaintiffs claiming employment discrimination under Title VI to plead "'a logical nexus between the use of federal funds and the practice toward which [the] action is directed.'"  (September 24, 2019 Opinion (Dkt. No. 89) at 24 (quoting Johnson v. Cty. of Nassau, 411 F. Supp. 2d 171, 175 (E.D.N.Y. 2006)))  This Court went on to dismiss the Amended Complaint's Title VI retaliation claim because Plaintiff did not "plead a nexus between the use of federal funds and the alleged discriminatory practice about which [she] allegedly complained, and for which complains she allegedly suffered retaliation:  discrimination in the [Public School Athletic League]'s sports programs."  (Id. at 25)

Relying on Verdi v. City of New York, 306 F. Supp. 3d 532 (S.D.N.Y. 2018), this Court found the Amended Complaint's factual allegations insufficient to plead the necessary nexus:

> The Amended Complaint alleges only that "[a]t all times relevant the DOE was and is a recipient of federal funding for purposes of Title VI," and "[t]he New York City DOE receives Federal Financial Assistance." (Am. Cmplt. (Dkt. No. 37) ¶¶ 23, 125)  These allegations do not sufficiently plead the requisite "logical nexus."  See Verdi, 306 F. Supp. 3d at 546 (dismissing Verdi's Title VI claim because his "allegations regarding federal funding are bare and conclusory and do not describe the federal funding the DOE

3

A.241

received, let alone link that funding to the students whose discrimination was the subject of Plaintiff's complaints").

(Id.)

> In response to this Court's dismissal order, Plaintiff sought permission to file a second amended complaint that adds the following allegations concerning DOE's receipt of federal funds:

> 23. . . . the DOE receives federal funds pursuant to Title I of the Elementary and Secondary Education Act which provides funds to schools which have a high percentage of families from impoverished backgrounds.
> 24. Schools qualify for Title I if a certain percentage of the students qualify for free or reduced lunch programs.
> 25. Because over 60% of the students at [Park Slope Collegiate, Plaintiff's school,] qualified for free or reduced lunch programs, [Park Slope Collegiate] receives Title I funds for school wide programs.

(Proposed SAC (Dkt. No. 94-1) ¶¶ 23-25; see also id. ¶¶ 154-56)

## II.   THE SEPTEMBER 23, 2021 ORDER DENYING PLAINTIFF LEAVE TO AMEND HER TITLE VI RETALIATION CLAIM

> In her motion for leave to amend, Plaintiff argued that she was not required to "show a logical nexus between federal funds received by the DOE and the sports programs allocated to [Park Slope Collegiate]," because any such requirement would be "program specific" and thus "prohibited by the Civil Rights Restoration Act of 1987." (Pltf. Reply Br. (Dkt. No. 104) at 6) Plaintiff did not cite to any case law interpreting or applying the Civil Rights Restoration Act. (See id. at 4-7)

> In the September 23, 2021 order denying Plaintiff leave to amend her Title VI retaliation claim, this Court acknowledged Plaintiff's argument that a "'program specific'" pleading requirement is "'prohibited by the Civil Rights Restoration Act of 1987.'" (September 23, 2021 Order (Dkt. No. 108) at 17 (quoting Pltf. Reply Br. (Dkt. No. 104) at 6)) But the Court nonetheless reaffirmed its holding that a plaintiff asserting a Title VI retaliation claim must

4

A.242

"plead facts showing a nexus between the federal funding and the program at issue." (Id. at 18-19)  This Court went on to deny Plaintiff's motion to amend, finding that – despite Plaintiff's new allegations – "[t]he proposed SAC does not plead facts showing a nexus between the federal funding allotted to DOE and [the Public School Athletic League]'s sports programs." (Id. at 19) In so holding, this Court relied on Verdi's holding that a Title VI retaliation plaintiff "must show a link between the federal funds allotted to DOE and 'the students whose discrimination was the subject of Plaintiff's complaint.' Verdi v. City of New York, 306 F. Supp. 3d 532, 546 (S.D.N.Y. 2018)." (Id. at 17-18)

## III.   PLAINTIFF'S MOTION FOR RECONSIDERATION

On October 8, 2021, Plaintiff moved "pursuant to Local Rule 6.3 for an order reconsidering the [September 23, 2021 order denying Plaintiff leave to amend her Title VI retaliation claim]." (Reconsideration Mot. (Dkt. No. 111) at 1)

In her reconsideration motion, Bloomberg argues that this Court overlooked "[t]he clear language of the Civil Rights Restoration Act . . . prohibit[ting] the Court from requiring a plaintiff to show any kind of connection between the federal assistance a school system receives and a particular program or activity alleged to be discriminatory." (Id. at 8) According to Plaintiff, this Court "committed clear error [in] denying Plaintiff's motion to amend her claim under Title VI" when it found that Bloomberg must "'plead facts showing a nexus between the federal funding and the program at issue.'" (Id. (quoting September 23, 2021 Order (Dkt. No. 108) at 13))

Defendants contend that the motion for reconsideration should be denied, because Plaintiff has not "demonstrate[d] that the Order [denying leave to amend the Title VI retaliation claim] was issued in clear error." (Def. Opp. (Dkt. No. 115) at 5) According to Defendants,

5

A.243

Plaintiff's reconsideration motion merely repeats arguments previously rejected, and this Court did not overlook the Civil Rights Restoration Act (the "CRRA") in its September 23, 2021 order denying leave to amend.  (Id. at 5-6)  In supplemental briefing ordered by this Court, Defendants argue that the CRRA "did not alter the pleading standard applied in cases of this Circuit in connection with employment-based retaliation claims brought pursuant to Title VI." (Def. Supp. Br. (Dkt. No. 119) at 3).  Defendant argues that Verdi was correctly decided and that – notwithstanding the CRRA's broad definition of "program or activity" – Bloomberg's proposed SAC remains deficient because it is "devoid of any allegation that participants in [Public School Athletic League] teams (i.e., the victims of the discrimination about which plaintiff complained) were the intended beneficiaries of the Title I funds received by DOE." (Id. at 4-5)

## DISCUSSION

### I.   LEGAL STANDARDS

#### A.   Motions for Reconsideration

"Motions for reconsideration are governed principally by Federal Rule of Civil Procedure 59(e) and Local Civil Rule 6.3, which are meant to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." Walsh v. Townsquare Media, Inc., 565 F. Supp. 3d 400, 402 (S.D.N.Y. 2021) (quotation marks and citations omitted).  "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" In re Beacon Assocs. Litig., 818 F. Supp. 2d 697, 701 (S.D.N.Y. 2011) (quoting In re Health Mgmt. Sys. Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).  "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the

6

conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 256-57 (2d Cir.

1995). "The decision to grant or deny a motion for reconsideration is 'committed to the sound

discretion of the district court.'" Sigmon v. Goldman Sachs Mortg. Co., 229 F. Supp. 3d 254,

257 (S.D.N.Y. 2017) (quoting Wilder v. News Corp., 2016 WL 5231819, at *3 (S.D.N.Y. Sept.

21, 2016)).

    **B.**    **Title VI Retaliation**

        To plead a Title VI retaliation claim, a plaintiff must "plausibly allege:

'(1) participation in a protected activity known to the defendants; (2) adverse action by the

defendants against the plaintiff; and (3) a causal connection between the plaintiff's protect[ed]

activity and defendants' adverse action.'" Diaz v. City Univ. of New York, 2016 WL 958684,

at *2 (S.D.N.Y. Mar. 8, 2016) (quoting Williams v. CUNY, 2014 WL 4207112, at *8 (E.D.N.Y.

2014)).

        Title VI provides that "[n]othing contained in [it] shall be construed to authorize

action under [Title VI] . . . with respect to any employment practice of any employer . . . except

where a primary objective of the Federal financial assistance is to provide employment." 42

U.S.C. § 2000d-3. As discussed in this Court's earlier decision in this action, "[i]n the Title VI

employment discrimination context, courts have construed Section 2000d-3 as imposing 'a

threshold requirement . . . that the employer be the recipient of federal funds aimed primarily at

providing employment.'" (September 24, 2019 Opinion (Dkt. No. 89) at 24 (quoting Ass'n

Against Discrimination in Emp., 647 F.2d at 276 and citing Sulehria v. New York, No. 13-CV-

6990 AJN, 2014 WL 4716084, at *5 (S.D.N.Y. Sept. 19, 2014) ("To state a claim under Title VI,

a plaintiff must plausibly allege . . . that the defendant was an entity receiving federal funding . . .

[and] that the federal funds have been made available primarily for providing employment.")))

A.245

C.    **The Civil Rights Restoration Act of 1987**

The Civil Rights Restoration Act of 1987 (the CRRA") amends various civil

rights laws to broaden the definition of "program or activity" as follows:

> [T]he term "program or activity" and the term "program" mean all of the
> operations of – (1)(A) a department, agency, special purpose district, or other
> instrumentality of a State or of a local government; or (B) the entity of such State
> or local government that distributes such assistance and each such department or
> agency (and each other State or local government entity) to which the assistance
> is extended, in the case of assistance to a State or local government; (2)(A) a
> college, university, or other postsecondary institution, or a public system of higher
> education; or (B) a local educational agency (as defined in section 198(a)(10) of
> the Elementary and Secondary Education Act of 1965), system of vocational
> education, or other school system. . . .

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, § 6, 102 Stat. 28 (Mar. 22, 1988).

Courts have recognized that the CRRA was enacted to overturn the Supreme

Court's narrow interpretation of "program or activity," which had required plaintiffs to plead

program-specific funding:

> In Grove City College v. Bell, 465 U.S. 555, 571-75 (1984) the Supreme Court
> considered the meaning of Title IX's phrase "education program or activity" and
> defined it narrowly, holding that by referring to particular activities or programs,
> Congress intended that Title IX apply only to the particular program receiving
> financial assistance.  Thus, in Grove City, the Court found that the receipt by
> students of federal grants did not trigger institution-wide Title IX coverage, but
> only coverage of the school's financial aid program.  Id. at 573-74.

> In response to the Court's interpretation of Title IX, as well as out of concern that
> the Grove City definition of "program or activity" would be applied to similar
> language contained in . . . Title VI of the Civil Rights Act of 1964, Congress
> passed the Civil Rights Restoration Act of 1987, . . . which amended each of the
> affected statutes, including Title IX, by adding a section broadly redefining the
> term "program or activity."

> Following the 1988 Amendment, courts have consistently interpreted Title IX to
> mean that if one arm of a university or state agency receives federal funds, the
> entire entity is subject to Title IX's proscription against sex discrimination.

O'Connor v. Davis, 126 F.3d 112, 117 (2d Cir. 1997); see also Franklin v. Gwinnett Cnty. Pub.

Sch., 503 U.S. 60, 73 (1992) ("Congress [] enacted the Civil Rights Restoration Act of 1987. . .

A.246

[w]ithout in any way altering the existing rights of action . . . under Title IX, Title VI, § 504 of

the Rehabilitation Act, and the Age Discrimination Act, [to] broaden the coverage of these

antidiscrimination provisions . . . [and] correct what it considered to be an unacceptable decision

on our part in Grove City College v. Bell.").

## II.    ANALYSIS

### A.    Whether Reconsideration Should Be Granted

Bloomberg argues that "[t]he clear language of the Civil Rights Restoration Act

. . . prohibits the Court from requiring a plaintiff to show any kind of connection between the

federal assistance a school system receives and a particular program or activity alleged to be

discriminatory." (Reconsideration Mot. (Dkt. No. 111) at 8)

As discussed above, in dismissing the Amended Complaint's Title VI retaliation

claim, this Court ruled that the Amended Complaint failed to "plead a nexus between the use of

federal funds and the alleged discriminatory practice about which Plaintiff allegedly complained,

and for which complaints she allegedly suffered retaliation: discrimination in the [Public School

Athletic League's] sports programs." (September 24, 2019 Opinion (Dkt. No. 89) at 25)  And in

denying Plaintiff leave to amend her Title VI retaliation claim, this Court found Plaintiff's new

allegations insufficient, because they did not show "a nexus between the federal funding allotted

to DOE and [the Public School Athletic League]'s sports programs." (September 23, 2021 Order

(Dkt. No. 108) at 18-19)

In requiring that Plaintiff plead facts showing program-specific federal funding,

this Court erred.  As discussed above, the CRRA prohibits courts from requiring proof of

program-specific federal funding.  See O'Connor, 126 F.3d at 117 ("Out of concern that the

Grove City definition of 'program or activity' would be applied to similar language contained in

9

A.247

. . . Title VI of the Civil Rights Act of 1964, Congress passed the [CRRA], . . . broadly

redefining the term "program or activity.").

        This Court further concludes that a Title VI retaliation claim is adequately pled

where plaintiff alleges that he or she complained about discrimination against the "intended

beneficiaries" of a program that receives federal funding where the purported victims of

discrimination are participating in a federally-funded "program or activity" for purposes of a

direct Title VI discrimination claim.

        Here, Bloomberg alleges in the proposed SAC that "[o]n January 10, 2017, [she]

sent a damning complaint to [her DOE superiors], . . . accusing the DOE of race discrimination

and segregation within the sports program in her building." (Proposed SAC (Dkt. No. 94-1)

¶ 58)  The proposed SAC also alleges that "DOE receives federal funds pursuant to Title I of the

Elementary and Secondary Education Act which provides funds to schools which have a high

percentage of families from impoverished backgrounds," and that Park Slope Collegiate receives

Title I funds. (Id. ¶¶ 23-25).  Defendants do not dispute that Park Slope Collegiate students are

among the "intended beneficiaries" of the federal funds DOE receives.  If students at Park Slope

Collegiate sued DOE alleging that they were excluded from a school sports team on the basis of

their race in violation of Title VI and further pled that DOE – and not the Public Schools Athletic

League – receives federal funding, they would have adequately pled their participation in a

federally-funded "program or activity."  See O'Connor, 126 F.3d at 117; Horner v. Kentucky

High Sch. Athletic Ass'n, 43 F.3d 265, 272 (6th Cir. 1994) ("Simply put, it appears that

Kentucky's school system receives substantial federal financial assistance."); Rogers v. Bd. of

Educ. of Prince George's Cnty., 859 F. Supp. 2d 742, 752 (D. Md. 2012) ("The Complaints also

sufficiently allege Title VI's 'any program or activity receiving Federal financial assistance'

requirement.  The Board of Education of Prince George's County is a 'public board of education,' which qualifies as a 'local educational agency,' which in turn constitutes a 'program or activity' under Title VI.") (citations omitted).

In sum, the proposed SAC adequately alleges that the "victims of the discrimination about which [Bloomberg] complained" are the "intended beneficiaries" of a federally funded "program or activity" for purposes of Title VI.  Verdi, 306 F. Supp. 3d. 532 at 545-46.  Accordingly, Plaintiff's motion for reconsideration is granted.

**B.    Whether Plaintiff Should Be Granted Leave
to Amend Her Title VI Retaliation Claim**

In addition to arguing that Bloomberg is required to plead facts showing program-specific federal funding, Defendants have argued that Plaintiff's Title VI retaliation claim is barred by 42 U.S.C. § 2000d-3, which provides that

> [n]othing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d-3.[4]  According to Defendants, Plaintiff's Title VI retaliation claim is barred because she has not and cannot plead that the "primary objective of the federal financial assistance that . . . DOE received" is to provide employment.  (Def. MTD Br. (Dkt. No. 78) at 22-23 (noting that Plaintiff does not "plead the primary objective of the federal financial assistance that it is alleged DOE received or receives" and citing Moore v. City of New York, 2017 WL 35450, at *15 (S.D.N.Y. Jan. 3, 2017), report and recommendation adopted, 2017 WL

---

[4]  While the statute addresses department and agency action, the "primary objective" test applies to private causes of action as well.  In Ass'n Against Discrimination in Emp., Inc., 647 F.2d at 276, the Second Circuit states that Section 2000d-3 "in effect requires a logical nexus between the use of federal funds and the practice toward which agency action is directed."  The Second Circuit found "no indication [in the statute] that Congress would not have intended that the logical nexus requirement exist with respect to private actions as well as agency action."  Id.

11

A.249

1064714 (S.D.N.Y. Mar. 20, 2017) ("[Plaintiff's] Title VI claims additionally fail because he has not sufficiently pled that 'a primary objective of the Federal financial assistance is to provide employment.'" (quoting 42 U.S.C. § 2000d-3)) and <u>Acheampong v. New York City Health & Hosps. Corp.</u>, 2015 WL 1333242, at *14 (S.D.N.Y. Mar. 25, 2015) ("'[F]or a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment.'" (quoting <u>Ass'n Against Discrimination in Employment</u>, 647 F.2d at 276)); <u>see also</u> Def. Supp. Br. (Dkt. No. 119) at 3 ("The CRRA did not impact the provision of Title VI which provides that '[n]othing contained in [it] shall be construed to authorize action under [Title VI] . . . with respect to any employment practice of any employer . . . except where a primary objective of the Federal financial assistance is to provide employment.'" (quoting 42 U.S.C. § 2000d-3)))

This Court's prior orders endorsed <u>Verdi</u>'s reasoning that retaliation claims such as that brought by Plaintiff are permissible despite Section 2000d-3's language so long as plaintiff has pled program-specific funding. (<u>See</u> September 24, 2019 Opinion (Dkt. No. 89) at 24-25; September 23, 2021 Order (Dkt. No. 108) at 17-19) Having concluded that it was error for this Court to follow <u>Verdi</u>'s holding that a Title VI retaliation plaintiff is required to plead program-specific federal funding, this Court must revisit <u>Verdi</u>'s <u>dicta</u> – on which this Court likewise relied – that Plaintiff's Title VI retaliation claim is permissible under 42 U.S.C. § 2000d-3's "primary objective" test.

With respect to Section 2000d-3, <u>Verdi</u> acknowledges that, "[f]or a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing

A.250

employment." Verdi, 306 F. Supp. 3d at 544.  Verdi draws a distinction between "retaliation claims affecting employment" and "straight retaliation claims," however:

> It is unsettled . . . whether retaliation claims affecting employment – in which an individual who voices concerns about discrimination against others is retaliated against with respect to his or her employment – should be treated the same as straight retaliation for employment discrimination claims. . . ."

(Id. at 544-45 (emphasis in original))

The Verdi court goes on to assert that

> [a]t the heart of a Title VI retaliation claim could be the very individuals whom the statutory scheme was intended to protect, so it is important to distinguish between garden variety retaliation-for-complaining-about-employment-discrimination claims, on the one hand, and retaliation claims in which the complainant's employment is affected based on complaints regarding non-employment discrimination against others, on the other. Section 2000d–3 "ma[d]e it clear that discrimination in employment which does not affect [the] intended beneficiaries of federal assistance is not within the reach of title VI." Carmi v. Metro. St. Louis Sewer Dist., 620 F.2d 672, 674 & n.4 (8th Cir. 1980) (citing United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 882-83 (5th Cir. 1966) ), abrogated on other grounds by Consol. Rail Corp. v. Darrone, 465 U.S. 624 (1984)).  In contrast, recognizing a retaliation claim based on harms to a claimant's employment where the complained-of discrimination was against the intended beneficiaries of the relevant federal funding would vindicate rather than undermine the intent and spirit of § 2000d-3.  Accordingly, this Court finds that the "primary objective of providing employment" requirement does not apply when analyzing an employment-based retaliation claim where the victims of the discrimination about which the claimant complained (and for which complaining the claimant suffered retaliation) are the intended beneficiaries of the federal funding.

Verdi, 306 F. Supp. 3d at 545-46 (emphasis omitted).

Verdi's only support for this conclusion is the following footnote in Hickey v. Myers, 2010 WL 786459 (N.D.N.Y. Mar. 2, 2010)):

> Defendant argues that 42 U.S.C. § 2000d-3 precludes Plaintiff from recovering under [Title VI]. . . . Defendant misinterprets Plaintiff's allegations and argues that Title VI is inapplicable in the employment discrimination context.  Plaintiff does not allege employment discrimination but instead alleges that he was retaliated against because he spoke out against racial discrimination in the school's admission policy.  This argument does not implicate § 2000d–3.

13

A.251

Hickey, 2010 WL 786459, at *3 n.3.

        In asserting that employment-related retaliation claims are entirely divorced from employment-related discrimination claims, Hickey does not cite to any language in Section 2000d-3 or any case law suggesting that Congress intended to authorize employment-related Title VI retaliation claims in a context in which the "primary objective" of the federally-funded program is not to provide employment.

        Contrary to the suggestion in Hickey that retaliation in the employment context is completely divorced from discrimination in the employment context, such claims are closely related. Indeed, retaliation in the employment context is prohibited as "a form of 'discrimination[,]' because the complainant is being subjected to differential treatment." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005).

        While Verdi argues that "recognizing [an employment-based Title VI] retaliation claim . . . would vindicate rather than undermine the intent and spirit of § 2000d–3," Verdi 306 F. Supp. 3d at 545, statutory interpretation must "begin[] . . . with the statute's text," Permanent Mission of India to the United Nations v. City of New York, 551 U.S. 193, 197 (2007), and "[w]hen interpreting the meaning of a statutory provision, 'the best evidence of Congress's intent is the statutory text.'" Grajales v. Comm'r of Internal Revenue, 47 F.4th 58, 62 (2d Cir. 2022) (quoting NFIB v. Sebelius, 567 U.S. 519, 544 (2012)).

        Here, Section 2000d-3 broadly precludes a Title VI claim "with respect to any employment practice . . . except where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d. The Second Circuit has held that, "for a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at

14

A.252

providing employment." Ass'n Against Discrimination in Emp., Inc., 647 F.2d at 276; id. ("[Section 2000d-3] in effect requires a logical nexus between the use of federal funds and the practice toward which agency action is directed.").

There is no claim here that the Federal funding provided to DOE was for the purpose of providing employment. Accordingly, the issue under the plain language of the statute is whether Plaintiff's claim that she suffered a retaliatory adverse action in connection with her employment at DOE relates to "any employment practice" of DOE.

In Plaintiff's Title VI retaliation claim, she complains that DOE engaged in an unlawful "employment practice" – retaliation – when it opened an investigation into whether Plaintiff, a DOE employee, had violated "Chancellor's Regulation D-130 – a regulation designed to limit DOE employees from engaging in partisan electoral politics while on duty." (Proposed SAC (Dkt. No. 94-1) ¶ 3) Bloomberg has thus sued to vindicate her own rights with respect to her position as principal of Park Slope Collegiate, and has not sued to vindicate the rights of Park Slope Collegiate students. Bloomberg also seeks relief for herself – damages for her own "emotional distress, including reputational harm, that she has suffered because of DOE's [allegedly retaliatory investigation]" – and not for Park Slope Collegiate students (Id. ¶ 5)

In sum, Bloomberg's Title VI retaliation claim is premised on the assertion that DOE – in opening an investigation regarding a complaint that she had engaged in prohibited political activity at her school – engaged in an unlawful "employment practice." (See Proposed SAC (Dkt. No. 94-1) ¶¶ 66-77) Under the plain language of Section 2000d-3, such an action is not authorized unless the Federal funding DOE receives is for the purpose of providing employment. Because there is no such claim in this case, Bloomberg's Title VI retaliation claim cannot survive a motion to dismiss. See Miller-Sethi v. City Univ. of New York, 2023 WL

A.253

419277, at *8 (S.D.N.Y. Jan. 26, 2023) (dismissing an employment-based Title VI retaliation claim because "Plaintiff fails to plead that the federal funds that CUNY receives are aimed primarily at providing employment. Instead, Plaintiff alleges that CUNY is a publicly funded university system that receives federal funding and that its discriminatory employment practices negatively impact the intended beneficiaries of its programs, including faculty such as herself").

## **CONCLUSION**

For the reasons stated above, Plaintiff's motion for reconsideration (Dkt. No. 109) is granted, but leave to amend is denied. The Clerk of Court is directed to close this case.

Dated:  New York, New York
          February 10, 2023

SO ORDERED.

_Paul S. Gardephe_
Paul G. Gardephe
United States District Judge

16

A.254

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JILL BLOOMBERG
_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

THE NEW YORK CITY DEPARTMENT OF EDUCATION and
_____

CARMEN FARINA
_____
(List the full name(s) of the defendant(s)/respondent(s).)

 17  CV  3136  ( PGG)(      )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties:   JILL BLOOMBERG
_____

_____
(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the    ☐ judgment   ☒ order    entered on:   February 10, 2023
_____
(date that judgment or order was entered on docket)

that:   granted reconsideration, but denied Plaintiff's right to file a Second Amended Complaint, which was initially denied on 9/23/2021 (Dkt. 108) and affirming the dismissal of Plaintiff's Complaint in its entirety on 9/24/2019 (Dkt. 89).
_____

_____
(If the appeal is from an order, provide a brief description above of the decision in the order.)

March 10, 2023
_____
Dated

MIRER, JEANNE E.
_____
Name (Last, First, MI)

_____
Signature[*]

JULIEN MIRER & SINGLA, PLLC 1 WHITEHALL STREET, 16TH FLOOR   NEW YORK, NY  10004
_____
Address                                City                    State                    Zip Code

212-231-2235
_____
Telephone Number

jmirer@workingpeopleslaw.com
_____
E-mail Address (if available)

_____

[*] Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case. Fed. R. App. P. 3(c)(2). Attach additional sheets of paper as necessary.

Rev. 12/23/13

A.255